UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Lyman Holding Company, et al.,                              Chapter 11 Case No. 11-45190

Debtors.[1]                                                    (Jointly Administered)

---

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS
DATED JANUARY 18, 2013**

---

*This Plan provides for the release or exculpation of certain parties.
Please consult Sections 4.1.1(j) and 10.6.4.*

---

[1]   Jointly administered estates of the following Debtors:  Lyman Holding Company Case No. BKY 11-45190, Lyman Lumber Company Case No. BKY 11-45191, Automated Building Components, Inc. Case No. BKY 11-45192, Building Materials Wholesalers, Inc. Case No. BKY 11-45193, Carpentry Contractors Corp. Case No. BKY 11-45194, Construction Mortgage Investors Co. Case No. BKY 11-45196, Lyman Development Co. Case No. BKY 11-45199, Lyman Lumber Wisconsin, Inc. Case No. BKY 11-45201, Lyman Properties, L.L.C. Case No. BKY 11-45202, Mid-America Cedar, Inc. Case No. BKY 11-45203, Woodinville Lumber, Inc. Case No. BKY 11-45204, Woodinville Construction Services, L.L.C. Case No. BKY 11-45206.

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................ 1

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ........................... 8

ARTICLE III TREATMENT OF CERTAIN UNCLASSIFIED PRIORITY CLAIMS ............ 9

    3.1    Allowed Administrative Expense Claims ............................................ 9

        3.1.1   Postpetition Operating Expenses ......................................... 9

        3.1.2   Twenty-Day Claims ........................................................... 9

        3.1.3   Professional Fees and Expenses .......................................... 9

        3.1.4   PBGC Claims ................................................................... 10

        3.1.5   Retiree Benefits ................................................................ 10

        3.1.6   Sales Taxes ...................................................................... 11

        3.1.7   Reclamation Claims .......................................................... 11

        3.1.8   Claims Arising Under Assumed Executory Contracts or Unexpired Leases .............................................................. 11

    3.2    Statutory Fees and Court Costs ...................................................... 11

    3.3    Unsecured Priority Claims ............................................................. 12

        3.3.1   Priority Tax Claims ........................................................... 12

        3.3.2   Employee Claims .............................................................. 12

        3.3.3   Other Priority Claims ........................................................ 12

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ................... 12

    4.1    Secured Claims ........................................................................... 12

        4.1.1   Class 1-A – U.S. Bank (Longview Property) ......................... 12

        4.1.2   Class 1-B – TCF (Woodinville Property and Cottage Grove Property) ..................................................................... 15

        4.1.3   Class 1-C – Midland, as special servicer (General Office Property) ..... 19

        4.1.4   Class 1-D – Hennepin County Treasurer (General Office Property)..... 19

        4.1.5   Class 1-E – Chartis (Insurance) ......................................... 19

        4.1.6   Class 1-F – Lumbermen's Underwriting Alliance (Workers Compensation Insurance)............................................... 20

        4.1.7   Class 1-G – Wausau/Liberty Mutual (Insurance) ................. 20

    4.2    Unsecured Non-Priority Claims...................................................... 20

        4.2.1   Class 2-A – Convenience Claims ........................................ 20

        4.2.2   Class 2-B – General Unsecured Claims............................... 20

        4.2.3   Class 2-C – Intercompany Unsecured Claims ...................... 21

    4.3    Class 3 – Interests in Debtors........................................................ 21

    4.4    Special Provisions Relating to Creditors' Rights of Setoff ............... 21

ARTICLE V MEANS OF EXECUTION OF THE PLAN ..................................... 21

    5.1    Liquidating Fund and Liquidating Agent ........................................ 21

        5.1.1   Liquidating Fund.............................................................. 21

        5.1.2   Liquidating Agent ............................................................ 22

        5.1.3   Powers and Duties of the Liquidating Agent........................ 22

5.1.4    Compensation and Retention of Professionals ....................................... 23
5.1.5    Removal of the Liquidating Agent. ....................................................... 23

5.2    Oversight Committee ........................................................................................ 23

5.3    Liability and Indemnification of Liquidating Agent and Oversight
Committee Members........................................................................................ 24

5.4    Effectuating Documents; Further Transactions; Exemption from Certain
Transfer Taxes ................................................................................................ 24

ARTICLE VI DISTRIBUTIONS AND CLAIMS ADMINISTRATION................................ 25

6.1    Distributions.................................................................................................... 25

6.2    Method of Payment .......................................................................................... 25

6.3    Claims Administration Responsibility.............................................................. 25

6.3.1    Reservation of Rights to Object to Claims ............................................. 25
6.3.2    Filing of Objections ............................................................................... 25
6.3.3    Determination of Claims ........................................................................ 26

6.4    Procedures for Treating and Resolving Contested Claims ................................ 26

6.4.1    No Distributions Pending Allowance ...................................................... 26
6.4.2    Claim Estimation ................................................................................... 26
6.4.3    No Distribution if Cause of Action Asserted .......................................... 26
6.4.4    Reserve Account for Contested Claims ................................................... 27
6.4.5    Payment Upon Allowance and Disallowance of Contested Claims ....... 27

6.5    Subordination of Junior Creditors.................................................................... 27

6.5.1    Funding of the Subordination Fund and Senior Creditor Reserve.......... 27
6.5.2    Distributions from the Subordination Fund and Senior Creditor
Reserve................................................................................................... 28
6.5.3    Treatment and Subrogation of Senior Creditor Unsecured Claims ........ 28
6.5.4    U.S. Bank Sharing Distributions............................................................ 29
6.5.5    Objections to Subordination .................................................................. 29

6.6    No Claim Transfers.......................................................................................... 29

6.7    Limitations on Amounts To Be Distributed to Holders of Allowed Insured
Claims 29

6.8    De Minimis Distributions ................................................................................. 29

6.9    Unclaimed Payments ....................................................................................... 30

6.10    Time Bar to Check Payments ........................................................................... 30

6.11    Setoffs 30

ARTICLE VII RETENTION AND ENFORCEMENT OF CLAIMS OR INTERESTS
BELONGING TO THE DEBTORS OR THE ESTATES .......................... 30

7.1    Preservation of Causes of Action and Avoidance Actions ................................. 30

ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES...................... 31

8.1    Assumption or Rejection of Executory Contracts and Unexpired Leases .......... 31

8.2    Cure of Defaults............................................................................................... 31

8.3    Bar Date for Rejection Damage Claims............................................................ 32

ARTICLE IX SUBSTANTIVE CONSOLIDATION .................................................................. 32

    9.1    Consolidation for Limited Purposes ..................................................................... 32

    9.2    Order Granting Consolidation.............................................................................. 33

    9.3    Objections to Consolidation Waived After Confirmation ................................... 33

ARTICLE X CONFIRMATION OF THE PLAN............................................................................ 33

    10.1    Conditions Precedent to Confirmation................................................................. 33

    10.2    Conditions Precedent to the Effective Date ........................................................ 33

    10.3    Waiver of Conditions to Confirmation or Effective Date.................................... 34

    10.4    Effect of Nonoccurrence of Conditions to the Effective Date............................ 34

    10.5    Cramdown............................................................................................................ 34

    10.6    Effect of Confirmation of the Plan...................................................................... 34

          10.6.1  Title to and Vesting of Assets.................................................................. 34

          10.6.2  Injunction Against Interference with the Plan ........................................ 34

          10.6.3  No Discharge ........................................................................................... 35

          10.6.4  Exculpation ............................................................................................. 35

ARTICLE XI EVENTS OF DEFAULT....................................................................................... 35

ARTICLE XII RETENTION OF JURISDICTION ..................................................................... 35

ARTICLE XIII MISCELLANEOUS PROVISIONS.................................................................... 37

    13.1    Modification of the Plan ...................................................................................... 37

    13.2    Revocation of the Plan......................................................................................... 37

    13.3    Dissolution of the Committee .............................................................................. 37

    13.4    Severability of Plan Provisions............................................................................ 38

    13.5    Corporate Documents .......................................................................................... 38

    13.6    Regulated Rates ................................................................................................... 38

    13.7    Successors and Assigns........................................................................................ 38

    13.8    Governing Law .................................................................................................... 38

    13.9    Construction......................................................................................................... 38

EXHIBITS

1      Legal Descriptions

4.1.2  TCF Settlement Agreement

5.2    Oversight Committee By-Laws

6.5(a)  Junior Creditors

6.5(b)  Form of Subordination Agreement

7.1    Preserved Causes of Action; Avoidance Actions

8.1    Assumed Contracts

## INTRODUCTION

Debtors 300 LHC, Inc. (f/k/a Lyman Holding Company), 300 LYLC, Inc. (f/k/a Lyman Lumber Company), 300 ABC, Inc. (f/k/a Automated Building Components, Inc.), 300 BMW, Inc. (f/k/a Building Materials Wholesalers, Inc.), 300 CCC, Inc. (f/k/a Carpentry Contractors Corp.), 300 CMIC, Inc. (f/k/a Construction Mortgage Investors Co.), 300 LDC, Inc. (f/k/a Lyman Development Co.), 300 LLW, Inc. (f/k/a Lyman Lumber Wisconsin, Inc.), 300 LYP, L.L.C. (f/k/a Lyman Properties, L.L.C.), 300 MAC, Inc. (f/k/a Mid-America Cedar, Inc.), 300 WLI, Inc. (f/k/a Woodinville Lumber, Inc.), and 300 WCS, L.L.C. (f/k/a Woodinville Construction Services, L.L.C.) (collectively, the "Debtors") and the Official Committee of Unsecured Creditors ("Committee," together with the Debtors, the "Plan Proponents") jointly propose the following Plan of Liquidation (the "Plan") for the purpose of completing the liquidation of the Debtors' assets, resolving the outstanding claims against and interests in the Debtors' respective bankruptcy estates, and making distributions to holders of claims and interests. Reference is made to the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated January 18, 2013, for a discussion of the Debtors' history, business, properties and operations, a summary and analysis of this Plan, risk factors related to this Plan and certain other matters related to the Chapter 11 Cases, including the substantive consolidation of the Debtors' bankruptcy estates for certain limited purposes. This Plan follows the closing of sales of most of the Debtors' operating assets and contemplates the liquidation of any remaining unsold assets and distribution of the proceeds to creditors. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## ARTICLE I
## DEFINITIONS

1.1    "2009 Restructuring" means the series of transactions consummated in 2009 to, among other things, restructure the Debtors' indebtedness to secured lenders, note holders and debenture holders.

1.2    "Administrative Expense Claims" means claims described in Section 3.1 of this Plan.

1.3    "Allowed" means with respect to any claim, (a) a claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which the Debtors, the Liquidating Agent, or any other party-in-interest have not filed an objection; (b) a claim that either is not a Contested Claim or has been allowed by a Final Order; (c) a claim that is determined by the Debtors or the Liquidating Agent to be allowed; (d) a claim that is allowed in a stipulation or settlement executed prior to or after the Effective Date; (e) a claim relating to a rejected executory contract or unexpired lease that is not a Contested Claim or has been allowed by a Final Order, only if a proof of claim has been timely filed; or (f) a claim as to which a proof of claim has been timely filed and as to which the Debtors or any party-in-interest has not filed an objection; and with respect to all claims, only after reduction for applicable setoff and similar rights of the Debtors.

1.4    "Auction" has the meaning set forth in Section 4.1.1(b)(2) of this Plan.

1.5    "Avoidance Claim" means any claim, cause of action, or rights to property of the Debtors or the bankruptcy estates under Sections 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code.

1.6    "Bankruptcy Code" or "Code" means Title 11 of the United States Code.

1.7    "Bankruptcy Rule" or "Rule" means a Federal Rule of Bankruptcy Procedure.

1.8    "Causes of Action" means any and all actions, proceedings, causes of action (including, without limitation, any causes of action of a debtor or debtor in possession or the bankruptcy estate(s) under Chapter 5 of the Bankruptcy Code such as the Avoidance Claims), liabilities, obligations, suits, reckonings, covenants, contracts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, rights to object to claims, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured or whether asserted or assertable directly or derivatively, in law, equity or otherwise, and all rights thereunder or attendant thereto that belong to the debtors or the bankruptcy estates; provided, however, that "Causes of Action" shall not include those Causes of Action transferred by the Debtors under the Sales Orders or the Excluded Causes of Action.

1.9    "Chapter 11 Cases" means Debtors' pending cases under Title 11 of the United States Code, enumerated in the caption at the top of this Plan.

1.10    "Committee" means the official committee of the unsecured creditors appointed in these Chapter 11 Cases.

1.11    "Confirmation Date" means the date on which the Confirmation Order is entered.

1.12    "Confirmation Order" means the order confirming this Plan.

1.13    "Contested Claim" means (a) a claim that was scheduled by the Debtors in their Schedules as a disputed, contingent, or unliquidated claim and that has not been otherwise Allowed; (b) a claim that is not an Allowed claim because a Debtor, the Liquidating Agent, or other party in interest has objected to allowance of the claim under Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007; (c) any secured or unsecured portions of a Secured Claim that is the subject of a motion for determination of the value of security under Section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012; (d) any claim held by a Creditor against which the Liquidating Agent has demanded the recovery of property pursuant to Section 502(d) of the Bankruptcy Code, without regard to whether such claim was previously an Allowed claim; (e) a claim that is subject to final adjudication in a proceeding outside the Court against one or more of the Debtors' insurers; or (f) a claim whose validity or amount is subject to determination in an adversary proceeding that has not been resolved by a Final Order.

1.14    "Convenience Claims" means Class 2-A claims described in Section 4.2.1 of this Plan.

1.15    "Cottage Grove Property" means 7552 West Point Douglas Road South, Cottage Grove, MN 55016, which is legally described on Exhibit 1 to the Plan.

2

1.16    "Cottage Grove First Mortgage" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.17    "Cottage Grove Notes" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.18    "Cottage Grove Release Payment" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.19    "Cottage Grove Second Mortgage" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.20    "Court" means a United States Bankruptcy Court for the District of Minnesota, or any other court having competent jurisdiction to issue an order in this case.

1.21    "Creditor" means a holder of a claim entitled to distributions under the Plan.

1.22    "Creditor Subordination Agreements" has the meaning set forth in Section 6.5 of this Plan.

1.23    "Cure Amount Claim" means a Claim based upon a Debtor's monetary defaults under an executory contract or unexpired lease that is to be paid in connection with the assumption of such contract or lease under Section 365 of the Bankruptcy Code.

1.24    "Debtors" has the meaning set forth in the Introduction to this Plan.

1.25    "Disclosure Statement" means the Disclosure Statement for this Plan, as may be further revised or modified or amended.

1.26    "Effective Date" means the first day following the day on which the conditions of Section 10.2 have been satisfied or such earlier date as is established by a waiver by the Plan Proponents under Section 10.3.

1.27    "Employee Claims" means the claims described in Section 3.3.2 of this Plan.

1.28    "Estate Assets" means all of the Debtors' right, title, and interest in and to property of whatever type or nature as provided in Section 541 of the Bankruptcy Code, including Avoidance Claims and Causes of Action, that are not expressly abandoned or otherwise transferred by the Debtors under this Plan.

1.29    "Exculpated Parties" means the Plan Proponents, as well as their respective shareholders, directors, officers, agents, employees, members, attorneys, accountants, financial advisors, consultants, and representatives (solely in their capacities as such).

1.30    "Filing Date" means August 4, 2011.

1.31    "Final Determination" means a determination under non-bankruptcy law that has not been stayed, reversed or amended and to which (a) the time to appeal or seek review or

rehearing has expired and (b) no appeal or petition for review or rehearing was filed or, if filed, remains pending.

1.32    "Final Order" means an order of the Court which has not been reversed, stayed, modified, or amended and the time to appeal from such order has expired.

1.33    "Full Lien Release Conditions" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.34    "General Office Loan" means the loan evidenced by the Promissory Note dated May 13, 2004, between Union Central Mortgage Funding, as original lender, and 300 LYLC, Inc. (f/k/a Lyman Lumber Company) ("300 LYLC"), as borrower, and the related the Mortgage and Security Agreement and Fixture Financing Statement dated May 13, 2004, Assignment of Leases and Rents dated May 13, 2004, and the Assignment of Loan Documents, dated August 24, 2004, which assigned the original lender's interests to U.S. Bank, N.A. as successor to Bank of America, N.A., as successor-by-merger to LaSalle Bank, N.A., as Trustee for the Registered Holders of Morgan Stanley Capital 2004-IQ8 by and through Midland Loan Services, a division of PNC Bank, N.A. as special servicer pursuant to that certain Pooling and Servicing Agreement dated August 1, 2004.  300 LYLC is the only debtor entity obligated on the General Office Loan, and no entities or individuals have guaranteed the General Office Loan.

1.35    "General Office Property" means the real property located at 300 Morse Avenue, Excelsior, MN 55331, which is legally described on Exhibit 1 to the Plan.

1.36    "General Unsecured Claims" means the Class 2-B claims described in Section 4.2.2 of this Plan, which are not Unclassified Priority Claims, Secured Claims, or Administrative Convenience claims.

1.37    "Insured Claim" means that portion of any claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date:  (a) as to which any insurer whose insurance contract(s) premiums were paid by the Debtors is obligated pursuant to the terms, conditions, limitations and exclusions of such insurance contract(s) to pay any judgment, loss, damages, settlement or contractual obligation with respect to the Debtors; or (b) that any insurer whose insurance contract(s) premiums were paid by the Debtors otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable insurance contract(s).

1.38    "Intercompany Unsecured Claims" means the Class 2-C claims described in Section 4.2.3 of this Plan.

1.39    "Interest" means any ownership interest, equity or share in the Debtors (including, without limitation, all options, warrants or other rights to obtain such an interest or share in the Debtor) whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

1.40    "Junior Creditor" has the meaning set forth in Section 6.5 of this Plan.

1.41    "Liquidating Agent" means the person selected by the Committee with the consent of the Debtors and approved by the Court to be the successor to the assets of the bankruptcy estate  on behalf of the Creditors and to undertake and perform the powers and duties

of the Liquidating Agent described in Article V of the Plan. The Liquidating Agent shall assume his or her powers and duties upon the Effective Date. The Committee has selected and the Debtors have consented to Conway MacKenzie, Inc. as Liquidating Agent.

1.42    "Liquidating Fund" has the meaning set forth in Section 5.1.1 of this Plan.

1.43    "Longview Agreement Deadline" has the meaning set forth in Section 4.1.1(b)(1) of this Plan.

1.44    "Longview Loan" means the Second Amended and Restated Loan Agreement dated February 12, 2009 (as amended) among Woodinville Lumber, Inc., Lyman Lumber Company, Construction Mortgage Investors Co., Mid-America Cedar, Inc., Woodinville Construction Services, L.L.C., Carpentry Contractors Corp., Lyman Development Co., and Lyman Properties, L.L.C., in the original principal amount of $7,484,000.

1.45    "Longview Mortgage" means the Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated October 16, 2007 (as amended) executed by Woodinville Lumber, Inc. for the benefit of U.S. Bank that secures the Longview Loan, as amended from time to time.

1.46    "Longview Property" means the real property located at 3500 Hoehne Avenue, Longview, WA 98632, which is legally described on Exhibit 1 to the Plan.

1.47    "Midland, as special servicer" means U.S. Bank National Association, as Successor to Bank of America, N.A., as Successor-by-Merger to LaSalle Bank, N.A., as Trustee for the Registered Holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2004-IQ8, acting by and through Midland Loan Services, a division of PNC Bank, N.A. as special servicer pursuant to that certain Pooling and Servicing Agreement dated August 1, 2004.

1.48    "Minimum Woodinville Proceeds" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.49    "Other Priority Claims" means the claims described in Section 3.3.3 of this Plan.

1.50    "Oversight Committee" means the committee to undertake the powers and duties of the Oversight Committee described in Article V of the Plan which will initially be comprised of (a) four of the unsecured creditors currently serving on the Committee (as defined in Section 1.11) and (b) the Liquidating Agent. The Oversight Committee shall assume its powers and duties upon the entry of the Confirmation Order.

1.51    "Plan" means this Second Amended Joint Chapter 11 Plan of Liquidation as revised or modified or amended.

1.52    "Plan Proponents" means the Debtors and the Committee.

1.53    "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code.

1.54    "Private Sale Purchase Agreement" has the meaning set forth in Section 4.1.1(b)(1) of this Plan.

1.55    "Record Date" means the last date on which a claim transfer will be recognized. The Record Date is the Confirmation Date.

1.56    "Sales" means the sales of the Debtors' assets approved during the Chapter 11 Cases pursuant to the Sales Orders.

1.57    "Sales Orders" means the orders entered during the Chapter 11 Cases at Docket Nos. 171, 253, 254, and 261.

1.58    "Schedules" means the Debtors' schedules of assets and liabilities and the statements of financial affairs on file with the Clerk of the United States Bankruptcy Court for the District of Minnesota, as amended or modified in accordance with Bankruptcy Rule 1009.

1.59    "Secured Claim" means a claim described in Section 4.1 of this Plan.

1.60    "Senior Creditor" has the meaning set forth in Section 6.5 of this Plan.

1.61    "Senior Creditor Unsecured Claim" has the meaning set forth in Section 6.5.1 of this Plan.

1.62    "Senior Creditor Reserve" has the meaning set forth in Section 6.5.1 of this Plan.

1.63    "Senior Creditor Shortfall" has the meaning set forth in Section 6.5.1 of this Plan.

1.64    "Statutory Fees and Court Costs" means court costs and fees payable by the Debtors under 28 U.S.C. § 1930 and United States Trustee fees.

1.65    "Subordination Agreement" means the Subordination and Intercreditor Agreement, in substantially the form attached to the Plan as Exhibit 6.5, by and among certain lenders, including the Senior Creditors, and the Junior Creditors.

1.66    "Subordination Fund" means the separate fund created and managed by the Liquidating Agent to receive distributions to Junior Creditors to which the Senior Creditors may be entitled under the Subordination Agreement.

1.67    "TCF" means TCF National Bank or any successor to TCF's rights under this Plan.

1.68    "TCF Allowed Claim" has the meaning set forth in Section 4.1.2(a) of this Plan.

1.69    "TCF Assumed Unsecured Claim" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.70    "TCF Full Claim Amount" has the meaning of "Full Claim Amount" set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

6

1.71    "TCF Full Claim Event" has the meaning of "Full Claim Event" set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.72    "TCF Loan Documents" has the meaning of "Loan Documents" set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.73    "TCF Reserve Claim" means the amount that would be distributed to TCF based on the TCF Assumed Unsecured Claim at the time of such distribution.

1.74    "TCF Settlement Agreement" has the meaning set forth in Section 4.1.2 of this Plan.

1.75    "Title Transfer" shall mean a deed-in-lieu of foreclosure, voluntary surrender, or other transfer of real property in lieu of foreclosure initiated by the Liquidating Agent under the terms of the Plan or the Liquidating Agent's exercise of discretion as authorized by the Plan.

1.76    "Title Transfer Documents" means:  i) warranty deeds with non-merger language conveying the Cottage Grove Property and the Woodinville Property to TCF or the Longview Property to U.S. Bank; ii) deed-in-lieu of foreclosure agreements on terms mutually acceptable to the parties; and iii) such affidavits, DT1 forms, certificates of real estate value, and other related documents that are required by the title company selected by TCF or U.S. Bank or are otherwise necessary to complete the transfer of the Woodinville Property and the Cottage Grove Property to TCF or the Longview Property to U.S. Bank.

1.77    "Twenty-Day Claim" means a claim, under Section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtors in the 20 days immediately prior to the Filing Date and sold to the Debtors in the ordinary course of the Debtors' businesses.

1.78    "Twenty-Day Procedures" has the meaning set forth in Section 3.1.2.

1.79    "Unclassified Priority Claims" means the claims described in Article III of this Plan.

1.80    "Unsecured Claims" means all claims that are not Secured Claims, including Unsecured Priority Claims, Administrative Convenience Claims, General Unsecured Claims, and deficiency claims arising from undersecured Secured Claims.

1.81    "Unsecured Priority Claims" means the Priority Tax Claims, Employee Claims, and Other Priority Claims.

1.82    "U.S. Bank" means U.S. Bank, National Association or any successor to U.S. Bank's rights under this Plan.

1.83    "U.S. Bank Deficiency Claim" has the meaning set forth in Section 4.1.1(e) of this Plan.

1.84    "U.S. Bank Full Claim Amount" has the meaning set forth in Section 4.1.1(a) of this Plan.

1.85   "U.S. Bank Related Entity or Entities" has the meaning set forth in Section 4.1.1(j) of this Plan.

1.86   "U.S. Bank Sharing Distribution" has the meaning set forth in Section 4.1.1(f) of this Plan.

1.87   "Woodinville Lien Release Conditions" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.88   "Woodinville Note" has the meaning set forth in the TCF Settlement Agreement, which is Exhibit 4.1.2 to this Plan.

1.89   "Woodinville Property" means the real property located at 15900 Woodinville – Redmond Road, Woodinville, WA 98072, and legally described on Exhibit 1 to the Plan.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

The following table designates the classes of claims against and equity interests in the Debtors and specifies which of those classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code.

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Expense Claims | N/A | No |
| N/A | Priority Claims | N/A | No |
| 1-A | Secured Claim – U.S. Bank (Longview) | Yes | Yes |
| 1-B | Secured Claim – TCF (Woodinville and Cottage Grove) | Yes | Yes |
| 1-C | Secured Claim – Midland (General Office) | No | No |
| 1-D | Secured Claim – Hennepin County (General Office) | Yes | Yes |
| 1-E | Secured Claim – Chartis (Insurance) | Yes | Yes |
| 1-F | Secured Claim – Lumbermen's Underwriting Alliance (Workers Compensation Insurance) | Yes | Yes |
| 1-G | Secured Claim – Wausau/Liberty Mutual (Insurance) | Yes | Yes |
| 2-A | Convenience Claims | Yes | Yes |
| 2-B | General Unsecured Claims | Yes | Yes |
| 2-C | Subordinated Unsecured Claims | Yes | Yes |
| 3 | Equity Interests | Yes | No |

*N/A = Not applicable.

# ARTICLE III
## TREATMENT OF CERTAIN UNCLASSIFIED PRIORITY CLAIMS

Certain Allowed claims which are not classified will be treated as follows:

### 3.1    Allowed Administrative Expense Claims

Except as otherwise provided in this Article, all Allowed claims specified in Bankruptcy Code § 507(a)(2), including Allowed fees and expenses of professionals, will be paid from the Liquidating Fund in full in cash on the Effective Date or as soon as practicable after the Effective Date or later as approved by the Court.

### 3.1.1    Postpetition Operating Expenses

With respect to the Debtors' Allowed operating expenses incurred during the Chapter 11 Cases, the Debtors generally paid these expenses as they became due.  If any Allowed administrative expense claims come due after the Effective Date, or for any other reason have not been paid as of the Effective Date, these claims will be paid from the Liquidating Fund as the claims become due or as otherwise agreed between the holders of such claims and Liquidating Agent.  Upon confirmation of this Plan, the Court will enter an order setting deadlines for submission of motions to seek allowance of unpaid post-petition administrative expenses by any who believe they are entitled to be paid and have not been paid.  The Debtors estimate that approximately $25,000 in postpetition administrative operating expense claims will be Allowed and paid after the Effective Date.

### 3.1.2    Twenty-Day Claims

The Court has approved a procedure ("Twenty-Day Procedures") and claim form for filing Twenty-Day Claims.  The deadline for filing Twenty-Day Claims was November 13, 2011.  Holders of Twenty-Day Claims that did not file a claim form by November 13, 2011, are forever barred from asserting Twenty-Day Claims against the Debtors, the Liquidating Fund, or their respective property, and any such alleged Twenty-Day Claims shall be deemed discharged as of the Effective Date.

Claimants asserted 85 claims that total approximately $1,605,922.28.  Timely-filed Twenty-Day Claims are subject to objection by the Liquidating Agent, regardless of whether the holder votes to accept the Plan.  Unless otherwise ordered by the Court, any objections to Twenty-Day Claims shall be filed by the deadline set by the Twenty-Day Procedures, or at such later date as approved by the Court upon request from the Debtors or the Liquidating Agent.  All Allowed Twenty-Day Claims will be paid from the Liquidating Fund as soon as practicable after the later of the Effective Date or the approval of such claims by the Court.

### 3.1.3    Professional Fees and Expenses

The Debtors paid Allowed professional fees and expenses currently during the Chapter 11 Cases.  However, the Debtors withheld a portion of such fees in accordance with the Court's holdback rules, and professionals will not have billed some work in process in the weeks leading up to confirmation of this Plan.  Professional fees and expenses will be subject to Court approval after the Effective Date on a timeline to be determined by the Court.  Three of the Debtor's

professionals hold retainers totaling $356,000. The Debtors estimate that pre-confirmation professional fees to be paid after the Effective Date will total approximately $280,000. These claims will be paid from retainers or from the Liquidating Fund as they are approved by the Court.

### 3.1.4   PBGC Claims

Each of the Debtors are either a contributing sponsor of the Lyman Lumber & Affiliated Companies Defined Benefit Plan and Trust (the "Pension Plan") or a member of the contributing sponsor's controlled group. The Pension Plan is covered by Title IV of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"). The Pension Benefit Guaranty Corporation ("PBGC") is the wholly-owned United States government corporation and agency of the United States created under Title IV of ERISA to administer the federal pension insurance programs and enforce compliance with the provisions of Title IV. PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV.

By Agreement dated July 12, 2012, the Pension Plan was terminated, PBGC was appointed statutory trustee of the Pension Plan, and December 31, 2011, was established as the date of plan termination.

The Debtors and all members of their controlled group are jointly and severally liable for the unfunded benefit liabilities of the Pension Plan. PBGC has filed a claim in the Debtors' bankruptcy cases for unfunded benefit liabilities owed to the Pension Plan in the estimated amount of $5,185,684. PBGC asserts that part of the claim is an administrative expense entitled to priority.

The Debtors and all members of their controlled group are also jointly and severally liable to PBGC for unpaid premium obligations owed by Debtors on account of the Pension Plan in the estimated amount of $922,500. PBGC has filed an unliquidated claim in the Debtors' bankruptcy cases for statutory premiums owed to PBGC. PBGC asserts that part of the claim is entitled to priority.

The Debtors or the Liquidating Agent will assess and object to the PBGC claims for administrative expense and priority status to the extent that the claims exceed PBGC's right to such status based on the Debtors' net worth, the claim calculation, and other factors. All Allowed PBGC administrative expense and priority claims will be paid from the Liquidating Fund at such time as they are approved by the Court.

### 3.1.5   Retiree Benefits

The Debtors owe retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, to two early retirees for health insurance coverage through April 2013. From and after the Effective Date, pursuant to Section 1129(a)(13) of the Bankruptcy Code, the Liquidating Fund will pay all retiree benefits within the meaning of Section 1114 of the Bankruptcy Code at the level established thereby, subject to such modification as is permitted under applicable law. The Debtors estimate that the Allowed amount of retiree benefits will be approximately $7,000.

### 3.1.6    Sales Taxes

The Debtors may have liability to the Minnesota Department of Revenue on account of unpaid sales taxes that accrued and were payable after the Filing Date.  The Debtors and BEP/Lyman, LLC, the purchaser during the Chapter 11 Cases of the majority of the Debtors' assets, both assert that the other party is liable for approximately $508,000 in unpaid sales taxes arising around the time of the October 2011 sale.  The Debtors estimate that the liability could be as much as $650,000 with penalties and interest and have created a segregated bank account ("Sales Tax Account") containing $650,000.

Before and after the Effective Date, the Debtors and the Liquidating Agent will determine the liability for these sales taxes through negotiation with BEP/Lyman, LLC, or through an adversary proceeding.  Until the Debtors' liability for these taxes has been finally determined, the Debtors and the Liquidating Agent will keep separate and hold in trust the funds in the Sales Tax Account for the benefit of the Minnesota Department of Revenue.  To the extent the Debtors' are liable for the sales taxes, the Debtors or the Liquidating Agent will use funds from the Sales Tax Account to pay such taxes as soon as practicable and any excess funds will be contributed to the Liquidating Fund.

### 3.1.7    Reclamation Claims

The Debtors believe that reclamation claims asserted in the Chapter 11 Cases have no value.  However, Guardian Building Products Distribution, Inc., and Weyerhaeuser, Inc., objected to the Debtors' position and the reclamation claims will be valued through negotiation by the parties or by the Court in a contested hearing.  All Allowed reclamation claims will be treated as administrative expense claims and paid from the Liquidating Fund as soon as practicable after the later of the Effective Date or the approval of such claims by the Court.

### 3.1.8    Claims Arising Under Assumed Executory Contracts or Unexpired Leases

Allowed claims arising under any executory contracts or unexpired leases that are assumed under Section 8.1 of this Plan will be paid according to the terms of any order of the Court approving assumption of such contract or lease, or as otherwise agreed between the holders of such claims and the Debtors or the Liquidating Agent.

### 3.2    Statutory Fees and Court Costs

Court costs and fees payable by the Debtors under 28 U.S.C. § 1930 will be paid from the Liquidating Fund in full in cash on the Effective Date or as soon as practicable thereafter or as required under the Office of the United States Trustee's quarterly payment guidelines.  The Debtors estimate these claims to be $12,350.  After confirmation, the Liquidating Agent will continue to pay quarterly fees to the Office of the United States Trustee and file quarterly reports with the Office of the United States Trustee until this case is closed by the Court, dismissed or converted.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 Cases.

### 3.3 Unsecured Priority Claims

#### 3.3.1 Priority Tax Claims

a.      Payment of Priority Tax Claims

Each holder of an Allowed Priority Tax Claim will be paid, in full satisfaction of its Priority Tax Claim, cash equal to the amount of such Allowed Priority Tax Claim, on the later of (a) as soon as practicable after the Effective Date or (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.  These claims will be paid from the Liquidating Fund.  The Debtors estimate there will be no Allowed Priority Tax Claims.

b.      Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section 3.3.1.a, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such claim or demand for any such penalty shall be subject to treatment in Class 2-B (General Unsecured Claims), as applicable, if not subordinated to Class 2-B Claims pursuant to an order of the Court.  The holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors, the Liquidating Fund or their respective property (other than as a holder of a Class 2-B Claim).

#### 3.3.2 Employee Claims

Any claims entitled to priority under Section 507(a)(4) or (5) of the Bankruptcy Code will be paid from the Liquidating Fund in full on the earlier of the Effective Date or as soon as practicable thereafter or as they come due.  The Debtors believe there may be one holder of such claims in an amount of $9,436.75.  All Allowed employee claims will be paid from the Liquidating Fund at such time as they are approved by the Court

#### 3.3.3 Other Priority Claims

All other claims not specifically treated in this section and entitled to priority under Section 507(a) of the Bankruptcy Code will be paid from the Liquidating Fund in full on the earlier of the Effective Date or as soon as practicable thereafter or as they come due.  The Debtors do not believe there are any claims of this type.


# ARTICLE IV
# TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### 4.1 Secured Claims

#### 4.1.1 Class 1-A – U.S. Bank (Longview Property)

This class consists of the Allowed secured claim of U.S. Bank based on the Longview Loan which is secured by the Longview Mortgage.

a.    U.S. Bank Full Claim Amount

U.S. Bank has an Allowed claim ("U.S. Bank Full Claim Amount") in the amount of (i) the principal balance of $5,007,471.74 and accrued interest as of the Petition Date of $46,466.90 plus (ii) interest accruing from and after the Petition Date at the floating contract rate (currently 5.25% per annum or $686.51 per diem) plus (iii) fees and costs, including reasonable attorneys' fees.

b.    Disposition of Longview Property

This Allowed secured claim shall be satisfied by the following:

(1)    Private Sale

The Debtors and the Liquidating Agent will continue to pursue the Debtors' efforts to sell the Longview Property. The Debtors and the Liquidating Agent will have until February 28, 2013 (the "Longview Agreement Deadline"), to enter into a binding purchase agreement for the sale of the Longview Property on terms acceptable to U.S. Bank ("Private Sale Purchase Agreement"). If a Private Sale Purchase Agreement is entered into before the Longview Agreement Deadline, the Debtors or the Liquidating Agent shall obtain a Court order approving the sale in a manner satisfactory in all respects to U.S. Bank in order to facilitate the disposition of the Longview Property under that Private Sale Purchase Agreement, including the exercise of any remedies by the Liquidating Agent in the event the purchaser defaults thereunder. In exercising it discretion with respect to the sale terms and Court order approving the sale, U.S. Bank shall act in a commercially reasonable manner.

(2)    Auction Sale or Title Transfer

If a Private Sale Purchase Agreement is not entered into before the Longview Agreement Deadline or if the Longview Agreement Deadline has expired and there is a default under the Private Sale Purchase Agreement that is not cured within any applicable cure period thereunder, the Liquidating Agent shall immediately cause the disposition of the Longview Property to be facilitated through an auction sale (the "Auction"), the structure of which must be satisfactory in all respects to U.S. Bank; provided, however, that (a) the Auction must conclude (i.e., a sale of the Longview Property be closed) not later than June 1, 2013, (b) the Auction shall be conducted on commercially reasonable terms, (c) U.S. Bank will have the right to accept or reject any bid at the Auction, and (d) if no bid is accepted by U.S. Bank, then the Liquidating Agent will immediately take such action with regard to the Longview Property as U.S. Bank directs, including, but not limited to, performing a Title Transfer to U.S. Bank, permitting U.S. Bank to foreclose on the Longview Mortgage, or permitting U.S. Bank to take such other action with regard to the Longview Property as is commercially reasonable. Any reasonable costs and expenses related to the administration of the Auction, including a reasonable broker's fee, shall be paid from the gross proceeds of the sale of the Longview Property at the closing after conclusion of the Auction. However, if no bid is accepted by U.S. Bank, U.S. Bank will pay all reasonable costs of the Auction excluding any broker's fee. In exercising it discretion with respect to an Auction, Title Transfer, or other disposition of the Longview Property, U.S. Bank shall act in a commercially reasonable manner.

c.      Sale Proceeds

If the Longview Property is sold, U.S. Bank's claim shall be reduced by an amount equal to the net proceeds from such sale, whether by private sale or by Auction, and such net sale proceeds shall be immediately distributed to U.S. Bank when received from a buyer.

d.      Expenses

Until the closing date of the sale of the Longview Property, whether by private sale or by Auction, the Debtors or the Liquidating Agent shall be responsible for the regular maintenance and repair of the Longview Property and for the timely payment when due of all taxes, assessments, governmental charges, levies, security service costs, maintenance fees, insurance premiums and other expenses related to the Longview Property.  All the funds paid by any buyer, including, without limitation, earnest money, monthly payments, and extension fees, will be paid immediately to U.S. Bank to reduce its claim.

e.      Deficiency Claim Calculation

The amount of U.S. Bank's unsecured deficiency claim (the "U.S. Bank Deficiency Claim"), if any, shall be conclusively determined by the net amount U.S. Bank receives from the sale or other disposition of the Longview Property, whether by private sale, Auction, or foreclosure sale.  If no sale or other disposition occurs and U.S. Bank's secured claim is satisfied by a Title Transfer of the Longview Property to U.S. Bank, then U.S. Bank's Deficiency Claim shall be set at $2.0 million.

f.      Distribution on Account of U.S. Bank Deficiency Claim

The U.S. Bank Deficiency Claim shall be a Class 2-B Claim and receive a pro rata share of the Class 2-B distribution under this Plan, and receive distributions under Section 6.5 of this Plan, until the U.S. Bank Deficiency Claim is paid in full; provided, however, that U.S. Bank shall accept 85% of such aggregate distribution in satisfaction of its unsecured claim and permit the remainder to be distributed pro rata to the Junior Creditors as a "U.S. Bank Sharing Distribution" under Section 6.5.4 of this Plan.

g.      Distribution on Account of Secured Claim

If the net proceeds from a sale of the Longview Property exceed the U.S. Bank Full Claim Amount, U.S. Bank shall be entitled to all of the sales proceeds up to the full amount of the U.S. Bank Full Claim Amount.

h.      Continuing Lien

U.S. Bank shall retain the Longview Mortgage, which shall remain in full force and effect, until released as provided in the Plan or through other means as provided by law consistent with the Plan.

i.    No Liens; Indemnification

The Liquidating Agent shall not cause or permit any liens to be placed on the Longview Property after the Confirmation Date without written authorization from U.S. Bank.  The Liquidating Fund shall indemnify U.S. Bank for any loss due to unauthorized liens created after the Confirmation Date.

j.    Release of U.S. Bank

THE DEBTORS RELEASE AND FOREVER DISCHARGE U.S. BANK AS WELL AS U.S. BANK'S AGENTS, SERVANTS, EMPLOYEES, DIRECTORS, OFFICERS, MEMBERS, ATTORNEYS, BRANCHES, AFFILIATES, SUBSIDIARIES, SUCCESSORS AND ASSIGNS, AND ALL PERSONS, FIRMS, CORPORATIONS, AND ORGANIZATIONS ON THEIR BEHALF (COLLECTIVELY ALL OF THE FOREGOING INCLUDING U.S. BANK, THE "U.S. BANK RELATED ENTITY OR ENTITIES") OF AND FROM ALL DAMAGES, LOSSES, CLAIMS, DEMANDS, LIABILITIES, OBLIGATIONS, ACTIONS AND CAUSES OF ACTION WHATSOEVER WHICH ANY OF THE DEBTORS MAY NOW HAVE OR CLAIM TO HAVE AGAINST U.S. BANK RELATED ENTITIES, WHETHER PRESENTLY KNOWN OR UNKNOWN, AND OF EVERY NATURE AND EXTENT INCLUDING BUT NOT LIMITED TO ANY SUCH DAMAGES, LOSSES, CLAIMS, DEMANDS, LIABILITIES, OBLIGATIONS, ACTIONS AND CAUSES OF ACTION WHATSOEVER ON ACCOUNT OF OR IN ANY WAY TOUCHING, CONCERNING, ARISING OUT OF, FOUNDED UPON OR RELATING TO ANY LOANS, MORTGAGES, SECURITY AGREEMENTS OR ANY DOCUMENTS EXECUTED IN CONNECTION THEREWITH, THE DEBTORS' BANKRUPTCY CASES, THE SALE OF THE DEBTORS' ASSETS DURING THE BANKRUPTCY CASE, PERFORMANCE BY U.S. BANK UNDER THE TERMS AND CONDITIONS OF THE ANY LOAN DOCUMENTS (AS LENDER, AGENT, OR ANY OTHER CAPACITY), THE ENFORCEMENT OF REMEDIES OR PURSUIT OF COLLECTION ACTIVITIES WITH RESPECT TO THE OBLIGATIONS OR SECURITY EVIDENCED BY OR REFERENCED IN ANY LOAN DOCUMENTS OR ANY DOCUMENTS OR INSTRUMENTS DELIVERED IN CONNECTION WITH ANY OF THEM OR ANY ACT OR OMISSION BY ANY U.S. BANK RELATED ENTITY RELATING THERETO, INCLUDING BUT NOT LIMITED TO, ALL SUCH LOSSES OR DAMAGES OF ANY KIND HERETOFORE SUSTAINED, OR THAT MAY ARISE AS A CONSEQUENCE OF THE DEALINGS OF ANY DEBTORS, ON THE ONE HAND, AND ANY OF THE U.S. BANK RELATED ENTITIES ON THE OTHER HAND UP TO AND INCLUDING THE EFFECTIVE DATE.

### 4.1.2    <u>Class 1-B</u> – TCF (Woodinville Property and Cottage Grove Property)

This class consists of the Allowed secured claim of TCF based on the Settlement Agreement dated September 25, 2012, among the Debtors, the Committee, and TCF, which was filed with the Court on October 12, 2012 ("TCF Settlement Agreement") that resolves all issues relating to TCF's claims against the Debtors. The TCF Settlement Agreement was approved by the Court by order dated November 7, 2012.  A copy of the TCF Settlement Agreement is attached as Exhibit 4.1.2 and is incorporated herein.  This Section contains a summary of the treatment of TCF's Allowed secured claim.  To the extent there are inconsistent provisions in the

Plan or Disclosure Statement, the terms of the TCF Settlement Agreement govern. All terms in this section not defined in the Plan are as defined in the TCF Settlement Agreement.

The TCF Settlement Agreement generally provides the Debtors and the Liquidating Agent additional time to conclude a sale of the Woodinville Property and to market the Cottage Grove Property without having to make periodic payments of principal and interest to TCF (though the Debtors would still pay the carrying costs). In addition, if the Debtors or the Liquidating Agent take certain actions by certain deadlines, TCF's claim will be reduced by approximately $2 million, and the Debtors or the Liquidating Agent will have the opportunity to generate additional funds for the estates through a sale of the Cottage Grove Property after TCF's liens are released. The TCF Settlement Agreement provides for various timing and claim reduction options that reward the Debtors' quick action on the properties with reductions in TCF's claim amount. There is an option for a lien release and claim reduction and two paths for staggered sales of the properties. If the Debtors or the Liquidating Agent do not satisfy all of the conditions under the TCF Settlement Agreement, then TCF will have the allowed claim specified below.

As is further described below, as of December 26, 2012, the Debtors satisfied one of the conditions in the TCF Settlement Agreement (the sale of the Woodinville Property). Therefore, the Plan and Disclosure Statement describe TCF's Allowed Secured Claim under the TCF Settlement Agreement in light of the satisfaction of that condition.

a.    TCF Full Claim Amount

The Debtors' performance under the Settlement Agreement is secured by the springing of the Debtors' full liability to TCF in the event of the Debtors' default ("TCF Full Claim Amount"). Those defaults are defined as "TCF Full Claim Events" and are listed in Section 10 of the TCF Settlement Agreement and include the failure to satisfy any of the options related to the Woodinville Property or the Cottage Grove Property and other events such as the failure to maintain insurance and pay taxes on the properties. If any Full Claim Event occurs, TCF will have an allowed claim in the Full Claim Amount, though that amount may be reduced by specific amounts described in Section 10 of the TCF Settlement Agreement, depending on how the Debtors or the Liquidating Agent performed under the TCF Settlement Agreement prior to the Full Claim Event. The claim may or may not be secured by TCF's deeds of trust and mortgages on the Woodinville Property and the Cottage Grove Property, depending on whether TCF's liens on those properties were released prior to the occurrence of the Full Claim Event. The TCF Full Claim Amount is calculated as:

   i.     the principal amount of $10,213,415.00;

   ii.    all accrued and unpaid interest at the default rate which is $383,462.77 as of August 29, 2012, and will continue to accrue thereafter in accordance with the terms of the Cottage Grove Notes and the Woodinville Note;

   iii.   all attorneys' fees incurred by TCF which are $200,000.00 as of September 15, 2012, and as such fees continue to be incurred thereafter;

iv.        late fees in the amount of $519,298.82 as of September 19, 2012 and which will continue to accrue in accordance with the Cottage Grove Notes, the Woodinville Note and/or any other TCF Loan Documents related thereto; and

v.        costs and expenses.

Because interest, attorney fees, late fees, and costs and expenses continue to accrue, TCF projects that its total claim in these cases will exceed $11,500,000.

b.        Distribution on Account of TCF Full Claim Amount

The TCF Full Claim Amount, if any, shall be a Class 2-B Claim and receive a pro rata share of the Class 2-B distribution under this Plan and receive distributions under Section 6.5 of this Plan, until the TCF Full Claim Amount is paid in full.

c.        Release of Woodinville Property and Effect on the TCF Full Claim Amount

Debtors satisfied the conditions for release of the Woodinville Property by paying TCF $7,900,000 on or before December 26, 2012, pursuant to Section 4 of the TCF Settlement Agreement.  Because Debtors satisfied the Woodinville Lien Release Conditions, under Section 6(b) of the TCF Settlement Agreement, if no Full Claim Event occurs, TCF will be entitled to a claim against the Debtors secured by the Cottage Grove Property pursuant to the Cottage Grove Mortgage and Second Cottage Grove Mortgage equal to (i) the amounts due under the Cottage Grove Notes minus (ii) the difference between (A) the Minimum Woodinville Proceeds and (B) the amounts due under the Woodinville Note.  If a Full Claim Event occurs, under Section 10 of the TCF Settlement Agreement, the TCF Full Claim Amount will be reduced by $7,900,000.

d.        Release of Cottage Grove Mortgages Only

Because Debtors satisfied the Woodinville Lien Release Conditions, the Debtors and their successors are able to fully satisfy TCF's liens on the Cottage Grove Property, and reduce TCF's claim, by delivering a payment of $1.4 million plus any Environmental Damage Claim, if any, as further described below ("Cottage Grove Release Payment") to TCF on or before September 30, 2013.  If the Debtors or their successors cannot deliver the Cottage Grove Release Payment on or before September 30, 2013, the Settlement Agreement allows the Debtors to deliver a deed-in-lieu of foreclosure for the Cottage Grove Property to TCF on or before September 30, 2013.  If the Debtors timely pay the Cottage Grove Release Payment or deliver a deed-in- lieu, TCF will waive all claims in the cases.

e.        Environmental Damage Claim

The TCF Settlement Agreement provides that, in the event that environmental problems are discovered on the Woodinville Property or the Cottage Grove Property that were not previously disclosed, and TCF has taken title to the affected property, TCF shall have an Environmental Damage Claim.  The Environmental Damage Claim shall be in the amount of the damages TCF suffers on account of the environmental problem, however, the total amount of the

17

Environmental Damage Claim shall not exceed $1.5 million. The Debtors do not believe that there are any environmental issues with the Woodinville Property or the Cottage Grove Property that were not previously reported.

### f.      Sale of Cottage Grove

The Debtors or Liquidating Agent will be entitled to sell the Cottage Grove Property as one or separate parcels at the Liquidating Agent's discretion and to deliver title to the buyer or buyers free and clear of the Cottage Grove Mortgages, provided that the sale will result in the satisfaction of the Cottage Grove Lien Release Conditions, as defined in the TCF Settlement Agreement.  Proceeds from any sales shall be applied first to customary costs of sale payable by the Liquidating Agent as seller, then to amounts due under the mortgages, then to the Liquidating Fund.

### g.      Maintenance of the Cottage Grove Property

Until TCF has released the TCF Mortgages (as defined in the TCF Settlement Agreement) encumbering the Cottage Grove Property or the Cottage Grove Property has been deeded to TCF through delivery of the documents described in the TCF Settlement Agreement, the Debtors will pay all costs and expenses incurred with respect to the Cottage Grove Property including but not limited to the following: a) all real estate taxes, assessments or other similar obligations related to such properties; b) all insurance premiums to maintain insurance as required by the TCF Mortgages encumbering the Cottage Grove Property; and c) all costs of maintaining the property.

### h.      No Liens; Indemnification

The Liquidating Agent shall not cause or permit any liens to be placed on the Cottage Grove Property after the Confirmation Date without written authorization from TCF.  The Liquidating Fund shall indemnify TCF for any loss due to unauthorized liens created after the Confirmation Date.

### i.      Continuing Lien

TCF shall retain the Cottage Grove First Mortgage and the Cottage Grove Second Mortgage, which shall remain in full force and effect, until released as provided in the Plan and the TCF Settlement Agreement or by other means as provided by law consistent with the Plan.

### j.      Other Provisions of the TCF Settlement Agreement

Section 4.1.2 of the Plan does not repeat all provisions of the TCF Settlement Agreement. The TCF Agreement contains other important provisions regarding environmental issues and events, subrogation of the claims of Junior Creditors, and releases by Debtors and TCF.

### 4.1.3    Class 1-C – Midland, as special servicer (General Office Property)

This class consists of the Allowed secured claim of Midland, as special servicer. This claim arises from the General Office Loan, which is secured by a mortgage on the General Office Property. Midland filed a proof of claim asserting that its claim was $1,614,064.89 as of the Filing Date. The Debtors dispute this amount. The General Office Property is subject to a short-term lease to BEP/Lyman, LLC. During the Chapter 11 Cases, Midland, as special servicer, obtained relief from the automatic stay to pursue all remedies it may have under the loan agreement and applicable law.

Promptly following the Effective Date, Midland, as special servicer, will retain its lien on the General Office Property, and the Plan shall not modify the Court's order granting relief from the automatic stay. The Liquidating Agent may attempt to sell the General Office Property during any foreclosure procedures or subsequent redemption period. Upon a sale of the General Office Property in excess of the claim amount, the Liquidating Agent will promptly pay over to Midland, as special servicer, the net proceeds of the sale up to the full amount of the claim, and any excess proceeds shall become part of the Liquidating Fund. Upon such sale, Midland shall execute such documents and take such actions as are necessary to release Midland's lien. Alternatively, the Liquidating Agent may negotiate the terms of a sale for less than the claim amount on terms mutually agreed to by the Liquidating Agent and Midland, as special servicer. At any time after the Effective Date and consistent with Section 5.1.3 of this Plan, the Liquidating Agent shall have the authority to execute a deed in lieu of foreclosure or negotiate any other treatment of this claim. Midland has elected to foreclose on the General Office Property under Minnesota Statutes Chapter 580. In accordance with Chapter 580, Midland is not entitled to a deficiency claim, including a claim for attorney fees, property taxes, and any other costs or expenses, under Minn. Stat. §§ 580.225 and 582.30. The Liquidating Agent retains all rights to object to any claims asserts by Midland. Additionally, because Midland is exercising its contractual and legal rights, Midland's legal, equitable, and contractual rights unaltered and Midland is not impaired under the Plan.

### 4.1.4    Class 1-D – Hennepin County Treasurer (General Office Property)

This class consists of the Allowed secured claim of Hennepin County Treasurer for unpaid property taxes secured by the General Office Property that is being foreclosed upon by Midland, as special servicer. This Class 1-D claim will be satisfied in full upon the sale of the General Office Property by Midland, as special servicer, pursuant to applicable state law.

### 4.1.5    Class 1-E – Chartis (Insurance)

This class consists of the Allowed secured claim of Chartis f/k/a American Home Assurance Co., et al. with respect to workers compensation, automobile and general liability insurance, secured by cash in a loss deposit account with the last known balance of $392,000. This Class 1-E claim will be satisfied by application of funds from the loss deposit account up to the remaining amount of such funds, after which any additional claim will be treated as a Class 2-B General Unsecured Claim. In the event funds in the loss deposit account exceed the value of the secured claim, Chartis will return such funds to the Liquidating Fund.

19

### 4.1.6    Class 1-F – Lumbermen's Underwriting Alliance (Workers Compensation Insurance)

This class consists of the Allowed secured claim of Lumbermen's Underwriting Alliance with respect to workers compensation insurance, secured by cash in a loss deposit account with the last known balance of $200,000.  This Class 1-F claim will be satisfied by application of funds from the loss deposit account up to the remaining amount of such funds, after which any additional claim will be treated as a Class 2-B General Unsecured Claim.  In the event funds in the loss deposit account exceed the value of the secured claim, Lumbermen's Underwriting Alliance will return such funds to the Liquidating Fund.

### 4.1.7    Class 1-G – Wausau/Liberty Mutual (Insurance)

This class consists of the Allowed secured claim of Wausau/Liberty Mutual with respect to workers compensation, automobile and general liability insurance, secured by cash in a loss deposit account with the last known balance of $720,000.  This Class 1-G claim will be satisfied by application of funds from the loss deposit account up to the remaining amount of such funds, after which any additional claim will be treated as a Class 2-B General Unsecured Claim. In the event funds in the loss deposit account exceed the value of the secured claim, Wausau/Liberty Mutual will return such funds to the Liquidating Fund.

## 4.2    Unsecured Non-Priority Claims

### 4.2.1    Class 2-A – Convenience Claims

This class consists of all Allowed General Unsecured Claims against the Debtors that are (a) in the amount of $2,000 or less or (b) reduced by the holder of the claim to $2,000 by election on the Ballot.  Each holder of an Allowed Convenience Claim will be paid, in full satisfaction of its Allowed Convenience Claim, cash equal to 5% of its Allowed Convenience Claim (up to $100.00) as soon as practicable following 60 days after the Effective Date.   These claims will be paid from the Liquidating Fund.  The Debtors estimate that the Allowed claims in this class will be approximately $247,000 and that the distributions to this class will total approximately $12,350.

### 4.2.2    Class 2-B – General Unsecured Claims

Except as provided in Section 5.5 of the Plan, on one or more distribution dates established under Section 6.1, each holder of an Allowed General Unsecured Claim shall receive a pro rata share of the net proceeds of the Liquidating Fund after the payment of all Allowed Unclassified Priority Claims, Allowed Secured Claims, Allowed Administrative Convenience claims, and all costs and expenses of the Liquidating Fund.  General Unsecured Claims will include claims by counterparties to executory contracts and unexpired leases that are rejected pursuant to Section 8.1.

The Debtors estimate there to be up to $94,000,000 of Allowed General Unsecured Claims.  Holders asserting significant claims include, but are not limited to, the PBGC asserting an estimated $1,346,567 in shortfall and waiver amortization charges plus any amounts not entitled to priority under Section 3.1.4; the Central States, Southeast and Southwest Areas Pension Fund asserting an estimated $19,388,483.13 claim; Junior Creditors asserting claims in

20

the approximate aggregate amount of $59,889,000; and trade vendors asserting claims in the approximate aggregate amount of $6,524,000. The Debtors estimate that holders of Allowed General Unsecured Claims will receive distributions of approximately 1 to 3% of their Allowed claim amounts.

### 4.2.3   Class 2-C – Intercompany Unsecured Claims

This class consists of all Allowed unsecured claims of each Debtor against other Debtors. The Debtors estimate that Allowed claims in this class to be approximately $175,432,000. These claims shall be subordinated to payment in full of General Unsecured Claims.

### 4.3   Class 3 – Interests in Debtors

On the Effective Date, all Interests, as that terms is defined in Article I, in the Debtors shall be deemed automatically cancelled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Interests are not entitled to any distributions under this Plan. Holders of Class 3 Interests are conclusively deemed to have rejected this Plan, and therefore, the votes of holders of Class 3 Interests will not be solicited.

### 4.4   Special Provisions Relating to Creditors' Rights of Setoff

Nothing in this Plan shall expand or enhance a creditor's right of setoff, which shall be determined as of the Filing Date. Nothing in this Plan is intended to, or shall be interpreted to, approve any creditor's effectuation of a post-Filing Date setoff without the consent of the Debtors unless prior Court approval has been obtained.

## ARTICLE V
## MEANS OF EXECUTION OF THE PLAN

### 5.1   Liquidating Fund and Liquidating Agent

#### 5.1.1   Liquidating Fund

On the Effective Date, except as otherwise designated in this Plan, all of the Estate Assets shall become part of a liquidating fund ("Liquidating Fund"), which shall be used to liquidate remaining Estate Assets and distribute the proceeds thereof to holders of Allowed claims in accordance with the terms of this Plan under the direction of the Liquidating Agent.

The transfer of assets and rights to the Liquidating Fund shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Fund as if the asset or right was still held by the applicable Debtor.

a.   Disposition of Assets to Pay Secured Claims

The Liquidating Agent will dispose of all of the Estate Assets subject to Secured Claims through sales or, in its discretion, surrender or otherwise dispose of such assets in accordance with its duties under this Plan. Proceeds, if any, will be used to pay sale costs, then to pay Secured Claims as provided in this Plan, then for operation of the Liquidating Fund. Additional

proceeds, if any, will be used to pay the holders of General Unsecured Claims as such additional proceeds become available.

b.      Sale of Assets to Pay Unsecured Claims

As an integral part of implementation of the Plan, the Liquidating Agent shall sell or otherwise liquidate or abandon all remaining Estate Assets to fund operation and implementation of the Liquidating Fund for the benefit of the Creditors.

### 5.1.2    Liquidating Agent

The Liquidating Agent shall be appointed by the Committee with the consent of the Debtors, and the appointment shall be approved by the Court through the Order confirming the Plan.  In the event of the resignation or termination of the Liquidating Agent, any successor Liquidating Agent shall be appointed by the Oversight Committee.  The Liquidating Agent's primary tasks are to receive the Liquidating Fund, liquidate assets, pursue causes of action, administer claims and distribute proceeds for the benefit of Creditors.

### 5.1.3    Powers and Duties of the Liquidating Agent

In furtherance of and consistent with the purpose of the Plan, and subject to the direction and consent of the Oversight Committee, in addition to the powers and authority specifically provided elsewhere in the Plan, the Liquidating Agent shall receive the Liquidating Fund, have the powers of an agent to act for the holders of claims under the Plan on account of such claims and be a "representative of the estate" as set forth in 11 U.S.C. § 1123(b)(3)(B) together with the power and authority to (a) hold, manage or sell the Estate Assets, (b) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of this Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer real property on behalf of the Debtors and the Liquidating Fund, (c) establish reserves for Contested Claims, taxes, assessments, professional fees, and other expenses of administration of the Liquidating Fund as may be necessary and appropriate for the operation of the Liquidating Fund, (d) calculate and make distributions from the Liquidating Fund to the holders of all Allowed claims in accordance with the provisions of this Plan, (e) investigate, prosecute, litigate, settle or compromise any Avoidance Claims and Causes of Action on behalf of the Debtors and, as set forth in Section 7.1 of the Plan, those claims may be settled or compromised without notice and a hearing and without Court approval but shall be subject to the consent of the Oversight Committee, (f) review, reconcile or object to claims and resolve such objections as set forth in this Plan, (g) object to the amount of any claim on any of the Debtors' Schedules if the Liquidating Agent determines in good faith that the claim is invalid, has previously been paid or satisfied, or other grounds exist for an objection, (h) defend, protect and enforce any and all rights and interests transferred to the Liquidating Fund or Liquidating Agent, (i) retain professionals and incur any reasonable and necessary expenses in performance of its duties, and to the extent such payments are approved by the Oversight Committee, to pay those expenses without any further application to the Bankruptcy Court;  (j) pay any and all claims, liabilities, losses, damages, costs and expenses incurred by the Liquidating Agent, including all fees and expenses of the Liquidating Agent and professionals retained by the Liquidating Agent, (k) file estate tax returns and other tax returns as required and provide tax information to Creditors, (l) operate assets for periods reasonably required to

preserve or maximize value pending liquidation and distribution to Creditors, (m) open, create, or close accounts to deposit, hold, and disburse funds, (n) invest cash in demand or time deposits to obtain market rates of return pending distributions, (o) file any and all reports and motions or requests for relief with the court or any opposition thereto; (p) enter into, authorize, and benefit from any insurance policies and rights of indemnification; (q) dissolve the Debtors, terminate joint ventures, or otherwise wind up any of the Debtors' corporate entities; (r) subject to approval of the Oversight Committee, incur indebtedness to fund administration of the Plan; (s) perform any other functions that are necessary to effectuate this Plan and perform its duties as Liquidating Agent, and (t) have the power and authority to administer the closure of the Chapter 11 cases.   In all circumstances, the Liquidating Agent will act in the best interests of the Creditors.

### 5.1.4   Compensation and Retention of Professionals

The Liquidating Agent will be entitled to be paid reasonable compensation and expenses from the Liquidating Fund, subject to the consent of the Oversight Committee.  The Liquidating Agent will be entitled to retain professionals without court approval to assist in its duties and to pay such professionals reasonable compensation and expenses, subject to the consent of the Oversight Committee.  The Liquidating Agent may hire former employees and other "insiders" (as that term is defined in the Bankruptcy Code) of the Debtors for post-confirmation services and to pay such individuals reasonable compensation and expenses, subject to the consent of the Oversight Committee.   For certain post-petition services, Debtors have employed former employees James Hurd, Debtors' President and CEO, and Brian Balcer, Debtors' Treasurer and Controller, at the rate of $150/hour, and the Liquidating Agent anticipates requesting post-confirmation services from one or both of those individuals. The Liquidating Agent may retain attorneys, consultants and other professionals that represent the Debtors, subject to the consent of the Oversight Committee.  Fees that the Debtors' professionals incur on behalf of the Debtors after the Effective Date in connection with the implementation of this Plan may be paid out of the Liquidating Fund, subject to the Liquidating Agent and Oversight Committee's consent or by Court Order.  Any dispute as to such compensation and expenses between the Liquidating Agent, its professionals, and the Oversight Committee or any objection by any party in interest as to such compensation and expenses will be resolved by the Court on motion.

### 5.1.5   Removal of the Liquidating Agent.

At any time upon thirty (30) days' written notice to the Liquidating Agent and upon a unanimous vote by the members of the Oversight Committee, the Oversight Committee may move the Court for an order removing the Liquidating Agent and appointing a successor Liquidating Agent.  The motion shall identify a proposed successor Liquidating Agent and generally describe the qualifications of the person to act as successor Liquidating Agent.  The Court shall grant the motion if all members vote in favor of the removal and cause exists for the removal of the Liquidating Agent.

### 5.2   Oversight Committee

The Oversight Committee shall consist initially of four members selected by the Committee.  The Oversight Committee may act with as few as two members.  In the event that a resignation or termination of members of the Oversight Committee reduces the number of

members to less than two members, then one successor member shall be appointed by the remaining member and the Liquidating Agent.  The Oversight Committee will monitor the Liquidating Agent and all activities set forth in this Plan.  The Oversight Committee will have the power and authority to ratify or reject decisions of the Liquidating Agent, and in its discretion, the Oversight Committee may delegate to the Liquidating Agent such power and authority as it deems proper.  The members of the Oversight Committee will not be paid for their services except for reimbursement of actual expenses incurred by such members.  The Oversight Committee will be governed by by-laws substantially in the form of those attached as Exhibit 5.2.  Because the Committee is initially comprised of an even number of Members, if there is a tie vote, the Liquidating Agent (although not a Member) shall be entitled to vote on that issue as set forth in Section 2.5 of Exhibit 5.2.

### 5.3    Liability and Indemnification of Liquidating Agent and Oversight Committee Members

Neither the Liquidating Agent, Oversight Committee members, nor their designees, employees, professionals, or agents will be liable for the act or omission of any other designee, employee, professional or agent, nor will the Liquidating Agent or Oversight Committee members be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omissions resulting from willful misconduct, gross negligence, or fraud.  The Liquidating Agent, Oversight Committee members, their designees, employees, professionals, or agents shall be indemnified and held harmless, including the cost of defending such claims and the attorney fees in seeking indemnification, by the Liquidating Fund against any and all claims arising out of their duties under this Plan, expect to the extent their actions constitute willful misconduct, gross negligence, or fraud.

### 5.4    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

Each Debtor and the Liquidating Agent, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer real property on behalf of the Debtors and the Liquidating Fund.  Pursuant to Section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax or similar tax:  (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to this Plan.

# ARTICLE VI
## DISTRIBUTIONS AND CLAIMS ADMINISTRATION

### 6.1    Distributions

Subject to Section 6.4 and 6.5 of this Plan, the Liquidating Agent shall make an initial distribution to Creditors of net income from and net proceeds of sales of Estate Assets within forty-five (45) days or as soon as practicable thereafter of obtaining $2,000,000 in funds readily available for distribution after excluding reserves maintained by the Liquidating Agent under Sections 5.1.3 and 6.4.4 of this Plan.  The first distribution will occur after the deadline for filing of objections to claims as determined under Section 6.3.2 of this Plan.  The Liquidating Agent shall make a final distribution after determining, in consultation with the Oversight Committee, that all assets that feasibly could be liquidated have been liquidated and that the next distribution will be the final distribution.  At its discretion, the Liquidating Agent may make, but is not required to make, additional distributions after the initial distribution and before the final distribution.

### 6.2    Method of Payment

Payments under this Plan will be made by check, mailed with first class postage pre-paid, to the holder of each claim at the address listed on its proof of claim as of the Record Date, or if no proof of claim has been filed by the date of the hearing on confirmation, to the address listed on the Schedules as of the Record Date.  Holders of claims as of the Record Date may contact the Liquidating Agent to amend their addresses as follows:

>Kevin A. Berry
>Conway MacKenzie, Inc.
>401 South Old Woodward Avenue, Suite 340
>Birmingham, Michigan 48009

### 6.3    Claims Administration Responsibility

#### 6.3.1    Reservation of Rights to Object to Claims

Unless a claim is specifically Allowed under this Plan, or otherwise Allowed prior to or after the Effective Date, the Liquidating Agent shall have and retain any and all objections to any and all claims and motions or requests for the payment of claims, whether administrative expense, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged administrative expense claims, priority tax claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

#### 6.3.2    Filing of Objections

Unless otherwise ordered by the Court in the Confirmation Order, any objections to Claims other than administrative expense claims will be filed within one hundred and twenty (120) days after the Effective Date (unless such day is not a business day, in which case such deadline will be the next business day thereafter) or at such later date as approved by the Court upon request from the Liquidating Agent.  An objection to a claim will be deemed properly served on the holder of the claim if the Liquidating Agent effects service by any of the following

methods:   (a) in accordance with Federal Rule of Civil Procedure 4, as allowed and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a claimholder is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or interest or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of the claimholder in the Chapter 11 Cases.

### 6.3.3   Determination of Claims

Except as otherwise agreed by the Liquidating Agent, any claim as to which a proof of claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and liquidated pursuant to (a) a Final Order of the Court or (b) a Final Determination under applicable non-bankruptcy law, and will be deemed in such liquidated amount and satisfied in accordance with this Plan.   Nothing contained in this Plan, the Disclosure Statement, or the Confirmation Order will constitute or be deemed a waiver of any claim, right, interest, or Cause of Action that the estate or Liquidating Fund may have against any person in connection with or arising out of any claim or claims, including, without limitation, any rights under Section 157(b) of Title 28 of the United States Code.

### 6.4   Procedures for Treating and Resolving Contested Claims

### 6.4.1   No Distributions Pending Allowance

Notwithstanding any other provision hereof, no payments or distributions will be made with respect to all or any portion of a Contested Claim unless and until all objections to such Contested Claim have been settled or withdrawn or have been determined by a Final Order, and the Contested Claim has become an Allowed claim.

### 6.4.2   Claim Estimation

The Debtors or the Liquidating Agent may request estimation or limitation of any Contested Claim that is contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code; provided, however, that the Court will determine (a) whether such Contested Claim is subject to estimation pursuant to Section 502(c) of the Bankruptcy Code and (b) the timing and procedures for such estimation proceedings, if any.   Unless provided otherwise in an order of the Court, the estimated amount shall constitute the Allowed amount of such claim or a maximum limitation on such claim, as the Court may direct; provided, however, that if the estimate constitutes the maximum limitation on such claim, the Debtors or the Liquidating Agent may elect to pursue supplemental proceedings to object to the ultimate allowance of such claim.   The foregoing shall not limit the rights granted by Code Section 502(j).

### 6.4.3   No Distribution if Cause of Action Asserted

Notwithstanding any other provision hereof, no payment or distribution will be made with respect to all or any portion of a claim or Allowed claim held by a claimant against whom an Avoidance Claim or Cause of Action is asserted unless and until such Avoidance Claim or Cause of Action has been settled or withdrawn or has been determined by Final Order.

### 6.4.4    Reserve Account for Contested Claims

From and after the Effective Date and until such time as all Contested Claims have been compromised and settled or determined by Final Order or Final Determination, the Liquidating Agent shall establish and maintain a separate reserve account in an amount equal to distributions that would have been made to the holders of Contested Claims if each Contested Claim were an Allowed claim equal to the lesser of (i) the Contested Claim amount, which is the greater of (a) the amount of the claim scheduled by the Debtors in their schedules or (b) the amount listed on the proof of claim filed by the holder of the claim, (ii) the amount in which the Contested Claim is estimated by the Court for purposes of allowance, which amount unless otherwise ordered shall constitute the maximum amount in which the Contested Claim may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the Liquidating Agent and the holder of the Contested Claim.

### 6.4.5    Payment Upon Allowance and Disallowance of Contested Claims

At such time as a Contested Claim becomes, in whole or in part, an Allowed claim, the Liquidating Agent shall distribute to the holder thereof the distribution(s) to which the holder is then entitled under the Plan.  Such distribution, if any, shall be made as soon as practicable after the entry of the Final Order allowing the claim.  In the event that a Contested Claim is not Allowed, in whole or in part, the holders of Allowed claims in the same class as the holder of the Contested Claim shall receive their pro rata share of any amount reserved on account of the Contested Claim in the next distribution under the Plan, or, if no further distribution is scheduled under the Plan, at such time as all Contested Claims have been compromised and settled or determined by Final Order.

### 6.5    Subordination of Junior Creditors

Certain creditors who hold promissory notes and debentures and who are identified, to the best of the Debtors' knowledge, on Exhibit 6.5a to the Plan (the "Junior Creditors") have executed subordination agreements in substantially the form attached to the Plan as Exhibit 6.5b ("Creditor Subordination Agreements").  The Creditor Subordination Agreements provide that U.S. Bank and TCF (together the "Senior Creditors") are entitled to receive Plan distributions due the Junior Creditors until the Debtors' indebtedness to the Senior Creditors is paid in full.  To effectuate the Creditor Subordination Agreements pursuant to 11 U.S.C. § 510(a) and the TCF Settlement Agreement, Section 6.5.1 creates a Subordination Fund to receive distributions due to the Junior Creditors on account of their unsecured claims and Section 6.5.2 distributes such funds to the Senior Creditors.  Section 6.5.3 preserves the U.S. Bank Deficiency Claim, if any, and the TCF Full Claim Amount, if any, (together the "Senior Creditor Unsecured Claims") and subrogates the Junior Creditors to the rights of those claims.

### 6.5.1    Funding of the Subordination Fund and Senior Creditor Reserve

Pursuant to the Subordination Agreements and 11 U.S.C. § 510(a), the Liquidating Agent shall maintain a separate reserve account in an amount equal to (1) all distributions to which the Junior Creditors shall be entitled under Section 4.2.2 of this Plan ("Subordination Fund"); and (2) distributions that would have been made to the Senior Creditors on account of the Senior Creditor Unsecured Claims, if any (the "Secured Creditor Reserve").  For purposes of funding

27

the Senior Creditor Reserve, the U.S. Bank Deficiency Claim will be deemed to be four million dollars ($4.0 million) until its Allowed amount is finally determined. Once the amounts of the Senior Creditor Unsecured Claims are finally determined, and before distributions from the Senior Creditor Reserve are made to Senior Creditors, any excess contributions to the Senior Creditor Reserve due to over-estimates of the Senior Creditor Unsecured Claims shall be returned to the Liquidating Fund.

### 6.5.2   Distributions from the Subordination Fund and Senior Creditor Reserve

The Secured Creditor Reserve and Subordination Fund will be managed by the Liquidating Agent until it has been determined that funds or property equal to the Allowed amounts of the claims of the Senior Creditors in Classes 1-A, 1-B, and 2-B (collectively, the "Senior Creditor Claims") have been distributed to the Senior Creditors pursuant to the terms of Sections 4.1.1, 4.1.2, 4.2.2, and 6.5 of the Plan.

After (a) the sale or Title Transfer of each of the Cottage Grove Property and the Longview Property, (b) the final allowance of the TCF Full Claim Amount, if any, (c) the final determination of the U.S. Bank Deficiency Claim, if any, (d) the return of funds to the Liquidation Funds as provided in Section 6.5.1, and (e) the reduction of the Senior Creditor Unsecured Claims by distributions directly from the Secured Creditor Reserve and the Liquidating Fund, pursuant to Section 4.2.2 of the Plan, the amounts that remain unpaid to the Senior Creditors (the "Senior Creditor Shortfall"), if any, will be distributed to them from the Subordination Fund on a pro rata basis, subject to the terms of distribution of U.S. Bank Sharing Distributions described in Section 6.5.4 below.

In the event that any interim distribution from the Subordination Fund is not sufficient to satisfy in full the Senior Creditor Shortfall, later distributions will be made to the Senior Creditors based on the amount of their Class 2-B claims. When the Liquidating Agent distributes funds from the Subordination Fund sufficient to satisfy in full the Senior Creditor Unsecured Claims, the Liquidating Agent will distribute the remaining funds in the Subordination Fund to the Junior Creditors on a pro rata basis.

After the Senior Creditors have received funds in an amount equal to the Senior Creditor Unsecured Claims and the remaining funds in the Subordination Fund have been distributed to the Junior Creditors, the Subordination Fund shall be closed and the remaining distributions on account the of Junior Creditors' claims shall be made in the same manner as other distributions on account of Class 2-B claims.

### 6.5.3   Treatment and Subrogation of Senior Creditor Unsecured Claims

Distributions from the Subordination Fund to the Senior Creditors will not reduce the Senior Creditor Unsecured Claims for purposes of calculating future distributions. The Senior Creditor Unsecured Claims shall receive distributions from the Liquidating Fund consistent with the treatment of Class 2-B claims that are not held by Junior Creditors, and such distributions will reduce the amounts of the Senior Creditor Unsecured Claims on a dollar-for-dollar basis.

At the time that the total distributions to the Senior Creditors pursuant to the terms of Sections 4.1.1, 4.1.2, 4.2.2, and 6.5 of the Plan equal the amounts of the Senior Creditor

Unsecured Claims, then the Junior Creditors will be subrogated to the rights of the Senior Creditors and shall be entitled to exercise such subrogation rights. From that time, the Junior Creditors shall be entitled to any subsequent distributions on account of the Senior Creditor Unsecured Claims, which distributions will be divided among the Junior Creditors on a pro rata basis.

### 6.5.4    U.S. Bank Sharing Distributions

Pursuant to Section 4.1.1(f) of the Plan, fifteen percent (15%) of the distributions to which U.S. Bank is entitled to under this Section 6.5 shall be paid on a pro rata basis to the Junior Creditors as a U.S. Bank Sharing Distribution. This U.S. Bank Sharing Distribution shall not be treated as a distribution subject to the Creditor Subordination Agreements and further application of the terms of this Section 6.5; the Junior Creditors shall be paid their pro rata share of the U.S. Bank Sharing Distribution as soon as practicable following the corresponding distribution to U.S. Bank.

### 6.5.5    Objections to Subordination

Junior Creditors may object to the plan's treatment of their claims as subordinated to the rights of the holders of the TCF Deficiency Claim as part of the confirmation process. Any objections to the plan's treatment of the Junior Creditors as subordinated to the rights of the holders of the TCF Full Claim Amount after that time are deemed waived.

### 6.6    No Claim Transfers

The Record Date for claim transfers is the Confirmation Date. Payment under the Plan will be mailed to the address of the holder of the claim as of the Record Date until the holder of the claim as of the Record Date notifies the Liquidating Agent in writing of a different address.

### 6.7    Limitations on Amounts To Be Distributed to Holders of Allowed Insured Claims

Except as provided by previous Order, Distributions under this Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under this Plan for the class in which such Allowed Insured Claim is classified, subject to reserve as a Contested Claim under Section 6.4.4 of this Plan and to reduction of the total claim amount on a dollar-by-dollar basis to the extent that such Allowed Insured Claim is satisfied from proceeds payable to the holder thereof under any pertinent insurance contracts and applicable law. Nothing in this Section 6.7 constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurers.

### 6.8    De Minimis Distributions

Except for Convenience Claims, the Liquidating Agent shall not be required to make any payment of less than twenty-five dollars ($25.00) with respect to any Allowed Class 2-B claim. To the extent that any interim distribution is not paid to the holder of a Class 2-B claim because it amounts to less than twenty-five dollars ($25.00), the amount of such withheld distribution shall be reserved for addition to any future distribution or to the final distribution to such holder

of a Class 2-B claim, and will be made at that time if the total distribution is at least twenty-five dollars ($25.00).

### 6.9    Unclaimed Payments

In the event a payment is returned to the Liquidating Agent unclaimed, with no indication of the payee's forwarding address, the Liquidating Agent will hold such payment for a period of 90 days from the date of return.  If not claimed by the payee by the end of that period, the payment will become property of the Liquidating Fund for distribution to holders of General Unsecured Claims.  In the event there are unclaimed funds at the end of the distribution process and redistribution to other holders of Claims is impractical, the Liquidating Agent may donate such funds to a charitable organization qualified under 26 U.S.C. § 501(c)(3) of the Internal Revenue Service Code.

### 6.10    Time Bar to Check Payments

Checks issued by the Liquidating Agent shall be null and void if not negotiated within 120 days from and after the date of issuance.  Requests for re-issuance of any check shall be made to the Liquidating Agent by the holder of the Allowed claim with respect to which such check originally was issued.  Any claim in respect of such a voided check must be made on or before 180 days after the date of issuance of such check.  After 180 days after issuance of a non-negotiated check for which the holder of the Allowed claim did not request re-issuance, all claims in respect of voided checks shall be discharged and forever barred and the Liquidating Fund shall retain all monies related thereto for distribution in accordance with this Plan.

### 6.11    Setoffs

The Liquidating Agent may, pursuant to applicable non-bankruptcy law, set off against any distribution(s) to be made pursuant to the Plan, the claims, rights, and Causes of Action of any nature the Debtors or the Liquidating Agent may hold against the holder of such Allowed claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any claim hereunder shall constitute a waiver or release of any such claims, rights, and Causes of Action that the Debtors or the Liquidating Agent may hold against such holder.

### ARTICLE VII
### RETENTION AND ENFORCEMENT OF CLAIMS OR INTERESTS BELONGING TO THE DEBTORS OR THE ESTATES

### 7.1    Preservation of Causes of Action and Avoidance Actions

On the Effective Date, except as provided below, the Liquidating Agent shall be vested in and retain, as the representative of the estates under section 1123(b)(3)(B) of the Bankruptcy Code, all Causes of Action, including Avoidance Claims, and the Liquidating Agent may enforce or not enforce, consistent with its fiduciary duties, any Causes of Action that the Debtors, the estates, or the Liquidating Agent may hold against any entity to the extent not expressly released under this Plan or by any Final Order of the Court, including, but not limited to, those items identified on <u>Exhibit 7.1</u>.  No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or

the Liquidating Agent will not pursue any and all available Causes of Action against them. The Debtors expressly reserve all Causes of Action, including Avoidance Claims, for later adjudication by the Liquidating Agent, including but not limited to actions relating to (a) payments relating to Debtors' purchase of Woodinville Lumber, Inc. and Woodinville Construction Services, LLC, including but not limited to earn out payments, cash payments, and the issuance of subordinated debentures, (b) distributions made to shareholders or stockholders, and (c) payments or other distributions made to note holders or debenture holders; (d) payments relating to Debtors' purchase of assets of Carpentry Contractors Corp.; and (e) any and all claims relating to the transfer of certain operations to the Longview Property, including but not limited to claims against third parties and insurance carriers. Therefore, no preclusion doctrine shall apply to a Cause of Action upon, after, or as a consequence of the Confirmation Order. The Liquidating Agent may, at its option, compromise any Cause of Action, Avoidance Claim or any other claim, interest, or objection retained herein after the Effective Date without notice and a hearing and without Court approval. To the extent required by the Bankruptcy Code, the Liquidating Agent is hereby designated as the "Plan Representative." All recoveries on the Causes of Action and Avoidance Claims shall be retained by the Liquidating Agent for making distributions under this Plan.

Notwithstanding the foregoing, the Liquidating Agent may not pursue causes of action that the Liquidating Agent lacks standing to pursue, including actions that, under Minnesota law, run to the creditors personally, rather than to the corporation, because those rights of action are not assets of the estate under Section 541(a) of the Bankruptcy Code that are enforceable by a trustee under Section 704(1) of the Bankruptcy Code ("Excluded Causes of Action"). *In re Ozark Restaurant Equipment Co.,* 816 F.2d 1222 (8th Cir. 1987). For sake of clarity, Excluded Causes of Action includes any claims belonging to individual creditors arising under federal or state security laws or tort claims (such as for fraud, fraudulent misrepresentation, or negligent misrepresentation) that are based on particular and distinct injuries to individual creditors. However, Excluded Causes of Action does not include Causes of Action belonging to the Debtors at the commencement of these cases, Avoidance Claims, and Causes of Action that could have been asserted by the Debtors or by its stockholders in a derivative action.

## ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    Assumption or Rejection of Executory Contracts and Unexpired Leases

Each executory contract, unexpired lease or other agreement listed on Exhibit 8.1 shall be or has been assumed as of the Effective Date. All other executory contracts, unexpired leases or other agreements not already rejected by Order of the Court in the Chapter 11 Cases shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to Sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all such executory contracts and unexpired leases.

### 8.2    Cure of Defaults

Upon information and belief, all Cure Amount Claims have been satisfied in accordance with the terms and procedures of the Sales, the related process and the Sale Orders and no Cure Amount Claims exist related to the contracts and leases assumed under Section 8.1 of this Plan; provided, however, that in the event a Cure Amount Claim remains due and owing, such

31

payments shall be made by the Liquidating Fund as provided in Section 3.1.4 of the Plan.  The Liquidating Agent shall retain all rights to contest any outstanding Cure Amount Claims.

**8.3    Bar Date for Rejection Damage Claims**

To the extent not subject to a claims bar date set forth in a prior order of the Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of this Plan must be filed with the Court no later than 30 days after the entry of the Confirmation Order and, upon allowance, shall be an Allowed General Unsecured Claim.  Any claims not filed within such applicable time periods shall be forever barred from receiving a distribution from the Debtors, the estates or the Liquidating Fund.

## ARTICLE IX
## SUBSTANTIVE CONSOLIDATION

**9.1    Consolidation for Limited Purposes**

On the Confirmation Date, the Debtors' estates shall be substantively consolidated into a single entity only for purposes of confirmation, consummation, and Plan implementation, except that the holders of Allowed Secured Claims shall retain their liens on the property of each Debtor after the Confirmation Date to the same validity, extent, and priority as existed on the Confirmation Date to secure each such Allowed Secured Claim.  Accordingly, for purposes of distribution only Debtors request partial or limited substantive consolidation of the estates of the Debtors and the Confirmation Order shall provide that as of the Effective Date:  (a) partial substantive consolidation shall not affect the legal and corporate structures of the Debtors; (b) all intercompany claims by and among the Debtors will be subordinated to all other classes of claims created by this Plan; (c) with respect to Unsecured Claims, all assets and all proceeds thereof and all liabilities of any and all of the Debtors will be merged or treated as though they were the assets or liabilities jointly of all such Debtors; (d) with respect to Unsecured Claims, any obligation of any of the Debtors and all guarantees thereof executed by any of such Debtors will be deemed to be a single obligation of the Debtors in the amount of the primary obligation; (e) with respect to Unsecured Claims, any claims filed or to be filed in connection with any such obligation and any such guarantees will be deemed one claim against the Debtors in the amount of the primary obligation; (f) with respect to Unsecured Claims, every claim filed or to be filed in the Chapter 11 Case of any separate Debtor will be deemed one claim filed against the Debtors; and (g) with respect to Unsecured Claims, any claim filed by a single creditor against more than one of the Debtors in respect of separate transactions will be treated as a single claim against the Debtors in the aggregate amount of such obligations.

Notwithstanding the foregoing, such consolidation shall not prejudice or otherwise affect each individual Debtors' claims, objections, defenses, causes of action, and other rights of recovery against any person other than a Debtor or the rights of any party with a lien on any of the property of any of the Debtors.  To avoid any doubt regarding the foregoing, the Liquidating Agent shall pursue Avoidance Actions on account of each Debtor individually, and the elements of and defenses to Avoidance Actions will not be affected by the substantive consolidation provided under this Section.  *See In re Giller*, 962 F.2d 796 (8th Cir. 1992).

**9.2    Order Granting Consolidation**

This Plan serves as a motion seeking entry of an order consolidating the Debtors as described in Section 9.1 above.  Upon a proper evidentiary showing at the confirmation hearing by the Debtors, the consolidation order (which may be the Confirmation Order) may be entered by the Court.

**9.3    Objections to Consolidation Waived After Confirmation**

Any objections to substantive consolidation not made before or at the confirmation hearing are waived, and creditors or other parties may not raise objections to the consolidation or challenge the scope or effect of substantive consolidation as set forth in this Plan after confirmation of the plan, including in any subsequent motions or adversary proceedings.

**ARTICLE X
CONFIRMATION OF THE PLAN**

**10.1    Conditions Precedent to Confirmation**

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section 10.3 of this Plan:

a.    The Confirmation Order shall be reasonably acceptable in form and substance to the Debtors and to the Committee.

b.    This Plan shall not have been materially amended, altered or modified from the version as filed on January 18, 2013, unless such material amendment, alteration or modification has been made in accordance with Section 13.1 of this Plan.

**10.2    Conditions Precedent to the Effective Date**

The Effective Date shall not occur, and this Plan shall not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3 of this Plan:

a.    The Court shall have entered the Confirmation Order, the Confirmation Order shall be a Final Order, and no stay of the Confirmation Order shall then be in effect.

b.    The Debtors shall have sufficient cash on hand to pay obligations required to be paid on or as soon as reasonably practicable after the Effective Date of this Plan.

c.    This Plan shall not have been materially amended, altered or modified from this Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 13.1 of this Plan.

### 10.3    Waiver of Conditions to Confirmation or Effective Date

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the Plan Proponents without an order of the Court.

### 10.4    Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 10.3 of this Plan, then upon the successful adjudication of an adversary proceeding by the Debtors made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Court may direct, the Confirmation Order shall be vacated by the Court; provided, however, that, notwithstanding the filing of such adversary proceeding, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Court enters an order vacating the Confirmation Order.  If the Confirmation Order is vacated pursuant to this Section 10.5: (a) this Plan shall be null and void in all respects; and (b) nothing contained in this Plan shall (i) constitute a waiver or release of any claims by or against any Debtor or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

### 10.5    Cramdown

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired class that has not accepted or is deemed not to have accepted this Plan pursuant to section 1126 of the Bankruptcy Code.

### 10.6    Effect of Confirmation of the Plan

#### 10.6.1  Title to and Vesting of Assets

All property of the Debtors and the estates is dealt with by this Plan; therefore, on the Effective Date, to the full extent allowed by section 1141(b) of the Code, all property of the Debtors and the estates vests in the Liquidating Fund and such property is free and clear of all liens, encumbrances, claims and interests of creditors and equity security holders, except to the extent the Plan explicitly provides that such liens, encumbrances, claims or interests are retained. From and after the Effective Date, the Liquidating Fund may operate, use, acquire, and dispose of property in accordance with the Plan, free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter of provision of the Bankruptcy Code, except as provided in this Plan.

#### 10.6.2  Injunction Against Interference with the Plan

The Plan is binding on the Debtors, any Creditor, equity security holder or others to the full extent provided in Section 1141(a) of the Code.  All entities who are bound by this Plan, including entities with claims not listed on the Schedules, or who are listed on the Schedules as disputed, unliquidated or contingent, and did not timely file proofs of claim, are hereby enjoined and prevented from commencing or continuing any judicial or administrative proceeding or employing any process to interfere with the consummation or implementation of this Plan or the payments to be made hereunder, including commencing or continuing any judicial or administrative proceeding or employing any process against the Debtors, the estates, the

Oversight Committee or the Liquidating Agent; provided, however, such injunction shall not prohibit any entity from pursuing actions they may have against third parties, including but not limited to the PBGC's right to enforce a third parties' liabilities under the Pension Plan.

### 10.6.3  No Discharge

Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan does not discharge the Debtors' indebtedness. Furthermore, no provision contained herein, the Confirmation Order, Section 1141 of the Bankruptcy Code, or in any other documents filed in these bankruptcy proceedings shall be construed as discharging, releasing or relieving any party, in any capacity, from any liability with respect to the Pension Plan under any law, government policy or regulatory provision.

### 10.6.4  Exculpation

Subject to the occurrence of the Effective Date, none of the Exculpated Parties shall have or incur any liability to any holder of a claim or interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases and this Plan, the solicitation of this Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan, or the property to be distributed under this Plan; provided, however, that the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; provided further that nothing in this Plan shall, or shall be deemed to, release or exculpate the Exculpated Parties with respect to their respective obligations or covenants arising pursuant to this Plan.

## ARTICLE XI
## EVENTS OF DEFAULT

Unless otherwise provided elsewhere in the Plan, default with respect to the Debtors' or the Liquidating Agent's obligations under the Plan to any Creditor or other person will not occur unless and until such creditor or holder has delivered written notice of such default to the Liquidating Agent at the address set out in Section 6.2 of the Plan, and the Debtors or the Liquidating Agent have failed to cure such default within 30 days after receipt of such written notice.  If the Debtors or the Liquidating Agent fail to cure a default, a Creditor's or other person's sole remedy is a claim for breach of contract, and the Liquidating Agent shall have such claims and any other remedies provided for in the Plan or pursuant to any interests the Debtors have granted to the Liquidating Agent under the Plan.

## ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible to the full extent permitted by the Code, including jurisdiction to:

a.        Allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any

request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims;

b.      Resolve any issues arising under asset purchase agreements entered into during the case or their respective sale orders to the extent required for the implementation or execution of the Plan;

c.      Determine all questions and disputes regarding title to the assets of the estates to the extent required for the implementation or execution of the Plan;

d.      Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

e.      Resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any claims arising therefrom, including any cure amount claims;

f.      Ensure that distributions to holders of Allowed claims are accomplished pursuant to the provisions of this Plan;

g.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor that may be pending on the Effective Date or brought thereafter;

h.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

i.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

j.      Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with this Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

k.      Issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, and enter and implement other orders or take such other actions as may be

necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

l.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to this Plan are enjoined or stayed;

m.      Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement or the Confirmation Order;

n.      Enforce or clarify any orders previously entered by the Court in the Chapter 11 Cases;

o.      Enter a final decree or decrees closing the Chapter 11 Cases;

p.      Determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, including any Contested Claims for taxes;

q.      Recover all assets of the Debtors and their estates, wherever located; and

r.      Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

### 13.1    Modification of the Plan

Subject to the restrictions on alteration, amendment and modification set forth in Section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend or modify this Plan before the Effective Date.

### 13.2    Revocation of the Plan

The Plan Proponents reserve the right to revoke or withdraw this Plan prior to the Confirmation Date.  If the Plan Proponents revoke or withdraw this Plan, or if Confirmation does not occur, then this Plan shall be null and void in all respects, and nothing contained in this Plan shall:  (a) constitute a waiver or release of any claims by or against any Debtor; (b) prejudice in any manner the rights of the Debtors, any Debtor or any other party in interest; or (c) constitute an admission of any sort by the Debtors, any Debtor or any other party in interest.

### 13.3    Dissolution of the Committee

On the Effective Date, the Committee shall be dissolved, and the members thereof and the professionals retained thereby shall be released and discharged from their respective fiduciary obligations.  The dissolution of the Committee shall not impair the ability of its members to serve on the Oversight Committee.

### 13.4    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of this Plan is held by the Court to be invalid, void or unenforceable, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.5    Corporate Documents

The certificates of incorporation of the Debtors and related documents will be amended to the extent necessary as required by Section 1123(a)(6) of the Bankruptcy Code and as may otherwise be required by this Plan.

### 13.6    Regulated Rates

This Plan affects no rates subject to approval by any governmental regulatory commission.

### 13.7    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 13.8    Governing Law

The rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Minnesota, without giving effect to principles of conflict of laws.

### 13.9    Construction

The section headings contained in this Plan are for reference purposes and shall not affect in any way the meaning or interpretation of the Plan.   To the extent of any inconsistencies between the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions of the Plan shall govern.

**[This space intentionally left blank.]**

IN WITNESS WHEREOF, the undersigned have executed this Debtors' Second Amended Joint Chapter 11 Plan of Liquidation as of the date set forth above.

300 LHC, INC.

(F/K/A LYMAN HOLDING COMPANY)

300 LYLC, INC.

(F/K/A LYMAN LUMBER COMPANY)

_____
James E. Hurd, President and CEO

_____
James E. Hurd, President and CEO

300 ABC, INC.

(F/K/A AUTOMATED BUILDING COMPONENTS, INC.)

300 BMW, INC.

(F/K/A ) BUILDING MATERIALS WHOLESALERS, INC.

_____
James E. Hurd, President and CEO

_____
James E. Hurd, President and CEO

300 CCC, INC.

(F/K/A CARPENTRY CONTRACTORS CORP.)

300 CMIC, INC.

(F/K/A CONSTRUCTION MORTGAGE INVESTORS CO.)

_____
James E. Hurd, President and CEO

_____
James E. Hurd, President and CEO

300 LDC, INC.

(F/K/A LYMAN DEVELOPMENT CO.)

300 LLW, INC.

(F/K/A LYMAN LUMBER WISCONSIN, INC.)

_____
James E. Hurd, President and CEO

_____
James E. Hurd, President and CEO

300 LYP, L.L.C.

(F/K/A LYMAN PROPERTIES, L.L.C.)

300 MAC, INC.

(F/K/A MID-AMERICA CEDAR, INC.)

_____
James E. Hurd, President and CEO

_____
James E. Hurd, President and CEO

300 WLI, INC.

(F/K/A WOODINVILLE LUMBER, INC.)

300 WCS, L.L.C.

(F/K/A WOODINVILLE CONSTRUCTION
SERVICES, L.L.C.)

_____

James E. Hurd, President and CEO

_____

James E. Hurd, President and CEO


THE OFFICIAL COMMITTEE OF UNSECURED

CREDITORS


_____

John N. Wedekind, Chairperson


*/e/ Douglas W. Kassebaum*
James L. Baillie (#3980)
Douglas W. Kassebaum (#386802)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, #4000
Minneapolis, MN  55402
Telephone:  (612) 492-7000
Facsimile:  (612) 492-7077
jbaillie@fredlaw.com
dkassebaum@fredlaw.com

ATTORNEYS FOR DEBTORS

*/e/ Lorie A. Klein*
Connie A. Lahn (#0269219)
David E. Runck (#0289954)
Lorie A. Klein (#0311790)
**FAFINSKI MARK & JOHNSON, P.A.**
400 Flagship Corporate Center
775 Prairie Center Drive
Eden Prairie, Minnesota 55344
Telephone: (952) 995-9500
Facsimile: (952) 995-9577
Connie.Lahn@fmjlaw.com
David.Runck@fmjlaw.com
Lorie.Klein@fmjlaw.com

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS

## Exhibit 1

**Legal description for Cottage Grove Property:**

Lot 10, Block 1, Canadian Pacific Railway Addition, according to the recorded plat thereof, Washington County, Minnesota.

**Legal description for the General Office Property:**

PARCEL 1:   Lot 46, Auditor's Subdivision No. 120, Hennepin County, Minnesota.

Abstract Property.

PARCEL 2:   Lot 47, the Easterly Line of said Lot 47 being 183 feet Westerly of and parallel with the Westerly line of Morse alley, Auditor's Subdivision Number 120, Hennepin County, Minnesota.

Torrens Property.
Certificate of Title No. 584691.

PARCEL 3:   That part of Lot 54, "Excelsior" which lies Easterly of the Southerly extensions of the West Line of Lot 47, Auditor's Subdivision No. 120, Hennepin County, Minnesota (the Easterly Line of Lot 47 being 183 feet Westerly of and parallel with the Westerly Line of Morse Alley as shown on Auditor's Subdivision No. 120, Hennepin County, Minnesota) and Northerly of the Northerly boundary line of the Hennepin County Regional Railroad Authority which line is parallel with and 25 feet Northerly of the Former center line of the main track of the Minneapolis & St. Louis Railway Company (later known as the Chicago and North Western Transportation Company).

That part of Lot 54, Auditor's Subdivision No. 120, Hennepin County, Minnesota which lies Northerly of the Northerly boundary line of the Hennepin County Regional Railroad Authority which line is parallel with and 25 feet Northerly of the former center line of the main track of the Minneapolis & St. Louis Railway Company (Later known as the Chicago and North Western Transportation Company).

PARCEL 4:   TRACT 1:  Lot 55, Auditor's Subdivision No. 120, Hennepin County, MN.

TRACT 2:  All that piece or parcel of land lying and being in the Village of Excelsior, Hennepin County, Minnesota, described as follows, to-wit:

Commencing at a point formed by the intersection of the Easterly line of School Alley, so called, extended with the Northerly line of the abandoned right of way of the Great Northern Railway Company; thence in a Southeasterly direction along said Northerly line of said right of way 125 feet; thence at right angles to the Southerly line of said right of way; thence

5015479

in a Northwesterly direction along said Southerly line of said right of way to a point where said Easterly line of said School Alley intersects said Southerly line of said right of way; thence in a Northeasterly direction to the place of beginning.  Said line of said Alley being as shown on the original plat of the Village of Excelsior and corresponding to the Westerly line of Lots 36 and 37, on said plat, otherwise known and designated as Lot 201, Auditor's Subdivision No. 120, Hennepin County, Minnesota, and that part of adjoining vacated School Alley lying Easterly of the centerline thereof and between the extensions across it of the North and South lines of said Lot 201.

PARCEL 5:        That part of the Southwesterly 25 feet of the Hennepin County Regional Railroad Authority property in Government Lot 4, Section 34, Township 117, Range 23, lying Northeasterly of the following described line:

Commencing at the intersection of "Match Line No. 16" as shown on sheet 10 of 22, Hennepin County Regional Railroad Property Map No. 1, County Recorder Document No. 5404251 and a line which is parallel with and 25 feet Southwesterly of the former centerline of the main track of the Minneapolis and St. Louis Railway Company (Later known as the Chicago and North Western Transportation Company); thence South 58 degrees 18 minutes 05 seconds East, assumed bearing, a distance of 554.27 feet along said Southwesterly line; thence South 31 degrees 41 minutes 55 seconds West a distance of 25.00 feet to an intersection with a line which is parallel with and 50 feet Southwesterly of said former centerline of the main track and the point of beginning of the line to be described; thence South 58 degrees 18 minutes 05 seconds East a distance of 143.39 feet along said line; thence Easterly, continuing, along said line, a distance of 209.53 feet along a curve concave Northerly having a central angle of 11 degrees 56 minutes 27 seconds and a radius of 1005.37 feet to the Westerly line of Morse Avenue and said line there terminating.

Abstract Property.

**Legal description for the Longview Property:**

Parcel A

Lots 13 and 14, Mint Farm Industrial Park Plat No.1, according to the plat thereof, recorded in Volume 13 of Plats, page 71 and 72, records of Cowlitz County, Washington.

Parcel B

Those portions of Sections 30 and 31, Township 8 North, Range 2 West, of the Williamette Meridian, adjacent to and Easterly of the Easterly line of the Mint Farm Industrial Park Plat Number 1 as recorded in Volume 13, Page 71 and 72, records of the Auditor of Cowlitz County, Washington, more particularly described as follows;

BEGINNING at the Northeasterly corner of Lot 14 of said plat; thence South 00°05'23" East along the East line of said Lot 14, 359.37 feet to the Southeast corner of said Lot 14 and being

the Northerly margin of Hoehne Avenue; thence South 89°42'10" East along an extension of the said margin of Hoehne Avenue, 33.00 feet; thence North 00°05'23" West, 2058.03 feet to a point of curvature; thence on a curve to the left with a radius of 33.00 feet and a central angle of 88°22'33", an arc distance of 50.90 feet to a point of tangency; thence North 88°27'56" West, a distance of 752.76 feet to a point of intersection with the Easterly line of Tract C and the Southerly line of Crocker Avenue; thence South 00°05'23" East (called South 02°10'09" West on record of survey under Auditor's File number 3109792) along the Easterly line of Tract C and Tract B, 1752.76 feet to the Northwesterly corner of Lot 13; thence North 89°54'37" East (called South 87°49'51" East under Auditor's File Number 3109792) along the Northerly line of Lots 13 and 14, a Distance of 751.52 feet to the Point of Beginning.

Parcel C

Non-exclusive easements as described in Section 5.5 of the Amended and Restated Declaration of Protected Covenants, Conditions, Restrictions, Easements and Agreements for the Mint Farm Industrial Park, recorded March 3, 2006 under Auditor's File No. 3289842, Cowlitz County, Washington.

EXCEPT any portion lying with the public right-of-way.

ALSO EXCEPT any portion lying within the above-described Parcel A.


**Legal description for the Woodinville Property:**

PARCEL A:

THE SOUTH 300 FEET OF THAT PORTION OF THE NORTH ½ OF THE NORTHWEST ¼ OF SECTION 15, TOWNSHIP 26 NORTH, RANGE 5 EAST, W.M., LYING BETWEEN THE SAMMAMISH RIVER AND THE MAINLINE NORTHERN PACIFIC RAILROAD RIGHT OF WAY;

EXCEPT THAT PORTION DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE ABOVE-DESCRIBED MAIN TRACT;

THENCE SOUTH 88°37'50" EAST, ALONG THE NORTH LINE THEREOF, 470.68 FEET; THENCE SOUTH 01°22'10" WEST 270 FEET TO THE NORTH LINE OF THE SOUTH 30 FEET OF THE ABOVE-DESCRIBED MAIN TRACT;

THENCE NORTH 88°37'50" WEST, ALONG SAID NORTH LINE, TO THE EASTERLY MARGIN OF THE BURLINGTON NORTHERN AND SANTA FE RAIL WAY COMPANY RIGHT OF WAY (FORMERLY NORTHERN PACIFIC RAILROAD RIGHT OF WAY); THENCE NORTH 25°08'6" WEST, ALONG SAID EASTERLY MARGIN TO THE POINT OF BEGINNING;

AND EXCEPT THAT PORTION THEREOF CONDEMNED FOR RIGHT OF WAY BY DRAINAGE DISTRICT NO. 3 IN KING COUNTY SUPERIOR COURT CAUSE NO. 81311;

SITUATE IN THE CITY OF WOODINVILLE, COUNTY OF KING, STATE OF WASHINGTON.

PARCEL B:

LOT 1 OF CITY OF WOODINVILLE BOUNDARY LINE ADJUSTMENT NO. BLA-2003-0011, AS RECORDED UNDER RECORDING NO. 20031015900008, RECORDS OF KING COUNTY;

SITUATE IN THE CITY OF WOODINVILLE, COUNTY OF KING, STATE OF WASHINGTON.

PARCEL C:

LOT 2 OF CITY OF WOODINVILLE BOUNDARY LINE ADJUSTMENT NO. BLA-2003-0011, AS RECORDED UNDER RECORDING NO. 20031015900008, RECORDS OF KING COUNTY;

SITUATE IN THE CITY OF WOODINVILLE, COUNTY OF KING, STATE OF WASHINGTON.

**Exhibit 4.1.2**

**TCF Settlement Agreement**

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement") is entered into as of the 25th day of September, 2012, by and among TCF NATIONAL BANK ("TCF"); 300 LYLC, Inc. formerly known as LYMAN LUMBER COMPANY ("Lyman Lumber"); 300 LHC, Inc. formerly known as LYMAN HOLDING COMPANY ("Holding"); 300 WLI, Inc., formerly known as WOODINVILLE LUMBER, INC. ("Woodinville Lumber"); 300 ABC, Inc., formerly known as AUTOMATED BUILDING COMPONENTS, INC., 300 BMW, Inc., formerly known as BUILDING MATERIALS WHOLESALERS, INC., 300 CCC, Inc., formerly known as CARPENTRY CONTRACTORS CORP., 300 CMIC, Inc., formerly known as CONSTRUCTION MORTGAGE INVESTORS CO. CASE, 300 LDC, Inc., formerly known as LYMAN DEVELOPMENT CO., 300 LLW, Inc., formerly known as LYMAN LUMBER WISCONSIN, INC. CASE, 300 LYP, L.L.C.., formerly known as LYMAN PROPERTIES, L.L.C., 300 MAC, Inc., formerly known as MID-AMERICA CEDAR, INC., and 300 WCS, L.L.C., formerly known as WOODINVILLE CONSTRUCTION SERVICES (Lyman Lumber, Holding, Woodinville Lumber, the Affiliate Debtors (as defined below) and, if in existence, the Liquidating Entity and the Asset Assignee, the "Debtors"); and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR LYMAN HOLDING COMPANY, ET AL. ("Committee").

## R E C I T A L S :

NOW, THEREFORE, for good and sufficient consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree as follows:

**FIRST:** Pursuant to that certain Credit Agreement dated March 1, 1999 (as amended, the "First Chanhassen Credit Agreement") between Lyman Lumber and TCF, TCF agreed to extend to Lyman Lumber a term loan in the maximum principal amount of $1,875,000 (the "First Chanhassen Loan"). The First Chanhassen Loan was evidenced by a Promissory Note dated March 1, 1999 in the maximum principal amount of $1,875,000 (as amended, the "Chanhassen Note").

**SECOND:** In order to secure the repayment of the First Chanhassen Note, Lyman Lumber, among other things, executed and delivered to TCF a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "First Chanhassen Mortgage") dated March 1, 1999, which grants TCF a mortgage lien in that certain real and personal property located at 18800 and 18900 West 78th Street, Chanhassen, Hennepin County, Minnesota, as further described in the First Chanhassen Mortgage (the "Chanhassen Property").

**THIRD:** Pursuant to that certain Loan Agreement dated March 1, 1999 (the "City of Chanhassen Loan Agreement"), between Lyman Lumber and the City of Chanhassen, Minnesota (the "City"), the City agreed to extend a loan to Lyman Lumber (the "City of Chanhassen Loan") evidenced by that certain Industrial Development Refunding Revenue Note, Series 1999, in the

1

original principal amount of $1,725,000 dated March 1, 1999 (as amended, the "City of Chanhassen Note").

**FOURTH:** Pursuant to a certain Assignment of Loan Agreement dated March 1, 1999 (as amended, the "Assignment of City of Chanhassen Loan Agreement"), among Lyman Lumber, the City, and TCF, TCF agreed to purchase the City of Chanhassen Note from the City and assume all right, title, and interest in and to the City of Chanhassen Loan Agreement.

**FIFTH:**   In order to secure the repayment of the City of Chanhassen Note, Lyman Lumber has, among other things, executed a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "City of Chanhassen Mortgage") dated March 1, 1999, which granted the City a mortgage lien in the Chanhassen Property.  The City of Chanhassen Mortgage was assigned to TCF by assignment dated April 30, 1999.

**SIXTH:**   Pursuant to that certain Credit Agreement dated October 20, 2004 (as amended, the "Woodinville Credit Agreement"), among Lyman Lumber, Woodinville Lumber, and TCF, TCF agreed to extend to Lyman Lumber and Woodinville Lumber a term loan to finance that certain real and personal property located at 15900 Woodinville-Redmond Road N.E., Woodinville, King County, Washington, as further described in the Woodinville Deed of Trust (as defined below) (the "Woodinville Property") in the amount of $7,280,000 (the "Woodinville Loan") as evidenced by a Promissory Note dated October 20, 2004, in the principal amount of $7,280,000 (as amended, the "Woodinville Note").

**SEVENTH:**   In order to secure the repayment of the Woodinville Note, Woodinville Lumber, among other things, executed a Deed of Trust, Security Agreement and Fixture Financing Statement (as amended, the "Woodinville Deed of Trust") dated October 20, 2004, which grants to Transnation Title Insurance Company, as trustee for the benefit of TCF, a lien in the Woodinville Property.

**EIGHTH:** Pursuant to that certain Credit Agreement dated October 20, 2004 (as amended, the "Eau Claire Credit Agreement"), between Lyman Lumber and TCF, TCF agreed to extend to Lyman Lumber a term loan to finance that certain real and personal property located at 1700 Western Avenue N., Eau Claire, Eau Claire County, Wisconsin, as further described in the Eau Claire Mortgage (as defined below) (the "Eau Claire Property") in the amount of $2,176,000 (the "Eau Claire Loan") as evidenced by a Promissory Note dated October 20, 2004, in the principal amount of $2,176,000 (as amended, the "Eau Claire Note").

**NINTH:**   In order to secure the repayment of the Eau Claire Note, Lyman Lumber has, among other things, executed and delivered to TCF a Combination Mortgage, Security Agreement and Fixture Financing Statement

(as amended, the "Eau Claire Mortgage") dated October 20, 2004 which grants TCF a mortgage lien in the Eau Claire Property.

TENTH:   Pursuant to that certain Construction Loan and Credit Agreement dated December 7, 2006 (as amended, the "Cottage Grove Credit Agreement"), between Lyman Lumber and TCF, in part, TCF agreed to extend to Lyman Lumber two (2) advances in the maximum principal amounts of (i) $4,300,000, and (ii) $1,100,000 (collectively, the "Cottage Grove Loan") to finance that certain real and personal property located in Washington County, Minnesota, as further described in the Cottage Grove Mortgage (as defined below) (the "Cottage Grove Property").  The Cottage Grove Loan is evidenced by two individual Promissory Notes each dated December 7, 2006 in the respective amounts of (i) $4,300,000 (as amended, "Cottage Grove Note I"), and (ii) $1,100,000 (as amended, "Cottage Grove Note II"; collectively with Cottage Grove Note I, the "Cottage Grove Notes").

ELEVENTH:   In order to secure the repayment of the Cottage Grove Notes, Lyman Lumber has, among other things, executed and delivered to TCF a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "Cottage Grove Mortgage") dated December 7, 2006, which grants TCF a mortgage lien in the Cottage Grove Property.

TWELFTH:   Pursuant to that certain Credit Agreement dated October 20, 2004 (as amended, the "ABC Credit Agreement") between Debtor Automated Building Components, Inc. ("ABC") and TCF, TCF agreed to extend to ABC a term loan to finance that certain real and personal property located at 1111 – 8th Street, Chetek, Barron County, Wisconsin, as further described in the Barron County Mortgage (as defined below) (the "Barron County Property") in the amount of $976,000 (the "ABC Loan") as evidenced by a Promissory Note dated October 20, 2004, in the principal amount of $976,000 (as amended, the "ABC Note").

THIRTEENTH:   In order to secure the repayment of the ABC Note, ABC, among other things, executed and delivered to TCF a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "Barron County Mortgage") dated October 20, 2004, which granted TCF a mortgage lien in the Barron County Property.

FOURTEENTH:   In order to further secure the repayment of the ABC Note, ABC executed and delivered to TCF a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "Excelsior Mortgage") dated June 25, 2008, which granted TCF a mortgage lien in that certain real and personal property located in Excelsior, Hennepin County, Minnesota, as further described in the Excelsior Mortgage ("Excelsior Property"), in order to secure up to a total of $500,000 of indebtedness under the ABC Note.

**FIFTEENTH:** In order to further secure the repayment of Cottage Grove Note I and Cottage Grove Note II, Lyman Lumber executed and delivered to TCF a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "Second Eau Claire Mortgage") dated June 26, 2008, which granted TCF a mortgage lien up to the aggregate principal amount of $6,700,000 in the Eau Claire Property.

**SIXTEENTH:** In order to further secure the repayment of the Woodinville Note, Eau Claire Note, Cottage Grove Note I, and Cottage Grove Note II, Lyman Lumber executed a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "Second Chanhassen Mortgage") dated June 26, 2008, which granted TCF a mortgage lien up to the aggregate principal amount of $5,000,000 in the Chanhassen Property.

**SEVENTEENTH:** In order to further secure the repayment of the Chanhassen Note, City of Chanhassen Note, Woodinville Note, and Eau Claire Note, Lyman Lumber executed a Combination Mortgage, Security Agreement and Fixture Financing Statement (as amended, the "Second Cottage Grove Mortgage") dated June 26, 2008, which granted TCF a mortgage lien up to the aggregate principal amount of $2,000,000 in the Cottage Grove Property.

**EIGHTEENTH:** In order to further secure the repayment of the Chanhassen Note, City of Chanhassen Note, Eau Claire Note, Cottage Grove Note I, Cottage Grove Note II, and Woodinville's guaranty of certain obligations, Lyman Lumber and Woodinville Lumber executed a Deed of Trust, Security Agreement and Fixture Financing Statement (as amended, the "Second Woodinville Deed of Trust") dated June 26, 2008, which granted to Transnation Title Insurance Company, as trustee for the benefit of TCF, a lien in the Woodinville Property up to the aggregate principal amount of $11,000,000. Each of the Notes evidencing the Loans described herein shall be jointly referred to as the "TCF Notes." Each of the mortgages and deeds of trust granted to TCF as described herein shall be jointly referred to as the "TCF Mortgages."

**NINETEENTH:** On August 4, 2011, the Debtors filed petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court of the District of Minnesota ("Court").

**TWENTIETH:** On October 13, 2011, the Court entered an Order (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Buyer in Accordance with Asset Purchase Agreement; (II) Approving the Assumption and Assignment or Rejection of Certain Unexpired Leases and Executory Contracts; and (III) Granting Other and Further Relief – Core Business ("Sale Order"). In accordance with the terms of the Sale Order, BEP/Lyman, LLC ("Core Asset Purchaser") acquired certain assets ("Core Business Assets") of the Debtors including but not limited to the Eau Claire Property, the Chanhassen Property and the Barron County Property.

Further the Core Asset Purchaser assumed the outstanding principal balance due under the First Chanhassen Loan, the City of Chanhassen Loan, the Eau Claire Loan, and the ABC Loan. As of the closing of the sale of the Core Business Assets, the Borrower paid to TCF the then outstanding interest (but not default interest).

**TWENTY-FIRST:** The Debtors, TCF and the Committee desire to enter into an agreement regarding the treatment of TCF's remaining claims.

WHEREFORE, for good and valuable consideration, the Debtors, TCF and the Committee agree as follows:

1. <u>Acknowledgement of Recitals</u>. The Debtors, TCF and the Committee acknowledge that the Recitals herein are true and correct statements of fact.

2. <u>Definitions</u>. The following terms shall have the definitions set forth herein:

"<u>Affiliate Debtors</u>" means 300 ABC, Inc., formerly known as Automated Building Components, Inc., 300 BMW, Inc., formerly known as Building Materials Wholesalers, Inc., 300 CCC, Inc., formerly known as Carpentry Contractors Corp., 300 CMIC, Inc., formerly known as Construction Mortgage Investors Co., 300 LDC, Inc., formerly known as Lyman Development Co., 300 LLW, formerly known as Lyman Lumber Wisconsin, Inc., 300 LYP, L.L.C., formerly known as Lyman Properties, L.L.C., 300 MAC, Inc., formerly known as Mid-America Cedar, Inc., and 300 WCS, L.L.C., formerly known as Woodinville Construction Services. L.L.C.

"<u>Asset Assignee</u>" means any entity to whom the Woodinville Property and/or the Cottage Grove Property are transferred pursuant to a confirmed plan of reorganization or an order of the Court in connection with the Debtors' liquidation of their assets.

"<u>Assumed Unsecured Claim</u>" means

a) at any time prior to December 31, 2012, the sum of $11,500,000;

b) after December 31, 2012 but prior to October 1, 2013, $11,500,000 minus one of the following (whichever is applicable):

i) if no Full Claim Event has occurred, TCF does not have an Environmental Condition Claim and the Debtors timely satisfied the Full Release Conditions, $11,500,000; or

ii) if no Full Claim Event has occurred, TCF does not have an Environmental Condition Claim and the Debtors have not satisfied the Full Release Conditions but the Debtors have timely satisfied the Woodinville Release Conditions, the Minimum Woodinville Payment; or

iii) if no Full Claim Event has occurred, TCF does not have an Environmental Condition Claim and neither the Full Release Conditions nor the Woodinville Release Conditions are satisfied but the Debtors

5

timely delivered the Woodinville Deed-In-Lieu Documents, $8,000,000; or

iv)     if a Full Claim Event occurs and/or TCF has an Environmental Damage Claim, -0-; or

c)      on or after October 1, 2013, $11,500,000 minus one of the following (whichever is applicable):

i)      if no Full Claim Event has occurred and the Debtors timely satisfied the Full Release Conditions, $11,500,000; or

ii)     if no Full Claim Event has occurred and Debtors, in accordance with Section 6 have either timely delivered the Remain Claim Amount to TCF or have timely delivered the Cottage Grove Deed-In-Lieu Documents and the Cottage Grove Foreclosure Documents, $11,500,000; or

iii)    if a Full Claim Event has occurred and/or TCF has an Environmental Damage Claim, -0-;

"Cottage Grove Deed-In-Lieu Documents" means a) a fully executed and duly notarized deed in the form attached hereto as Exhibit A transferring the Cottage Grove Property to TCF, which deed shall include non-merger language and is otherwise in a form to be recorded or registered in the applicable property records; b) a bill of sale-in-lieu of foreclosure in a form attached hereto as Exhibit B; c) a Seller's Affidavit executed by the Debtor or Debtors required by TCF's title company; d) a Minnesota Form DT1 accurately completed and signed by the Debtor or Debtors required by TCF's title company; and e) FIRPTA Non-Foreign Person Affidavit.

"Cottage Grove Environmental Report" means Phase 1 Environmental Site Assessment prepared by Braun Intertec Corporation for the Cottage Grove Property dated as of January 30, 2006 and the Phase II Environmental Site Assessment  prepared by Braun Intertec Corporation for the Cottage Grove Property dated as of January 31, 2006.

"Cottage Grove Foreclosure Documents" means a) voluntary foreclosure agreement in the form attached hereto as Exhibit C duly executed by the appropriate Debtor or Debtors and notarized which shall be executed on the date delivered to TCF and shall be ineffective unless and until it is signed by TCF and otherwise in a form to be recorded or registered in the applicable property records; and b) short form voluntary foreclosure agreement in the form attached hereto as Exhibit D duly executed by the appropriate Debtor and notarized which shall be executed on the date delivered to TCF and shall be ineffective unless and until it is signed by TCF and otherwise in a form to be recorded or registered in the applicable property records.

"Environmental Damage Claim" mean, in the event that an environmental site assessment performed by TCF for either the Woodinville Property or the Cottage Grove Property indicates that there is a Recognized Environmental Condition that is not revealed in the Cottage Grove Environmental Site Assessment or the Woodinville Environmental Site Assessment, the damages that TCF suffers on account of the existence of such

Recognized Environmental Condition, including any costs and expenses incurred by TCF on account thereof, and the diminution in value to such properties on account of such Recognized Environmental Condition provided, however, that the total amount of such Environmental Damage Claim shall not exceed $1,500,000; and provided further that TCF shall not be entitled to an Environmental Damage Claim unless it is given the Debtors notice thereof on or before the 120th day following the date that the deed to the affected property is delivered to TCF; provided further that TCF shall only be entitled to an Environmental Damage Claim if it has taken title to the affected property.

"Full Claim Event" shall have the meaning ascribed to it in Section 10.

"Hazardous Substance" means those substances identified in 42 U.S.C. § 9601(14) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

"Intercreditor Agreement" means the Subordination and Intercreditor Agreement by and among the "Senior Lenders" (as that term is defined therein), the Junior Creditors and the Debtors party thereto dated as of February 12, 2009.

"Junior Creditor" or "Junior Creditors" shall have the meaning ascribed to in the Intercreditor Agreement.

"Liquidating Entity" means any entity (including one or more of the Debtors) who is designated under a confirmed plan of reorganization or by court order to liquidate the assets of the Debtor whether or not such entity holds title to the Debtors' property.

"Loan Documents" means the Notes, the TCF Mortgages, and any and all documents executed in connection with any of the foregoing, together with all amendments thereto.

"Loans" means the First Chanhassen Loan, the City of Chanhassen Loan, the Woodinville Loan, the Eau Claire Loan, the Cottage Grove Loan, and the ABC Loan.

"Minimum Woodinville Proceeds" means the greater of:  a) $7,900,000; or b) the total Net Proceeds from the sale of the Woodinville Property but not greater than $9,000,000.

"Net Proceeds" means the gross sale price for the sale of the applicable property less costs of sale that are obligations of the purchaser under the purchase agreement and the Debtors obligation for any commission owed to the broker.

"Order" shall have the meaning ascribed to it in Section 16.

"Plan" means a plan of reorganization of the Debtors (or any of them) that is confirmed by the Court.

"Property Expenses" shall have the meaning ascribed to it in Section 7.

"Prorations" shall have the meaning ascribed to it in Section 8.

"Release" means a release of mortgage or release of deed of trust release the applicable TCF Mortgage from the property in which TCF is required to deliver a "Release" in accordance with the terms of this Agreement.

"Recognized Environmental Condition" Recognized Environmental Condition" as defined by ASTM E1527-05 promulgated by ASTM International, means the presence or likely presence of any Hazardous Substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any Hazardous Substances or petroleum products into structures on the property or into the ground, ground water, or surface water of the property. The term includes Hazardous Substances or petroleum products even under conditions in compliance with laws. Recognized Environmental Condition does not include de minimis conditions that generally do not present a threat to human health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies.

"Cottage Grove Release Payment" means:   a) if the Debtors timely satisfy the Woodinville Lien Release Conditions in accordance with Section 4 and no Full Claim Event occurs, the lesser of:  i) $1,400,000 plus the Environmental Damage Claim and/or ii) $1,400,000 less the amount by which the sum paid to TCF in accordance with Section 4 exceeds the amount of $7,900,000; and b) if the Debtors do not timely satisfy the Woodinville Lien Release Conditions in accordance with Section 4 and no Full Claim Event occurs, the sum of $1,600,000 plus the Environmental Damage Claim.

"Remaining Liens" means the Woodinville Deed of Trust, the Cottage Grove Mortgage, the Second Woodinville Deed of Trust and the Second Cottage Grove Mortgage.

"Remaining Property" means the Woodinville Property and the Cottage Grove Property.

"Settlement Documents" means this Settlement Agreement, the Order, and any and all documents to be executed, either at the time of execution of this Agreement or at a later date.

"Wire Instructions" means the following wire transfer instructions for delivery of funds to TCF:

> TCF National Bank Minnesota
>  801 Marquette Ave.
> Minneapolis, MN 55402-3475
>
> ABA #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
> Credit Acct of Commercial Loan Servicing
> Account Number #10895-60
>
> Special Instructions:
> RE: Lyman Lumber/Woodinville Facility/Cottage Grove
> Attn: Barbara DeVahl, Loan Servicing Dept.

8

"<u>Woodinville Deed-In-Lieu</u>" means:  a) a fully executed and duly notarized deed in the form attached hereto as <u>Exhibit E</u> transferring the Woodinville Property to TCF, which deed shall include non-merger language and is otherwise in a form to be recorded or registered in the applicable property records; b) a bill of sale-in-lieu of foreclosure in the form attached hereto as <u>Exhibit F</u>, which bill of sale shall include non-merger language; c) a Seller's Affidavit executed by the Debtor or Debtors required by TCF's title company; and d) FIRPTA Non-Foreign Person Affidavit.

"<u>Woodinville Environmental Report</u>" means Woodinville Property Phase 1 Environmental Site Assessment prepared by Parametrix dated as of August, 2011.

3.     <u>Conditions for Release of Remaining Liens</u>.  TCF will execute and deliver to Debtors a Release which releases the Remaining Liens from the Remaining Property if and only if TCF receives the following on or before 2:00 pm Central time on December 26, 2012 (or at a later time as agreed to by TCF in writing, but no later than December 31, 2012) ("<u>Full Lien Release Conditions</u>") the sum of $9,000,000 in immediately available funds delivered pursuant to the Wire Instructions.

4.     <u>Conditions for Release of Woodinville Property</u>.  TCF will execute and deliver to Debtors a Release which releases the Woodinville Deed of Trust and the Second Woodinville Deed of Trust from the Woodinville Property if and only if TCF receives the following on or before 2:00 pm Central time on December 26, 2012 (or at a later time as agreed to by TCF in writing, but not later than December 31, 2012) ("<u>Woodinville Lien Release Conditions</u>") the Minimum Woodinville Proceeds in immediately available funds delivered pursuant to the Wire Instructions.

5.     <u>Delivery of Title to Woodinville</u>.  In the event that the Debtors fail to timely satisfy either the Full Lien Release Conditions in accordance with Section 3 or the Woodinville Lien Release Conditions in accordance with Section 4, then the Debtors shall deliver to TCF's Washington counsel or TCF's title company (as designated by TCF) on or before 10:00 am Pacific Time on December 31, 2012 the Woodinville Deed-In-Lieu Documents and shall deliver any Prorations to TCF pursuant to the Wire Instructions.

6.     <u>Remaining Claim</u>.

(a)     **Remaining Claim if Full Lien Release Conditions Satisfied.**  In the event that the Debtors timely satisfy the Full Lien Release Conditions in accordance with Section 3 and no Full Claim Event occurs, TCF shall have no remaining claim (secured or unsecured) against the Debtors.

(b)     **Remaining Claim if Woodinville Lien Release Conditions Satisfied.**  In the event that the Debtors timely satisfy the Woodinville Lien Release Conditions in accordance with Section 4 and provided no Full Claim Event occurs, TCF shall be entitled to a claim against the Debtor secured by the Cottage Grove Property pursuant to the Cottage Grove Mortgage and Second Cottage Grove Mortgage equal to i) the amounts due under the Cottage Grove Notes minus ii) the difference between A) the Minimum Woodinville Proceeds and B) the amounts due under the Woodinville Note.

9

(c)     **Remaining Claim if Debtor Timely Delivers Woodinville Deed-In-Lieu.**  If Debtors fail to timely satisfy the Woodinville Lien Release Conditions but timely deliver the Woodinville Deed-In-Lieu Documents in accordance with Section 5, and provided further that no Full Claim Event occurs, TCF shall be entitled to a claim against the Debtors secured by the Cottage Grove Property pursuant to the Cottage Grove Mortgage equal to the amounts due under the Cottage Grove Notes.

(d)     **Release of Cottage Grove Mortgages**.  TCF will execute and deliver to Debtors a Release which releases the Cottage Grove Mortgage and Second Cottage Grove Mortgage from the Cottage Grove Property if and only if the following conditions are satisfied ("Cottage Grove Lien Release Conditions"):  a) the Debtors shall have either timely satisfied the Woodinville Lien Release Conditions in accordance with Section 4 or shall have timely delivered the Woodinville Deed-In-Lieu Documents and the Woodinville Foreclosure Documents in accordance with Section 5; b) the Debtors shall have delivered to TCF the following on or before 2:00 pm Central time on September 30, 2013 the Cottage Grove Release Payment in immediately available funds delivered pursuant to the Wire Instructions.  If the Debtors do not timely satisfy the Cottage Grove Lien Release Conditions, the Debtors shall deliver the Cottage Grove Deed-In-Lieu Documents and the Cottage Grove Foreclosure Documents to TCF on or before 5:00 pm Central time on September 30, 2013 and shall deliver any Prorations to TCF pursuant to the Wire Instructions.  It is agreed and understood by the parties that the Cottage Grove Foreclosure Documents will be effective at the sole discretion of TCF in the event that TCF elects to execute Cottage Grove Foreclosure Documents and record one or both of such Cottage Grove Foreclosure Documents.

(e)     **Interest and Attorneys' Fees.**  Provided that that no Full Claim Event occurs and the Debtors timely comply with conditions herein, the Cottage Grove Notes shall not bear interest and the Debtors shall not be obligated for the Lender's attorneys' fees with respect thereto.

7.     Obligation to Maintain Properties.  Until TCF has released the TCF Mortgages encumbering the Cottage Grove Property and the Woodinville Property or such properties have been deeded to TCF as provided herein, the Debtors shall be obligated for and shall pay all costs and expenses incurred with respect to such properties including but not limited to the following ("Property Expenses"):  a) all real estate taxes, assessments or other similar obligations related to such properties; b) all insurance premiums to maintain insurance as required by the TCF Mortgages encumbering the Cottage Grove Property and the Woodinville Property; c) all costs of maintaining the property including appropriate lawn care, building maintenance and security; and d) all utilities provided to such properties.

8.     Proration for Deeds in Lieu.  For any deed in lieu, all Property Expenses shall be prorated as of the last date that the deed is to be delivered to TCF in accordance with Section 5 (December 31, 2012 for the Woodinville Property) or Section 6 (September 30, 2013 for the Cottage Grove Property).  The term "Proration" shall mean the net amount determined after prorating all Property Expenses in accordance with the preceding sentence.  Any Proration that

10

the Debtors owe TCF shall be paid to TCF pursuant to the Wire Instructions at the time that the applicable deed-in-lieu of foreclosure is delivered to TCF.  Any Proration that TCF owes to Debtors on account of the Woodinville Property shall be deducted from the Cottage Grove Release Payment.  Any Proration that TCF owes to Debtors on account of the Cottage Grove Property will be paid to Debtors at the time that the Cottage Grove Property is deeded to TCF. Notwithstanding the foregoing, the Debtors shall forfeit their right to any Prorations if there has occurred a Full Claim Event.

9.    Insurance.  Until TCF has released the TCF Mortgages encumbering the Cottage Grove Property and the Woodinville Property or such properties have been deeded to TCF as provided herein, the Debtors shall maintain insurance coverage on the Woodinville Property and the Cottage Grove Property to the full extent required by the TCF Mortgages encumbering such properties.

10.    Full Claim Event.  Until Debtors satisfy their obligations under this Agreement, TCF shall have an allowed claim against the Debtors secured by the Cottage Grove Property and the Woodinville Property pursuant to the Woodville Deed of Trust, the Second Woodinville Deed of Trust, the Cottage Grove Deed of Trust and the Second Cottage Grove Deed of Trust (subject however to reductions as provided in Section 6) for the following ("Full Claim Amount"):  a) the principal sum of $10,213,415.00; b) all accrued and unpaid interest at the default rate which shall be the sum of $383,462.77 as of August 29, 2012 and shall continue to accrue thereafter in accordance with the terms of the Cottage Grove Notes and the Woodinville Note; c) all attorneys' fees incurred by TCF which shall be the sum of $200,000.00 as of September 15, 2012 and as such fees continue to be incurred thereafter; d)  late fees in the amount of $519,298.82 as of September 19, 2012 and which shall continue to accrue in accordance with the Cottage Grove Notes, the Woodinville Note and/or any other Loan Documents related thereto; and e) costs and expenses that may be incurred after the date of this Agreement.  Provided that no Full Claim Event occurs, the Full Claim Amount shall be reduced to the extent permitted in Section 6.  TCF shall be entitled to a distribution of any general unsecured claim arising with respect to the Full Claim Amount only after there has occurred a Full Claim Event.  The occurrence of any one of the following shall be a "Full Claim Event":

(a)    The Debtors do not timely satisfy the Full Lien Release Conditions in accordance with Section 3, do not timely satisfy the Woodinville Lien Release Conditions in accordance with Section 4 and do not timely deliver the Woodinville Deed-In-Lieu Documents and the Woodinville Foreclosure Documents in accordance with Section 5.

(b)    The Debtors do not timely deliver either the Cottage Grove Release Payment or the Cottage Grove Deed-In-Lieu Documents and the Cottage Grove Foreclosure Documents in accordance with Section 6.

(c)    The Court enters an order confirming a plan of reorganization that fails to incorporate each and every obligation and condition herein and/or contradicts the terms and conditions contained herein or otherwise prevents the implementation of any terms contained herein and if neither the Debtors nor the Committee sought such order, such order is not vacated with 60 days of entry.

(d)     Any court order is sought or obtained or any stay is sought or obtained which prevents the implementation of any provision of this Agreement and if neither the Debtors nor the Committee sought such order or stay, such order or stay is not vacated within 60 days of imposition.

(e)     Any liens or encumbrances attach to either the Cottage Grove Property or the Woodinville Property after August 4, 2011 which are not released or removed by: (i) in the case of the Woodinville Property, the date that the Woodinville Deed-In-Lieu Documents are required to be delivered to TCF in accordance with Section 5; and ii) in the case of the Cottage Grove Property, the date that the Cottage Grove Deed-In-Lieu Documents and Cottage Grove Foreclosure Documents are required to be delivered to TCF in accordance with Section 6.

(f)     The Debtors fail to maintain insurance on the Cottage Grove Property and the Woodinville Property in accordance with the requirements set forth in the TCF Mortgages encumbering such properties.

(g)     The Lender obtains an environmental site assessment for the Cottage Grove Property or the Woodinville Property that indicates that there is a Recognized Environmental Condition to either such property and which condition or action was not disclosed in the Woodinville Environmental Report or the Cottage Grove Environmental Report and TCF elects not to accept title to such property.

(h)     The Debtors fail to pay all real estate taxes, assessments and similar obligations on or before the date such taxes, assessments and other obligations are due.

(i)     The Debtors or the Committee assert any claim, cause of action or otherwise pursue any recourse against the Lender whether by filing a law suit in state or federal court, commencing an adversary proceeding against the Lender, objecting to the Lender's claim in the Debtor's bankruptcy cases or through provisions contained in the Plan.

For purposes of determining TCF's Full Claim Amount, (x) the Full Claim Amount will be reduced by any amounts received by TCF in compliance with Section 4 or Section 6; (y) the Full Claim Amount will be reduced by outstanding Woodinville Note principal balance plus interest accrued through the date that the Woodinville Deed-In-Lieu Documents are delivered to TCF if prior to the Full Claim Event the Woodinville Property is deeded to TCF in accordance with Section 5; and (z) the Full Claim Amount will be reduced by the sum of $1,400,000 if prior to the Full Claim Event the Cottage Grove Property is deeded to TCF in accordance with the terms of Section 6.

11.     Remedies Upon Occurrence of a Full Claim Event/Environmental Damage Claim. Upon the occurrence of a Full Claim Event or if TCF shall incur an Environmental Damage Claim, TCF shall continue to retain an allowed claim in the Full Claim Amount or the Environmental Damage Amount (as applicable) which shall be secured by the Woodinville Property (unless the Woodinville Property has been released in accordance with Section 4) and the Cottage Grove Property (unless the Cottage Grove Property has been released in accordance with Section 6). If there has occurred a Full Claim Event, TCF shall be entitled to relief from the

12

automatic stay if it is still in effect to pursue any and all remedies available to it against Woodinville and Cottage Grove on three business days' notice and the only defense to such application for relief from stay is that no Full Claim Event has occurred.  The Plan will provide that any post-confirmation or plan injunction shall not apply to TCF with respect to its rights and remedies with respect to the Woodinville Property and the Cottage Grove Property if there has occurred a Full Claim Event.  The Plan shall preserve all rights and claims TCF may have under the Intercreditor Agreement including but not limited to the right, together with U.S. Bank National Association, to receive all distributions that would otherwise be payable to Junior Creditors for payment of the Full Claim Amount and/or the Environmental Damage Claim.

12.    Reserve for TCF Claim.  The Plan shall provide that no distribution shall be made to general unsecured creditors unless the Debtors have established and maintained a reserve ("Secured Creditor Reserve") in an amount equal to the following: a) the amount that would be distributed to TCF based on its Assumed Unsecured Claim at the time of such distribution; plus b) all amounts that would have been distributable to the Junior Creditors.  The Plan shall provide that x) no distributions shall be made to Junior Creditors prior to October 31, 2013 provided however that, if a Full Claim Event has occurred, no distributions will be made to Junior Creditors until TCF's claim has been determined by agreement of the parties or final order of the Court; y) Junior Creditors may not object after confirmation to the Plan's treatment of their distributions to the extent the treatment is consistent with and necessary to implement the terms of the Intercreditor Agreement; and z) the Secured Creditor Reserve will be maintained at a financial institution acceptable to TCF, U.S. Bank, the Debtors and the Committee.  Notwithstanding the foregoing, if the Debtors agree to provide in the Plan a different method for holding funds distributable to U.S. Bank on account of its unsecured claims and the Intercreditor Agreement ("Alternative Funds Retention"), then the Debtors shall notify TCF of the Alternative Funds Retention prior to filing the Plan and TCF shall have the option, at its sole discretion, to elect the Alternative Funds Retention in lieu of the Secured Creditor Reserve.

13.    Release of TCF.  The Debtors hereby release and forever discharge TCF as well as TCF's agents, servants, employees, directors, officers, members, attorneys, branches, affiliates, subsidiaries, successors and assigns, and all persons, firms, corporations, and organizations on their behalf (collectively all of the foregoing including TCF, the "TCF Related Entity or Entities") of and from all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever which any of the Debtors may now have or claim to have against TCF Related Entities, whether presently known or unknown, and of every nature and extent including but not limited to any such damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever on account of or in any way touching, concerning, arising out of, founded upon or relating to the Loans, the TCF Mortgages or any documents executed in connection therewith, the Debtors' bankruptcy cases, the sale of the Core Business Assets, performance by TCF under the terms and conditions of the Loan Documents, the enforcement of remedies or pursuit of collection activities with respect to the obligations or security evidenced by or referenced in any of the Loan Documents or any documents or instruments delivered in connection with any of them or any act or omission by any TCF Related Entity relating thereto, including but not limited to, all such losses or damages of any kind heretofore sustained, or that may arise as a consequence of the dealings of any Debtors, on the one hand, and any of the TCF Related Entities on the other hand up to and including the effective date of this Agreement.

13

14.    <u>Limited Release of Debtors</u>.    Provided that no Full Claim Event occurs and except for the obligations provided herein, TCF hereby releases and forever discharges the Debtors as well as Debtor's agents, servants, employees, directors, officers, members, attorneys, branches, affiliates, subsidiaries, successors and assigns, and all persons, firms, corporations, and organizations on their behalf (collectively all of the foregoing including Debtors, the "Debtor Related Entity or Entities") of and from all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever which any of the Debtors may now have or claim to have against Debtor Related Entities, whether presently known or unknown, and of every nature and extent excluding, however, any claim under this Agreement or the Loan Documents (except to the extent that the Loan Documents are modified by the terms of this Agreement).

15.    <u>Recording Fees/Registration Taxes</u>.  The Debtors shall pay any recording fees or deed taxes that may be required with respect to implementation of any all terms of this Agreement including all releases and deeds-in-lieu of foreclosure.

16.    <u>Order Approving Settlement Agreement.</u>   The parties' obligations under this Agreement and the other Settlement Documents are conditioned upon the entry of an order approving the settlement in the form attached hereto as <u>Exhibit G</u> ("Order").

17.    <u>Substitute Title Holder</u>.  TCF in its sole and exclusive discretion shall have the right to transfer or convey all right, title and interest in any of the Loan Documents, this Agreement, and/or the Settlement Documents to any party including but not limited to an affiliate or subsidiary of TCF.  TCF shall also have the right to designate a third party including but not limited to a special purpose entity which TCF directly or indirectly controls to be the transferee for any deed-in-lieu of foreclosure that is required under this Agreement.

18.    <u>Merger</u>.    All prior oral and written communications, commitments, alleged commitments, promises, alleged promises, agreements and alleged agreements by or between TCF, on the one hand, and Debtors and/or the Committee on the other hand, with respect to the subject matter of this Agreement and the other Settlement Documents are hereby merged into this Agreement, the other Settlement Documents and the Loan Documents; shall be of no force or effect; and shall not be enforceable unless expressly set forth in this Agreement, the Settlement Documents or the Loan Documents.  All commitments, promises and agreements of the parties hereto are set forth in this Agreement, the Settlement Documents and/or Loan Documents and no other commitments, promises or agreements, oral or written, of any of the parties hereto shall be enforceable against any such party.

19.    <u>No Waiver; Cumulative Remedies</u>.  No failure or delay on the part of TCF or its Nominee in exercising any right, power or remedy under this Agreement, the other Settlement Documents, the Loan Documents and/or any documents executed in connection therewith shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under this Agreement, the other Settlement Documents, the Loan Documents and/or any other document executed in connection therewith.

20.    <u>Amendments, Etc.</u>  No amendment, modification, termination or waiver of any provision of this Agreement and/or any documents executed in connection therewith or consent

to any departure by the Debtors therefrom shall be effective unless the same shall be in writing and signed or consented to, by TCF, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Debtors or the Committee in any case shall entitle the Debtors or the Committee to any other or further notice or demand in similar or other circumstances.

21.    Subrogation.  Each Debtor hereby waives all rights that such Debtor may now have or hereafter acquire, whether by subrogation, contribution, reimbursement, recourse, exoneration, contract or otherwise, to recover from another Debtor or from any property of another Debtor any sums paid pursuant to this Agreement, the Loan Documents or any other Settlement Documents.  The Debtors will not exercise or enforce any right of contribution to recover any such sums from any person who is a co-obligor with the Debtors or a guarantor or surety of the obligations under the Loan Documents or the Settlement Documents or from any property of any such person.

22.    Notices.  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under this Agreement, the other Settlement Documents and/or any documents executed in connection herewith shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, or (d) transmitted by telecopy, in each case addressed or telecopied to the party to whom notice is being given at its street address or email address as set forth below:

If to TCF:

TCF National Bank
11100 Wayzata Boulevard, Suite 600
Minnetonka, MN 55305
Attn:  Martin J. Krogman
Email:  mkrogman@tcfbank.com

With a copy to:

Oppenheimer Wolff & Donnelly LLP
Campbell Mithun Tower – Suite 2000
222 South Ninth Street
Minneapolis, MN 55402
Attn:  Steven W. Meyer
Email:  smeyer@oppenheimer.com

If to any Debtor:

Fredrikson & Byron
200 South Sixth Street
Suite 4000
Minneapolis, MN 55402
Attn:  James L. Baillie
Email:  jbaillie@fredlaw.com

15

If to the Committee:

Prior to Confirmation:

John Wedekind
16765 Luther Way
Eden Prairie, MN 55346
jwedekind@q.com

After Confirmation:

Kevin A. Barry
Conway MacKenzie, Inc.
410 South Old Woodward Avenue
Suite 340
Birmingham, MI 48009
kberry@conwaymackenzie.com

With a copy to:

Fafinski Mark & Johnson
Flagship Corporate Center
775 Prairie Center Drive
Suite 400
Eden Prairie, MN 55344
Attn:  Connie A. Lahn
Email:  connie.lahn@fmjlaw.com

or, as to each party, at such other address or telecopier number as may hereafter be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section.  All such notices, requests, demands and other communications shall be deemed to have been given on (a) the date received if personally delivered, (b) when deposited in the U.S. mail if delivered by U.S. mail, (c) the date sent if sent by overnight courier, or (d) the date of transmission if delivered by telecopy.

23.    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such portion without invalidating the remaining provisions of this Agreement, or any other agreement executed between TCF, on the one hand, and Debtors or any of them, on the other hand, or affecting the validity or enforceability of such provisions in any other jurisdiction.

24.    Headings.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.

25.    Jurisdiction, Venue and Exclusive Forum.  This Agreement is to be construed and interpreted in accordance with the laws of the State of Minnesota.  The exclusive forum for the resolution of any and all disputes concerning this Agreement shall be the Court or, if for any reason the Court does not have jurisdiction over such dispute, then in Hennepin County District Court, Hennepin County, Minnesota.  The parties hereto hereby (i) consent to the personal

16

jurisdiction in the State of Minnesota in connection with any controversy related to this Agreement; and (ii) waive any argument that venue in any such forum is not convenient.

26.    <u>Waiver of Jury Trial</u>. THE UNDERSIGNED WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH ANY PARTIES TO THIS AGREEMENT ARE INVOLVED DIRECTLY OR INDIRECTLY AND ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, AND WHETHER ARISING OR ASSERTED BEFORE OR AFTER THE DATE OF THIS AGREEMENT.

27.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  The Plan will specifically provide that there provisions hereof will be binding on the any Liquidating Entity or Asset Assignee.

28.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.  With the consent of TCF, signatures may be exchanged by email, with original signatures to follow.  Subject to TCF's consent, each party hereto agrees that it will be bound by its own telecopied signature and that it accepts the telecopied signatures of the other parties hereto.

*(Signatures on Following Pages)*

*(Signature Page of Settlement Agreement)*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the day and year first above written.

TCF NATIONAL BANK

By: _____

Its: _Senior Vice President_

By: _____

Its: _Vice President_

*(Signature Page of Settlement Agreement)*

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR LYMAN HOLDING
COMPANY, ET AL.

By:_____

Its:____Chairman____

*(Signature Page of Settlement Agreement)*

300 LYLC, Inc. formerly known as LYMAN LUMBER COMPANY; 300 LHC, Inc, formerly known as LYMAN HOLDING COMPANY; 300 WLI, Inc., formerly known as WOODINVILLE LUMBER, INC.; 300 ABC, Inc., formerly known as AUTOMATED BUILDING COMPONENTS, INC., 300 BMW, Inc., formerly known as BUILDING MATERIALS WHOLESALERS, INC., 300 CCC, Inc., formerly known as CARPENTRY CONTRACTORS CORP., 300 CMIC, Inc., formerly known as CONSTRUCTION MORTGAGE INVESTORS CO. CASE, 300 LDC, Inc., formerly known as LYMAN DEVELOPMENT CO., 300 LLW, Inc. formerly known as LYMAN LUMBER WISCONSIN, INC. CASE, 300 LYP, L.L.C., formerly known as LYMAN PROPERTIES, L.L.C., 300 MAC, Inc., formerly known as MID-AMERICA CEDAR, INC., and 300 WCS, L.L.C., formerly known as WOODINVILLE CONSTRUCTION SERVICES, L.L.C.

By: _____

Their: _____

20

## **Exhibit 5.2**

### **Oversight Committee By-Laws**

## BY-LAWS OF THE OVERSIGHT COMMITTEE
### In re Lyman Lumber Company, *et al.*

### Case No. 11-45191 (Jointly Administered)

1.    <u>THE COMMITTEE</u>

      1.1.    <u>Appointment of Committee</u>. On August 9, 2011, the United States Trustee for the District of Minnesota, under the authority conferred by Section 1102(a)(1) of Title 11, United States Code ("<u>Bankruptcy Code</u>"), appointed the Official Committee of Unsecured Creditors ("<u>Unsecured Committee</u>") of Lyman Holding Company, Case No., 11-45190; Lyman Lumber Company, Case No. 11-45191; Automated Building Components, Inc., Case No. 11-45192; Building Materials Wholesalers, Inc., Case No. 11-45193; Carpentry Contractors Corp., Case No. 11-45194; Construction Mortgage Investors Co., Case No. 11-45196; Lyman Development Co., Case No. 11-45199; Lyman Lumber of Wisconsin, Inc., Case No. 11-45201; Lyman Properties, L.L.C., Case No. 11-45202; Mid-America Cedar, Inc., Case No. 11-45203; Woodinville Lumber, Inc., Case No. 11-45204; and Woodinville Construction Services, L.L.C., Case No. 11-45206 (collectively, the "<u>Debtors</u>"), currently pending in the United States Bankruptcy Court for the District of Minnesota ("<u>Bankruptcy Court</u>"). Pursuant to the Joint Chapter 11 Plan of Liquidation of the Debtors and Official Committee of Unsecured Creditors dated _____, 2012 ("<u>Plan</u>"), and confirmed on _____, 2012, all Estate Assets[1] became part of the Liquidating Fund, which shall be used to liquidate remaining Estate Assets and distribute the proceeds according to the terms of the Plan under the direction of the Liquidating Agent. Also pursuant to the Plan, the Unsecured Committee was dissolved and this Oversight Committee ("<u>Committee</u>") was appointed to undertake the powers and duties granted to it as set forth in the Plan, including monitoring the Liquidating Agent and all activities set forth in the Plan.

      1.2.    The members of the Committee are referred to individually herein as a "<u>Member</u>" and collectively as the "<u>Members</u>." The functions of the Committee are set forth in the Plan. Although the Unsecured Committee has been dissolved, all Members shall continue to have the duties imposed upon committee members pursuant to 11 U.S.C. § 1103.

      1.3.    <u>Membership</u>. The Committee is composed of the Members listed in <u>Exhibit A</u>, which also identifies the representatives for the respective Members where appropriate. The Committee shall initially consist of four Members who served as members on the Unsecured Committee.

      1.4.    <u>Chairperson</u>. The Committee has selected Thea Dudley, representative of Guardian Building Products, as its chairperson ("<u>Chairperson</u>"). In the event the Chairperson resigns or for any other reason is unable to serve, the majority of the Members entitled to vote shall choose a successor. Additionally, such a majority may at any time, with or without cause, replace the Chairperson at: (i) a meeting called with at least three days' advance written notice, or (ii) a meeting attended by all Members.

---

[1] The terms Estate Assets, Liquidating Fund, and Liquidating Agent have the definitions set forth in the Plan.

1.5.    Professionals.  The Unsecured Committee previously retained the law firm of Fafinski Mark & Johnson, P.A., to serve as the Unsecured Committee's general bankruptcy counsel.

1.6.    Other Professional Persons.  The Committee has retained Conway MacKenzie, Inc., as the Liquidating Agent.   The Liquidating Agent is entitled to retain professionals to assist in its duties and to pay such professionals reasonable compensation and expenses, subject to the consent of the Oversight Committee.   Through execution of these By-Laws, the Committee consents to the Liquidating Agent's retention of the law firm of Fafinski Mark & Johnson, P.A., to serve as the Liquidating Agent's general bankruptcy counsel ("Counsel").

1.7.    Resignation.  A Member may resign at any time by giving written notice thereof to the Liquidating Agent and a copy to Counsel.

1.8.    Replacement of Representative of Member.   If any representative of a Member that is a corporate entity resigns, dies, is no longer employed by, or is no longer an agent of the Member represented, or for any other reason is unable to serve, the Member represented shall have the absolute right to designate a successor representative or alternate, as the case may be, which shall be any authorized employee or agent of such Member.

1.9.    Resignation, Removal, and Replacement Members.   In the event of the resignation or removal of any Member of the Committee, the Committee shall perform all of its functions with its reduced number (disregarding such vacancy for purposes of determining a majority).   The Committee may act with as few as two (2) members.   If the resignation or removal reduces the number of members to less than two (2) members, then one successor Member shall be appointed by the remaining Member and the Liquidating Agent.

2.    MEETINGS AND ACTION BY THE COMMITTEE.

2.1.    Calling and Notice.  Meetings of the Committee may be called by the Chairperson, the Liquidating Agent, or by Counsel, and shall be called by Counsel, the Liquidating Agent, or the Chairperson upon the request of two of the voting Members.  Notice of the time and place of each meeting of the Committee shall be given to each Member and its counsel no less than two (2) business days in advance of such meeting except when such notice is impractical or unreasonable due to exigent circumstances.  No notice of an adjourned meeting need be given, other than by announcement at the meeting at which the adjournment is taken and by reasonable notice (under the circumstances) to any Members and their counsel who were not present at such meeting.  The Committee shall endeavor, whenever feasible, to determine at each meeting when the next meeting shall be held.  If feasible, each notice of a meeting shall be in writing; if not, notice may be given orally, by telephone or otherwise.

2.2.    Place of Meetings; Meetings by Conference Call.   Meetings of the Committee shall be held at such place as designated by the Committee.  Meetings shall be held in person or by conference call.

2

2.3.    <u>Meeting Agenda</u>.  The agenda for regularly scheduled meetings shall be prepared by Counsel.  Any Member or the Liquidating Agent may supplement the Agenda by circulating additional items by email to all other Members, the Liquidating Agent, and Counsel. If feasible, a proposed agenda will be circulated to each Member, the Liquidating Agent, and Counsel at least one (1) business day in advance of each Committee meeting.

2.4.    <u>Quorum</u>.  A majority of all voting Members shall constitute a quorum for the transaction of business at any meeting.  A quorum shall include Members attending in person, by Proxy (with respect to any Committee votes within the scope of such Proxy), and by telephone connection as long as such connection is sufficient for all attending Members to hear each other attending Member (in each such case, such Member deemed to be "<u>Present</u>").

2.5.    <u>Voting; Polling by Telephone</u>.  Each voting Member shall be entitled to one vote, and may attend and vote (a) in person by its representative, or (b) through a designated alternate.  Subject to Section 2.7, all issues to be voted on shall be decided by a simple majority of those present at the meeting in which the vote takes place.  Each Member shall have the right to authorize any other Member to cast the Member's vote for them ("<u>Voting by Proxy</u>") in the event that the Member is not able to attend or participate by telephone in a meeting.  Action of the Committee shall be authorized by the vote of a majority of the Members Present at the time of the vote if there is a quorum.  A Member who abstains shall be counted as voting.  A Member recused from voting under Section 2.7 shall not be counted as voting.  Because the Committee is initially comprised of an even number of Members, if there is a tie vote on an issue other than a vote under Section 2.7(b), the Liquidating Agent (although not a Member) shall be entitled to vote on that issue.  In the event a Member resigns or is removed, Section 1.10 of these By-Laws addresses replacement Members and voting under those circumstances.

The designation of alternates at meetings may be in such form, written or oral, as may be acceptable to the Chairperson, upon advice of Counsel.  If the matter to be voted on is one of significance and urgency, as determined by a majority of the Members Present, with the advice of Counsel, a reasonable effort shall be made during the meeting to poll by telephone or email all absent Members, provided that the failure to reach any such absent Member will not affect the validity of any vote otherwise proper under these By-Laws.  Telephone or email votes solicited pursuant to this section, along with Votes by Proxy, shall be given full voting effect, and may be counted in computing a quorum in respect of the relevant action.  Attendance at meetings of the Committee shall be limited to Members, their respective counsel, the Liquidating Agent, professionals or agents employed or retained by the Committee, and other persons invited by the Committee for special or limited purposes.

2.6.    <u>Action Without Meeting</u>.  Any action required or permitted to be taken by the Committee, or any subcommittee, may be taken without a meeting provided that a reasonable effort is made to contact each Member or subcommittee member for its vote and to notify each <u>ex officio</u> member of the pendency of such action, and the action voted on is approved by no less than a majority of the entire Committee or subcommittee then acting as such.  Such polling shall be conducted by the Chairperson or by Counsel acting upon the direction of the Chairperson, or by the chairperson of a subcommittee.  Any action taken pursuant to this section shall be

memorialized in writing and filed with the minutes of the Committee subcommittee, as the case may be.

2.7.    <u>Conflicts of Interest</u>.    In the event that any matter under review or consideration by the Committee may involve a conflict of interest with respect to any Member, such Member shall disclose such potential conflict of which he or she has knowledge, shall be removed from voting on the matter voluntarily or, if determined by the Committee to involve a conflict of interest, may be excluded by vote of a majority of the Members then Present and not subject to such conflict of interest from that portion of the meeting at which such matter is considered.

(a)    A Member shall be deemed to have an irrebuttable conflict in matters concerning:  (1) any potential or actual Causes of Action (as that term is defined in the Plan) asserted against the Member; and (2) any potential or actual Contested Claim (as that term is defined in the Plan) involving a claim asserted by the Member.

(b)    Counsel shall make a determination as to whether a Member should be excluded from a meeting or any portion thereof and shall submit a recommendation to the Committee in respect of each potential conflict unless the Member voluntarily abstains from voting or otherwise participation in the consideration of the matter giving rise to a potential conflict.  Any Member subject to an alleged conflict of interest that does not fall within the scope of Section 2.7(a) shall be provided with a reasonable opportunity to be heard and to provide other Members with additional information and/or refute any allegations of its alleged conflict of interest prior to any Committee vote regarding such Member's alleged conflict of interest. Whether a conflict of interest exists as to a particular Member or group of Members will be determined on an individual basis and each Member shall have the opportunity to be heard and have the Committee vote in connection with its alleged conflict of interest.  For the purpose of a vote under this Section to exclude a particular Member from a meeting, the Member not allowed to vote shall not be counted for a quorum.  Also, for purposes of a vote under this Section, if Counsel recommended that more than one Member be excluded from a meeting for a substantially similar reason ("<u>Excluded Members</u>"), and if one or more of the Excluded Members requests a reasonable opportunity to be heard on the conflict issue, the Excluded Members shall not be entitled to vote on whether a conflict of interest exists on that issue for any other Excluded Member.  Additionally, for the purpose of a vote under this Section, a majority vote is required to overrule Counsel's recommendation to the Committee on issues of potential conflicts.  For clarification, in the event of a tie vote, Counsel's recommendation is adopted.

(c)    Consistent with the foregoing, the Member having a conflict of interest shall not have access to summaries, analyses, reports or work product prepared by the professionals of the Committee with respect to the matter in which the conflict of interest exists, except to the extent determined to be appropriate under the circumstances in the discretion of the Committee.

(d)    Each Member of the Committee retains the right to appear in the Chapter 11 cases of the Debtors in respect of its own interests and to take a position different from that of the Committee, provided, however, that no Member shall purport to represent or speak for the Committee in connection therewith.  Nothing contained in these By-Laws shall: (i) prevent any Member from exercising or seeking to enforce or protect any of its rights as an

individual creditor or other party-in-interest; or (ii) otherwise affect the ability of any Member to act in its capacity as an individual creditor or other party-in-interest as it may deem appropriate, whether or not such actions are opposed by the Committee.

3.    ACTION BY REPRESENTATIVES OF THE COMMITTEE

      3.1.    Chairperson.    The Chairperson shall preside at the meetings of the Committee.  Subject to the vote of the Committee, the Chairperson shall have such powers and duties as are set forth in these By-Laws or as the Committee assigns to him.

      3.2.    Emergency Motions.    Subject to Section 2.5, the Chairperson, with the advice of Counsel, or Counsel shall be empowered, without prior Committee action or consent, to consent to or otherwise act upon applications or motions for court orders on an emergency basis if the Chairperson, with the advice of Counsel, or Counsel determines that it is not feasible to obtain a vote of the Committee pursuant to these By-Laws.  The Chairperson and Counsel will make best efforts under the circumstances to communicate with as many Members of the Committee as possible before taking any such actions.  The Committee shall be advised of any court orders, motions or applications so acted upon by the Chairperson pursuant to this section promptly thereafter.

      3.3.    Subcommittees.    The Committee may, with the advice of Counsel, form one or more subcommittees to serve at the Committee's pleasure, with such powers and duties as the voting Members of the Committee shall determine.

      3.4.    Professionals' Actions.    The Committee's professionals shall act at the request of the Committee (or, when appropriate, a subcommittee) or the Chairperson, and shall perform the duties specified in their respective orders of retention, together with such implementing duties as are set forth in these By-Laws or as may be requested by the Chairperson, the Committee, or a subcommittee.

      3.5.    Secretary.    There shall be no secretary for the Committee.  In lieu thereof, Counsel shall maintain minutes of the meetings which shall include a list of the Members Present and the Committee action with respect to any motion or resolution.  The minutes shall be circulated to the Members for approval as soon as practicable.

4.    MISCELLANEOUS.

      4.1.    Ex Officio Members.    There shall be no ex officio members of the Committee without the express approval of the Committee upon a vote of the majority of participating members voting on such issue.  Such ex officio members shall be subject to any and all restrictions contained in these By-Laws including, but not limited to, Section 4.2.  Ex officio members shall not be permitted to vote on any matters.

      4.2.    Confidentiality.    Except to the extent otherwise required by 11 U.S.C. § 1102:  (i) all information, documents and matters of whatever nature and kind disclosed to the Committee (unless such information becomes generally available to the Committee on a non-confidential basis); (ii) all information or documents generated by the Committee, or by any of

the Committee's professionals, the Liquidating Agent, or by any of the Committee's professionals, or by any Member or counsel to any Member for the Committee's use; and (iii) all communications between Members in their capacity as such, including information regarding specific positions taken by Members, and all matters discussed at Committee meetings and the minutes thereof (collectively, (i), (ii) and (iii) are referred to as "Confidential Information"), are confidential and shall not be disclosed or revealed to third parties in any manner whatsoever, except that a Member may share any such Confidential Information with its attorneys and financial consultants, provided that the person or entity receiving such disclosure agrees to be and is bound by these rules of confidentiality.

With respect to any required disclosure of Confidential Information by a Member to a third party by order of a court of appropriate jurisdiction, such Member shall promptly advise Counsel of such disclosure or prospective disclosure and shall reasonably cooperate with Counsel's efforts to obtain a protective order or other appropriate remedy to protect the confidentiality of such information.  With respect to any required disclosure of Confidential Information relating to the Debtors, the Member shall advise Counsel as promptly as reasonably possible prior to such disclosure, and Counsel shall immediately notify the Debtors and the Debtors' counsel so that the Debtors may seek a protective order or other appropriate remedy to protect the confidentiality of such information.

4.3.    Causes for Removal From Committee.  Upon receiving a recommendation from the Liquidating Agent, a Member, or Counsel, the Committee may elect to remove a Member under the following circumstances:

(a)    For a breach of any of his/her fiduciary duties as a Member;

(b)    For a breach of Section 4.2 of these By-Laws;

(c)    For conduct that would warrant removal of a member of any committee by the United States Trustee or the court pursuant to 11 U.S.C. §§ 1102-1103.

A Member may be removed by the affirmative vote of not less than two-thirds of the Members entitled to vote on such matters.

4.4.    Media Communications.  No Member shall communicate directly with the public or the media as a representative of the Committee, unless the Committee has so authorized the communication to be made by majority vote.  Nothing in these By-Laws shall preclude any Member from sharing public, non-confidential information concerning this bankruptcy case with other creditors.

4.5.    Expenses.  Reasonable and actual expenses of the Committee and of Members incurred in connection with Committee business may be submitted to the Liquidating Agent, with a copy to Counsel, in order to seek reimbursement from the estate pursuant to Section 5.2 of the Plan.  Unless approved in advance by the Chairperson, with the advice of Counsel, reasonable expenses shall not include the expenses of any person other than a designated representative of a Member, an alternate, or a person invited by the Committee or by the Chairperson to attend a Committee meeting or participate in a Committee-related function.

Requests for reimbursement shall be itemized and reasonably detailed, and shall include receipts where practicable.

       4.6.    <u>Amendments</u>.  These By-Laws may be amended, repealed or adopted by the vote of a majority of the Members of the Committee entitled to vote.

       4.7.    <u>Execution of These By-Laws</u>.  These By-Laws may be executed in any number of counterparts, each of which shall constitute an original, and all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to these By-Laws by telecopier or email shall be as effective as delivery of a manually-executed counterpart of a signature page of these By-Laws.

       **IN WITNESS WHEREOF**, the undersigned Members have executed these By-Laws on this _____ day of _____, 2012.

_____

Member:  **Central States Pension Fund**
By:       Timothy C. Reuter
Its:      Attorney

_____

Member:  **Guardian Building Products**
By:       Thea Dudley
Its:      Division Credit Director

_____

Member:  **Craig MacKay**

_____

Member:  **James G. Penberthy**

## EXHIBIT A

## BY-LAWS OF THE OVERSIGHT COMMITTEE

*In re Lyman Lumber Company, et al.*
**Case No. 11-45191 (Jointly Administered)**

| COMMITTEE MEMBER | REPRESENTATIVES |
| --- | --- |
| James Penberthy | |
| Guardian Building Products | Thea Dudley |
| Craig MacKay | |
| Central States Pension Fund | Timothy Reuter |

**<u>Exhibit 6.5(a)</u>**

**Junior Creditors**

**Exhibit 6.5A**

## Junior Creditors

| NAME | ISSUING DEBTOR[1] | CONSIDERATION | AMOUNT[2] |
|---|---|---|---|
| A.L. Laurent Revocable Trust | Lyman Lumber Co. | Promissory Note | $ 63,614.57 |
| Alexander G. & Joyce E Stewart Living Trust | Lyman Lumber Co. | Promissory Note | $ 93,202.38 |
| Amato, Dennis J. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 320,787.12 |
| Amato, Dennis J. | Building Material Wholesalers | Subordinated Debenture | $ 17,672.88 |
| Amato, Dennis J. | Automated Building Components | Subordinated Debenture | $ 50,979.48 |
| Amato, Dennis J. | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 41,463.28 |
| Annalee Hanson Revocable Trust | Lyman Lumber Co. | Promissory Note | $ 454,439.43 |
| Anne G. Ziemer Revocable Trust | Lyman Lumber Co. | Promissory Note | $ 27,521.43 |
| Arno W. Windsor Revocable Trust 10/13/1998 | Lyman Lumber Co. | Promissory Note | $ 168,169.14 |
| Bachman, Donna | Lyman Lumber Co. | Promissory Note | $ 148,568.55 |
| Bates, Mike & Cheryl | Lyman Lumber Co. | Subordinated Debenture | $ 5,437,808.14 |
| Benson, Carl & Carmen | Lyman Lumber Co. | Promissory Note | $ 202,842.79 |
| Blanchard, Glen H. & Marilyn J. | Lyman Lumber Co. | Promissory Note | $ 66,868.26 |
| Bolesta, Cindy | Lyman Lumber Co. | Subordinated Debenture | $ 67,972.61 |
| Brown, Katherine M. & Will C. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 230,372.96 |
| Bruce, Maureen R. & James W. | Lyman Lumber Co. | Promissory Note | $ 66,956.19 |
| Buford T. Miller Sr. IRA | Lyman Lumber Co. | Subordinated Debenture | $ 787,747.44 |
| Bush, Jasper T.W. | Lyman Lumber Co. | Subordinated Debenture | $ 27,189.06 |
| Bush, Kathleen G. | Lyman Lumber Co. | Promissory Note | $ 83,188.10 |
| Bush, Madeline L. | Lyman Lumber Co. | Subordinated Debenture | $ 27,189.06 |
| Bush, Robert D. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 226,197.51 |
| Bush, Steven R. W. | Lyman Lumber Co. | Subordinated Debenture | $ 402,936.96 |
| Bush, Walter J. & Katherine | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 67,972.61 |
| Caridad Corp. | Lyman Lumber Co. | Subordinated Debenture | $ 237,904.11 |
| Caroline Gagne 1992 Trust | Building Material Wholesalers | Subordinated Debenture | $ 13,594.53 |
| Caroline Gagne 1992 Trust | Automated Building Components | Subordinated Debenture | $ 40,783.57 |
| Caroline Gagne 1992 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 27,189.04 |
| Dale J. Carlson Trust | Lyman Lumber Co. | Subordinated Debenture | $ 135,945.20 |
| David J. Peterson Revocable Trust | Lyman Lumber Co. | Promissory Note | $ 257,071.18 |
| David Wilson Capital Guard Trust Company | Lyman Lumber Co. | Subordinated Debenture | $ 67,972.61 |
| Erdman, Dale A. & Carol M. | Lyman Lumber Co. | Promissory Note | $ 129,965.20 |

---

[1] In some cases, one or more debtors are also co-borrowers and/or guarantors of the debt of the issuing debtor.

[2] This exhibit will not be construed to be a waiver of the right to object to any claims listed herein on any applicable grounds.

**Exhibit 6.5A**

| NAME | ISSUING DEBTOR | CONSIDERATION | AMOUNT |
|------|----------------|---------------|--------|
| Estate of Catherine E. Wood | Lyman Lumber Co. | Promissory Note | $  69,374.76 |
| Fass, Teresa J. | Lyman Lumber Co. | Promissory Note | $  178,860.53 |
| Fiecke, Cory | Lyman Lumber Co. | Promissory Note | $  184,504.51 |
| Forner, Linda J. & Leo J. | Lyman Lumber Co. | Promissory Note | $  30,454.90 |
| Frauendienst, Harlan & Janice | Lyman Lumber Co. | Promissory Note | $  105,681.84 |
| Gagne, Robert | Lyman Lumber Co. | Subordinated Debenture | $  27,189.04 |
| Gagne, Victoria | Lyman Lumber Co. | Subordinated Debenture | $  539,229.06 |
| Gagne, Victoria | Automated Building Components | Subordinated Debenture | $  36,252.09 |
| Gagne, Victoria | Lyman Lumber of Wisconsin | Subordinated Debenture | $  13,594.53 |
| Gilpin, John D. & Cynthia L. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $  584,327.91 |
| Goodpaster Trust Dated 12/8/92 | Lyman Lumber Co. | Promissory Note | $  39,450.68 |
| Grace Hall Dahlbeck et al | Lyman Lumber Co. | Promissory Note | $  35,020.85 |
| Grace Marie Lowe 1994 Trust | Building Material Wholesalers | Subordinated Debenture | $  27,189.04 |
| Grace Marie Lowe 1994 Trust | Automated Building Components | Subordinated Debenture | $  27,189.06 |
| Grace Marie Lowe 1994 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $  27,189.04 |
| GST Trust fbo Victoria Bush Pajeski | Lyman Lumber Co. | Promissory Note | $  59,736.52 |
| H.E. Harrison Family Trust | Lyman Lumber Co. | Promissory Note | $  141,127.40 |
| Hall, Duane | Lyman Lumber Co. | Promissory Note | $  96,095.55 |
| Hall, Richard S. & Marcella W. | Lyman Lumber Co. | Promissory Note | $  28,482.71 |
| Hanson, Anne | Lyman Lumber Co. | Subordinated Debenture | $  434,301.37 |
| Hanson, Anne | Building Material Wholesalers | Subordinated Debenture | $  40,783.57 |
| Hemphill, Beth | Lyman Lumber Co. | Promissory Note | $  221,418.78 |
| Hoagland, Carol & Cory | Lyman Lumber Co. | Promissory Note | $  133,671.97 |
| Hovde, Thad | Lyman Lumber Co. | Promissory Note | $  101,928.13 |
| Hugh E. Gilmore Trust | Lyman Lumber Co. | Promissory Note | $  243,726.19 |
| Hughes, Ronald N. & Shirlee L. | Lyman Lumber Co. | Promissory Note | $  134,658.25 |
| Hurd, James | Lyman Lumber Co. | Subordinated Debenture | $  135,945.22 |
| Hurst, William C. | Lyman Lumber Co. | Subordinated Debenture | $  67,972.61 |
| Huston Family Trust 5/12/01 | Lyman Lumber Co. | Promissory Note | $  144,634.67 |
| Jeanne Figura Intervivios Trust | Lyman Lumber Co. | Subordinated Debenture | $  27,189.04 |
| Jerome & Ardella Kalkes Living Trust | Lyman Lumber Co. | Promissory Note | $  191,259.05 |
| Jessica M. Sterrett 1997 Trust | Lyman Lumber Co. | Subordinated Debenture | $  13,594.53 |
| Jessica M. Sterrett 1997 Trust | Building Material Wholesalers | Subordinated Debenture | $  27,189.04 |
| Jessica M. Sterrett 1997 Trust | Automated Building Components | Subordinated Debenture | $  42,143.04 |
| Jessica M. Sterrett 1997 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $  13,594.53 |
| John B. MacWherter Revocable Trust | Lyman Lumber Co. | Promissory Note | $  265,192.88 |
| Johnson, Brad Donald | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $  608,422.90 |
| Johnson, Brad Donald | Automated Building Components | Subordinated Debenture | $  81,567.14 |

2

**Exhibit 6.5A**

| NAME | ISSUING DEBTOR | CONSIDERATION | AMOUNT |
|---|---|---|---|
| Johnson, Janet L. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $  4,826,407.13 |
| Johnson, Janet L. | Building Material Wholesalers | Subordinated Debenture | $  68,108.52 |
| Johnson, Janet L. | Automated Building Components | Subordinated Debenture | $  110,795.41 |
| Johnson, Janet L. | Lyman Lumber of Wisconsin | Subordinated Debenture | $  110,115.58 |
| Johnson, Jeff P. & Barbara J. | Lyman Lumber Co. | Subordinated Debenture | $  271,890.42 |
| Johnson, Randall | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $  259,502.14 |
| Johnson, Randall | Automated Building Components | Subordinated Debenture | $  81,567.14 |
| Johnston, Jim W. | Lyman Lumber Co. | Subordinated Debenture | $  13,594.53 |
| Karen Sosted Foot Revocable Trust | Lyman Lumber Co. | Promissory Note | $  43,823.42 |
| Kasner, Gary P. | Lyman Lumber Co. | Promissory Note | $  122,893.31 |
| Keller, Mark J. & Connie C. | Lyman Lumber Co. | Promissory Note | $  107,716.70 |
| Kerber, Steven U. & Rebecca A. | Lyman Lumber Co. | Promissory Note | $  28,704.31 |
| Kevitt Excavating, Inc. | Lyman Lumber Co. | Promissory Note | $  696,816.09 |
| Kevitt Excavating, Inc. | Lyman Lumber Co. | Promissory Note | $  707,407.90 |
| Kevitt, Scott | Lyman Lumber Co. | Promissory Note | $  1,577,445.94 |
| Knecht, Murray & Larae | Lyman Lumber Co. | Promissory Note | $  194,674.39 |
| Konetchy, Kevin J. | Lyman Lumber Co. | Subordinated Debenture | $  142,742.52 |
| Konezny Family Trust | Lyman Lumber Co. | Promissory Note | $  97,095.22 |
| Korby, Richard & Carole | Lyman Lumber Co. | Promissory Note | $  131,465.17 |
| Lano, V. Rebecca | Lyman Lumber Co. | Promissory Note | $  165,779.17 |
| Lanzo, Jack & Barbara | Lyman Lumber Co. | Promissory Note | $  100,083.77 |
| Larson, Shirley M. & Kim R. | Lyman Lumber Co. | Promissory Note | $  75,071.94 |
| Liester, Timothy G. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $  343,514.07 |
| Lorraine Besonen Revocable Trust | Lyman Lumber Co. | Promissory Note | $  78,930.06 |
| Lowe, Gerald M. & Carol A. | Lyman Lumber Co. | Subordinated Debenture | $  375,208.84 |
| Lowe, Gerald M. & Carol A. | Automated Building Components | Subordinated Debenture | $  19,032.36 |
| Lowe, Thomas P. & Margaret L | Lyman Lumber Co. | Promissory Note | $  27,499.38 |
| Lowe, Thomas P. Jr. | Lyman Lumber Co. | Subordinated Debenture | $  539,229.03 |
| Lowe, Thomas P. Jr. | Automated Building Components | Subordinated Debenture | $  77,035.66 |
| Lowe, Thomas P. Jr. | Lyman Lumber of Wisconsin | Subordinated Debenture | $  13,594.53 |
| Lukenbach, Bridget & David | Lyman Lumber Co. | Subordinated Debenture | $  40,783.57 |
| MacGregor Gagne 1992 Trust | Building Material Wholesalers | Subordinated Debenture | $  13,594.53 |
| MacGregor Gagne 1992 Trust | Automated Building Components | Subordinated Debenture | $  40,783.57 |
| MacGregor Gagne 1992 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $  27,189.04 |
| MacKay, Craig & Kate | Lyman Lumber Co. | Subordinated Debenture | $  7,544,958.87 |
| Madole, Susan | Lyman Lumber Co. | Subordinated Debenture | $  135,945.20 |
| Madole, Susan | Building Material Wholesalers | Subordinated Debenture | $  19,576.10 |
| Madole, Susan | Automated Building Components | Subordinated Debenture | $  9,063.02 |

**Exhibit 6.5A**

| NAME | ISSUING DEBTOR | CONSIDERATION | AMOUNT |
|---|---|---|---|
| Margaret L. Lowe 2006 Trust | Lyman Lumber Co. | Promissory Note | $ 127,989.58 |
| Margaret L. Lowe Trust | Lyman Lumber Co. | Subordinated Debenture | $ 275,855.31 |
| Margaret L. Lowe Trust | Automated Building Components | Subordinated Debenture | $ 2,175.12 |
| Margaret L. Lowe Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 20,391.75 |
| Mary Webb Miller IRA | Lyman Lumber Co. | Subordinated Debenture | $ 92,986.53 |
| Meuwissen, Mary J. | Lyman Lumber Co. | Promissory Note | $ 42,133.66 |
| Miller Jr., Buford T. & Katherine D. | Lyman Lumber Co. | Promissory Note | $ 1,025,153.36 |
| Miller, Mary | Lyman Lumber Co. | Subordinated Debenture | $ 1,783,601.04 |
| Miller, Mary | Building Material Wholesalers | Subordinated Debenture | $ 29,364.16 |
| Miller, Mary | Automated Building Components | Subordinated Debenture | $ 242,435.63 |
| Miller, Mary | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 54,378.08 |
| Minnetonka County Club et al | Lyman Lumber Co. | Promissory Note | $ 590,660.45 |
| Nguyen, Kim Nhung | Lyman Lumber Co. | Promissory Note | $ 261,998.56 |
| Pajeski, R. Hurish & Victoria Bush | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 609,205.69 |
| Pajeski, R. Hurish & Victoria Bush | Automated Building Components | Subordinated Debenture | $ 28,341.82 |
| Patricia L. Anderson Revocable Trust | Lyman Lumber Co. | Promissory Note | $ 86,891.54 |
| Payne, Marshall | Automated Building Components | Subordinated Debenture | $ 9,063.03 |
| Payne, Robert Jr. | Lyman Lumber Co. | Subordinated Debenture | $ 101,958.95 |
| Payne, Robert Jr. | Building Material Wholesalers | Subordinated Debenture | $ 9,788.06 |
| Payne, Robert Jr. | Automated Building Components | Subordinated Debenture | $ 122,350.74 |
| Payne, Robert Jr. | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 54,378.08 |
| Payne, Virginia | Lyman Lumber Co. | Subordinated Debenture | $ 339,863.02 |
| Payne, Virginia | Building Material Wholesalers | Subordinated Debenture | $ 40,783.57 |
| Payne, Virginia | Automated Building Components | Subordinated Debenture | $ 304,703.50 |
| Payne, Virginia | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 46,221.40 |
| Penberthy, James G. | Lyman Lumber Co. | Promissory Note | $ 245,010.35 |
| Perkins, Alec H. | Lyman Lumber Co. | Subordinated Debenture | $ 40,783.57 |
| Perkins, Serena | Lyman Lumber Co. | Subordinated Debenture | $ 536,983.57 |
| Perkins, Serena | Automated Building Components | Subordinated Debenture | $ 20,391.75 |
| Perkins, Serena | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 76,129.31 |
| Perry Jr., Richard W. & Debbie J. | Lyman Lumber Co. | Promissory Note | $ 115,378.19 |
| Peterson, Paul W. & Sharon L. | Lyman Lumber Co. | Promissory Note | $ 227,299.10 |
| Peterson, Peter A. & Joseph W. | Lyman Lumber Co. | Promissory Note | $ 242,811.05 |
| Richard Figura Trust | Lyman Lumber Co. | Subordinated Debenture | $ 135,945.22 |
| Robert D. Bush Revocable Trust | Automated Building Components | Subordinated Debenture | $ 28,341.82 |
| Robert Gagne 1992 Trust | Building Material Wholesalers | Subordinated Debenture | $ 13,594.53 |
| Robert Gagne 1992 Trust | Automated Building Components | Subordinated Debenture | $ 40,783.57 |
| Robert Gagne 1992 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 27,189.04 |
| Rust, Lucille | Lyman Lumber Co. | Promissory Note | $ 319,548.04 |

4

**Exhibit 6.5A**

| NAME | ISSUING DEBTOR | CONSIDERATION | AMOUNT |
|------|----------------|---------------|--------|
| Ruth B. Witrak et al | Lyman Lumber Co. | Promissory Note | $ 561,593.49 |
| Ryan, Stephen T. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 174,959.60 |
| Sage L. Sterrett 1995 Trust | Lyman Lumber Co. | Subordinated Debenture | $ 16,313.46 |
| Sage L. Sterrett 1995 Trust | Building Material Wholesalers | Subordinated Debenture | $ 34,122.24 |
| Sage L. Sterrett 1995 Trust | Automated Building Components | Subordinated Debenture | $ 35,209.83 |
| Sage L. Sterrett 1995 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 13,594.53 |
| Sally J. Hurd Revocable Trust | Lyman Lumber Co. | Subordinated Debenture | $ 135,945.20 |
| Sally J. Hurd Revocable Trust | Automated Building Components | Subordinated Debenture | $ 54,378.08 |
| Scheible, Dr. Robert F. | Lyman Lumber Co. | Promissory Note | $ 53,801.71 |
| Scheible, James William | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 380,458.13 |
| Scheible, Steven A. & Pamela S. | Lyman Lumber Co. | Promissory Note | $ 104,131.08 |
| Schlenk, Gerald W. & Lois A. | Lyman Lumber Co. | Promissory Note | $ 29,831.53 |
| Schoen, Timothy J. | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 393,407.24 |
| Schumacher, Barbara | Lyman Lumber Co. | Promissory Note | $ 135,700.72 |
| Shermer, Harold & Darlene | Lyman Lumber Co. | Promissory Note | $ 243,833.10 |
| Shermer, Kevin & Stacy | Lyman Lumber Co. | Promissory Note | $ 183,240.50 |
| Sophia E. Bush 2002 Trust | Lyman Lumber Co. | Subordinated Debenture | $ 74,769.63 |
| Statz, Wilbert & Linda | Lyman Lumber Co. | Promissory Note | $ 114,206.27 |
| Steadman, Bruce C. & Barbara A. | Lyman Lumber Co. | Promissory Note | $ 44,564.48 |
| Stensvold, James | Lyman Lumber Co. | Subordinated Debenture | $ 108,756.16 |
| Sterrett, Carolyn | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 715,872.07 |
| Sterrett, Carolyn | Building Material Wholesalers | Subordinated Debenture | $ 40,783.57 |
| Sterrett, Carolyn | Automated Building Components | Subordinated Debenture | $ 77,035.66 |
| Sterrett, Carolyn | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 40,783.57 |
| Stone, Nancy | Lyman Lumber Co. | Promissory Note | $ 145,657.15 |
| SVK Development, LLC | Lyman Lumber Co. | Promissory Note | $ 398,424.37 |
| The J. Amato GST Exempt Trust | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 320,787.10 |
| The J. Amato GST Exempt Trust | Building Material Wholesalers | Subordinated Debenture | $ 17,672.88 |
| The J. Amato GST Exempt Trust | Automated Building Components | Subordinated Debenture | $ 50,979.48 |
| The J. Amato GST Exempt Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 41,463.28 |
| The Marital Trust | Lyman Lumber Co. | Promissory Note | $ 100,505.43 |
| The Ronald D. Puhl Trust | Lyman Lumber Co. | Promissory Note | $ 97,095.22 |
| Theis, Roger & Beth | Lyman Lumber Co. | Subordinated Debenture | $ 67,972.61 |
| Thomas P. Lowe IV 2000 Trust | Lyman Lumber Co. | Subordinated Debenture | $ 29,907.99 |
| Thomas P. Lowe Trust | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 1,493,644.59 |
| Thomas P. Lowe Trust | Automated Building Components | Subordinated Debenture | $ 1,359.48 |
| Thomas P. Lowe Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 40,783.00 |

**Exhibit 6.5A**

| NAME | ISSUING DEBTOR | CONSIDERATION | AMOUNT |
|------|----------------|---------------|--------|
| Thomas Parker Lowe IV 2000 Trust | Building Material Wholesalers | Subordinated Debenture | $ 28,548.51 |
| Thomas Parker Lowe IV 2000 Trust | Automated Building Components | Subordinated Debenture | $ 13,594.53 |
| Thomas Parker Lowe IV 2000 Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 28,548.51 |
| Thomas, Victor Cameron Jr. | Lyman Lumber Co. | Promissory Note | $ 108,332.79 |
| Thomford, William F. | Lyman Lumber Co. | Subordinated Debenture | $ 16,313.46 |
| Victoria Bush Pajeski Trust | Lyman Lumber Co. | Promissory Note | $ 241,274.59 |
| Waldron, Mariellen | Lyman Lumber Co. | Subordinated Debenture | $ 312,674.02 |
| Walter L. Bush III Trust | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 243,518.57 |
| Walter L. Bush Jr. Revocable Trust | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 6,920,571.42 |
| Walter L. Bush Jr. Revocable Trust | Building Material Wholesalers | Subordinated Debenture | $ 135,945.20 |
| Walter L. Bush, Jr. Revocable Trust | Automated Building Components | Subordinated Debenture | $ 183,526.07 |
| Walter L. Bush, Jr. Revocable Trust | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 174,009.83 |
| Walters, Mary Webb | Building Material Wholesalers | Subordinated Debenture | $ 72,050.96 |
| Walters, Mary Webb | Lyman Lumber Co. | Subordinated Debenture | $ 20,391.75 |
| Webb, Lyman | Lyman Lumber Co. | Promissory Note and Subordinated Debenture | $ 3,951,989.78 |
| Webb, Lyman | Building Material Wholesalers | Subordinated Debenture | $ 29,364.16 |
| Webb, Lyman | Automated Building Components | Subordinated Debenture | $ 208,449.30 |
| Webb, Lyman | Lyman Lumber of Wisconsin | Subordinated Debenture | $ 100,599.48 |
| Wedekind, Elizabeth J. | Lyman Lumber Co. | Promissory Note | $ 100,532.37 |
| Wedekind, John N. & Jolynn | Lyman Lumber Co. | Subordinated Debenture | $ 135,945.20 |
| Wheeler, Brook S. | Lyman Lumber Co. | Subordinated Debenture | $ 20,391.75 |
| Windrath, Mary Beth & Paul | Lyman Lumber Co. | Promissory Note | $ 201,142.14 |
| Withrak et al, Bohdan | Lyman Lumber Co. | Promissory Note | $ 508,618.07 |
| Zirbes, John P. | Lyman Lumber Co. | Subordinated Debenture | $ 27,189.04 |

## Exhibit 6.5(b)

**Form of Subordination Agreement**

## SUBORDINATION AND INTERCREDITOR AGREEMENT

THIS SUBORDINATION AND INTERCREDITOR AGREEMENT (this "Agreement") is made and entered into as of February 12, 2009, by and among the "Senior Lenders" and the "Junior Creditors", with the acknowledgement of the "Borrowers" (each as defined below).

## RECITALS

WHEREAS, Lyman Lumber Company ("Lyman"), Construction Mortgage Investors Co. ("CMIC"), Mid-America Cedar, Inc. ("MAC"), Lyman Development Co. ("LDC"), Woodinville Lumber, Inc. ("WLI"), Woodinville Construction Services, L.L.C. ("WCS"), Carpentry Contractors Corp. ("CCC"), Lyman Properties, L.L.C. ("LP"), Automated Building Components, Inc. ("ABC"), Building Material Wholesalers, Inc., a Minnesota corporation ("BMW"), and Lyman Lumber of Wisconsin, Inc., a Minnesota corporation ("LLW") (individually a "Borrower" and collectively the "Borrowers"), and U.S. Bank National Association ("U.S. Bank"), Wells Fargo Bank, National Association ("Wells Fargo"), M&I Marshall & Ilsley Bank, Bank of America, N.A., JPMorgan Chase Bank, N.A. ("JPMorgan"), and The Prudential Insurance Company of America (individually a "Revolving Loan Lender" and collectively the "Revolving Loan Lenders") have entered into a Ninth Amended and Restated Credit Agreement dated on or about the date hereof (as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted thereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, or replacements of or to the arrangements provided therein, whether provided by the Revolving Loan Agent (as defined below), or any successor thereto or other Revolving Loan Lender, in each case as permitted thereunder, and all refinancings and refundings thereof, collectively the "Revolving Loan Credit Agreement"), under which U.S. Bank acts as administrative agent for the Revolving Loan Lenders (in such agent capacity, the "Revolving Loan Agent"), and pursuant to which, among other things, the Revolving Loan Lenders have agreed to make, subject to the terms and conditions set forth therein, certain loans and financial accommodations to the Borrowers in the aggregate principal amount of up to $40,000,000, comprised of a revolving credit facility in the principal amount of up to $40,000,000, with a $3,000,000 sublimit for issuance of standby letters of credit (the "Revolving Loan Debt").

WHEREAS, Lyman Holding Company, a Minnesota corporation ("LHC"), has guaranteed, among other things, the payment and performance of all obligations under the Revolving Loan Credit Agreement pursuant to an Affiliate Guaranty Agreement dated on or about the date hereof (the "Revolving Loan Guaranty").

WHEREAS, U.S. Bank issued for the account of Lyman an irrevocable direct-pay letter of credit in the original stated amount of $4,371,000 ("Letter of Credit") in connection with the issuance by the City of Montrose, Minnesota of certain Variable Rate Demand Industrial Development Revenue Bonds (Lyman Lumber Company Project), Series 2001 in the original principal amount of $4,300,000, and Lyman, CMIC, MAC, LDC, WLI, WCS, CCC, and LP (the "Original Borrowers") agreed to repay drafts drawn on the Letter of Credit pursuant to that certain Fourth Amended and Restated Reimbursement Agreement dated on or about the date hereof (as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted thereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, or replacements of or to the arrangements provided therein, whether provided by the Letter of Credit Bank (as defined below) or any successor thereto, in each case as permitted thereunder, and all refinancings and refundings thereof, collectively the "Montrose Reimbursement Agreement"), by and between the Original Borrowers, as co-obligors, and U.S. Bank, as letter of credit bank (the "Letter of Credit Bank").

WHEREAS, LHC, ABC, BMW and LLW have guaranteed, among other things, the payment and performance of all obligations under the Montrose Reimbursement Agreement pursuant to an Affiliate Guaranty Agreement dated on or about the date hereof (the "Montrose Guaranty").

WHEREAS, the Original Borrowers, U.S. Bank, and such other lenders as may become a party to the Longview Loan Agreement (as defined below) (collectively, the "Longview Lenders"), have entered into a Fourth Amended and Restated Loan Agreement dated on or about the date hereof (as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted thereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, or replacements of or to the arrangements provided therein, whether provided by the Longview Loan Agent (as defined below) or any successor thereto or other Longview Loan Lender, in each case as permitted thereunder, and all refinancings and refundings thereof, collectively the "Longview Loan Agreement"), under which U.S. Bank also acts as administrative agent for the Longview Lenders (in such agent capacity, the "Longview Loan Agent"), and pursuant to which, among other things, the Longview Lenders made a loan in the original principal amount of $7,484,000 to the Original Borrowers for the acquisition and development of real estate located in Longview, Washington (the "Longview Loan").

WHEREAS, LHC, ABC, BMW and LLW have guaranteed, among other things, the payment and performance of all obligations under the Longview Loan Agreement pursuant to an Affiliate Guaranty Agreement dated on or about the date hereof (the "Longview Loan Guaranty").

WHEREAS, the Borrowers, Wells Fargo, as administrative agent for, and one of, the Equipment Loan Lenders (as defined below) (in such agent capacity, the "Equipment Loan Agent"; and together with the Revolving Loan Agent and the Longview Loan Agent, collectively, the "Senior Agents") and JPMorgan (Wells Fargo, JPMorgan and such other lenders as may become a party to the Equipment Loan Credit Agreement (as defined below) shall be individually referred to herein as a "Equipment Loan Lender" and collectively as the "Equipment Loan Lenders") have entered into a Second Amended and Restated Credit Agreement dated on or about the date hereof (as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted thereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, or replacements of or to the arrangements provided therein, whether provided by the Equipment Loan Agent (as defined below) or any successor thereto or other Equipment Loan Lender, in each case as permitted thereunder, and all refinancings and refundings thereof, collectively the "Equipment Loan Credit Agreement"), pursuant to which, among other things, the Equipment Loan Lenders have agreed to make, subject to the terms and conditions set forth in the Equipment Loan Credit Agreement, certain loans and financial accommodations to the Borrowers in the aggregate original principal amount of $4,943,828.77 as of December 12, 2008.

WHEREAS LHC, guaranteed the payment and performance of all obligations under the Equipment Loan Credit Agreement pursuant to an Affiliate Guaranty Agreement dated on or about the date hereof (the "Equipment Loan Guaranty").

WHEREAS, one or more of Lyman, WLI, ABC and TCF have entered into the following instruments: (i) Credit Agreement and Loan Agreement, each dated March 1, 1999, relating to indebtedness evidenced by Promissory Notes in the original principal amounts of $1,875,000 and $1,725,000 and secured by mortgages covering property located in Chanhassen, Minnesota, Cottage Grove Minnesota, and Woodinville, Washington, (ii) Credit Agreement dated October 20, 2004 relating to indebtedness evidenced by a Promissory Note in the original principal amount of $2,176,000 and secured by mortgages covering property located in Eau Claire, Wisconsin, Sharon, Wisconsin, Chanhassen, Minnesota, Cottage Grove, Minnesota and Woodinville, Washington, (iii) Credit Agreement

dated October 20, 2004 relating to indebtedness evidenced by a Promissory Note in the original principal amount of $1,660,000 and secured by mortgages covering property located in Sharon, Wisconsin, Eau Claire, Wisconsin, Chanhassen, Minnesota, Cottage Grove, Minnesota and Woodinville, Washington, (iv) Credit Agreement executed by Lyman and Woodinville dated October 20, 2004 relating to indebtedness evidenced by a Promissory Note in the original principal amount of $7,280,000 and secured by deeds of trust and mortgages covering property located in Woodinville, Washington, Chanhassen, Minnesota, and Cottage Grove, Minnesota,  (v) Construction Loan and Credit Agreement dated December 7, 2006 relating to indebtedness evidenced by Promissory Notes in the original principal amounts of $4,300,000 and $1,100,000 and secured by mortgages covering property located in Cottage Grove, Minnesota, Sharon, Wisconsin, Eau Claire, Wisconsin, Chanhassen, Minnesota, and Woodinville, Washington, and (vi) Credit Agreement dated October 20, 2004 relating to indebtedness evidenced by a Promissory Note in the original principal amount of $976,000 and secured by mortgages covering property located Chetek, Wisconsin and Excelsior, Minnesota (as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted thereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, or replacements of or to the arrangements provided therein, whether provided by TCF or any successor thereto, in each case as permitted thereunder, and all refinancings and refundings thereof, collectively the "TCF Credit Agreements").

WHEREAS, LHC, CMIC, MAC, LDC, WCS, CCC, LP, ABC, BMW and LLW guaranteed the payment and performance of all obligations under the TCF Credit Agreements pursuant to an Affiliate Guaranty Agreement dated on or about the date hereof (the "TCF Loan Guaranty").

WHEREAS, the Borrowers have issued and delivered to each Junior Creditor either (i) one or more promissory notes dated on or about the date hereof (all such promissory notes, as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted hereunder, shall be referred to herein individually as a "Junior Note" and collectively as the "Junior Notes") in the principal amounts stated in each applicable Junior Note, or (ii) one or more Registered Debentures subject to a Debenture Forbearance Agreement dated on or about the date hereof (all such debentures and related agreements, as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted hereunder, shall be referred to herein individually as a "Junior Debenture" and collectively as the "Junior Debentures") (all indebtedness evidenced by and obligations under such Junior Notes and Junior Debentures shall be individually referred to herein as a "Junior Loan" and collectively the "Junior Loans").

WHEREAS, each Junior Creditor that holds a Junior Debenture has previously executed and delivered to the Revolving Loan Agent one or more Subordination Agreements (the "Old Subordination Agreements") and desires that this Agreement amend and restate such Old Subordination Agreements.

WHEREAS, as one of the conditions precedent to the agreement of the Senior Lenders to consummate the transactions contemplated by the Senior Debt Documents (as defined below), the Senior Lenders have required the execution and delivery of this Agreement by the Junior Creditors, with the acknowledgement of the Borrowers.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

## DEFINITIONS

In addition to the definitions contained in the recitals above or in any other section of this Agreement, the following terms shall have the following meanings in this Agreement:

"Adjusted EBITDA" shall have the meaning given it in the Revolving Loan Credit Agreement or other Senior Debt Documents.

"Bankruptcy Code" shall mean the provisions of Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as from time to time hereinafter amended, and any successor or similar statute.

"Collateral" shall mean all assets and properties of any kind whatsoever, real or personal, tangible or intangible and wherever located, of any Loan Party (including any stock or other equity securities), whether now owned or hereafter acquired, and upon which a Lien is now or hereafter granted or purported to be granted by such Person in favor of a Secured Creditor, as security for all or any part of the Senior Debt and the proceeds (including insurance proceeds) thereof.

"Enforcement Action" shall mean any action (whether in or outside of a Proceeding) by the Junior Creditors under the Junior Debt Documents, applicable law or otherwise, to (a) exercise any right of set-off or recoupment on account of the Junior Debt with respect to a Loan Party, (b) take possession or control of, or sell or otherwise realize or foreclose upon, dispose of, liquidate, or otherwise restrict or interfere with the use of, or exercise any other rights or remedies with respect to, any Collateral, (c) commence, continue or participate in (other than as a defendant, co-defendant or party in interest in defense of its own interests) any Proceeding or other collection or enforcement action of any kind, against any Loan Party or any assets of any Loan Party (including any insolvency, bankruptcy, dissolution or liquidation proceeding), in any case, seeking, directly or indirectly, to enforce any rights or remedies (including any action to have the automatic stay vacated in any Proceeding), or to enforce any of the obligations incurred by any Loan Party, under or in connection with the Junior Debt or the Junior Debt Documents, (d) commence or pursue any judicial, arbitral or other proceeding or legal action of any kind, seeking injunctive or other equitable relief to prohibit, limit or impair the commencement or pursuit by the Secured Creditors of any of their rights or remedies under or in connection with the Senior Debt Documents or otherwise available to the Secured Creditors under applicable law, (e) cause any Loan Party to have any redemption or mandatory prepayment obligation, or exercise any put rights, with respect to the Junior Debt, (f) cause the delivery of any notice, claim or demand relating to the Collateral to any Person in the possession or control of any Collateral or acting as bailee, custodian or agent for any holder of a Lien in respect of any Collateral, (g) commence any action to retain, or direct or cause a Loan Party to retain, a restructuring officer, crisis manager or similar Person in respect of a Loan Party, or (h) support any other Person (other than the Secured Creditors) in pursuit of any of the actions described in clauses (a), (b), (c), (d), (e), (f) or (g) hereinabove.

"Finally Paid" or "Final Payment" when used in connection with the Senior Debt, shall mean the full and final payment in cash of all of the Senior Debt (other than indemnification obligations not then asserted or due), the expiration, cancellation or cash collateralization (in an amount equal to 105% of the maximum amount that may be drawn thereon) of all letters of credit issued under the Senior Debt Documents, and the irrevocable termination of the Senior Lenders' obligations to make loans or other advances under the Senior Debt Documents.

"Fixed Charge Coverage Ratio" shall have the meaning given it in the Revolving Loan Credit Agreement or other Senior Debt Documents.

"Guarantor" shall mean any guarantor under the Revolving Loan Guaranty, the Montrose Guaranty, the Longview Loan Guaranty, the Equipment Loan Guaranty, or the TCF Loan Guaranty.

"Junior Creditor" shall mean each party that joins this Agreement under a Joinder Agreement pursuant to Section 10.2 hereof, acting in his, her or its capacity as a holder of Junior Debt, thereby agreeing to become a party to, to be bound by, and to comply with the provisions hereof in the same manner as if an original signatory hereto.

"Junior Debt" shall mean the Junior Loans evidenced by the Junior Notes or the Junior Debentures and all other amounts now or hereafter owed by any Borrower or LHC to the Junior Creditors under the Junior Notes, the Junior Debentures or any other Junior Debt Documents, including all loans, advances, debts, liabilities, obligations, indemnities, covenants and duties owing to any Junior Creditor from Borrowers or LHC (or any of them individually or collectively) of any kind, present or future, evidenced by or arising out of this Agreement (including amounts that must be turned over by any Junior Creditor to any Senior Lender hereunder) or any of the Junior Debt Documents, including any profit participations or similar arrangements, and whether for the payment of money, whether arising out of overdrafts on checking, deposit or other accounts or electronic funds transfers (whether through automatic clearing houses or otherwise) or out of any Junior Creditors' non-receipt of, or inability to collect, funds or otherwise not being made whole in connection with depository transfer checks or other similar arrangements and whether direct or indirect (including acquired by assignment), related or unrelated, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired, and including all interest, charges, expenses, fees and any other sums chargeable to Borrowers or LHC (or any of them individually or collectively) in connection with any of the foregoing, and all other indebtedness and liabilities (including all principal, interest (including interest accruing after the commencement of a Proceeding whether or not such interest is an allowed claim), default interest, fees, charges and collection expenses) now or hereafter owed by the Borrowers or LHC (or any of them individually or collectively) under any Junior Debt Document.  For all purposes hereunder, the Junior Debt shall also include all indebtedness, obligations and liabilities of the Borrowers or LHC (or any of them individually or collectively) to repay any amounts previously paid by them pursuant to the Junior Debt Documents, which amounts have been returned to the Borrowers or LHC (or any of them individually or collectively), to their bankruptcy estate, to a trust or similar structure established under a plan of reorganization or liquidation of the Borrowers or LHC (or any of them individually or collectively) or to a trustee or similar Person by any Junior Creditor pursuant to Sections 542, 544, 545, 547, 548, 549, 550, 553 and 724(a) of the Bankruptcy Code or otherwise under other applicable legislation.

"Junior Debt Documents" shall mean the collective reference to the Junior Notes, the Junior Debentures, and all other security documents, guarantees and other agreements or instruments entered into by the Borrowers or any other Loan Party in favor of the Junior Creditors evidencing or securing the Junior Debt.

"Junior Default" shall mean a default in the payment of the Junior Debt (whether following the maturity thereof or otherwise) or any other default under or non-compliance with the Junior Debt Documents, in any such case permitting the Junior Creditors to immediately (without giving effect to Section 1.6) accelerate (with or without the giving of notice, the passage or time, or both) the maturity of all or any portion of the Junior Debt.

"Junior Default Notice" shall mean a written notice from the Borrowers or the Junior Creditors to Senior Lenders pursuant to which Senior Lenders are notified of the occurrence of a Junior Default, which notice incorporates a reasonably detailed description of such Junior Default.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever and any contingent or other agreement to provide any of the foregoing.

"Loan Party" or "Loan Parties" shall mean, respectively, individually and collectively, the Borrowers, the Guarantors and any other Person now or hereafter obligated (whether as a guarantor, co-borrower, surety, accommodation party or otherwise) on any of the Senior Debt.

"Payment Blockage Period" shall mean the period which begins on the date that a Senior Default exists or would be created by the making of any payment in respect of the Junior Debt, and ending on the earliest to occur of (i) the date on which such Senior Default is waived or cured by written notice to the Borrowers from the Senior Lender or Senior Lenders under whose Senior Debt Documents such Senior Default exists, (ii) the date on which all of the Senior Debt has been Finally Paid, or (iii) the commencement of a Proceeding, in which case the provisions of Section 1.5 hereof shall apply.

"Payment Conditions" means, collectively, with respect to any Scheduled Payment, each of the following conditions precedent:

> (i)    there shall not exist at the time of such Scheduled Payment any breach of this Agreement by any Junior Creditor which has not been waived, in writing, by the Senior Agents and TCF;

> (ii)    at the time of such Scheduled Payment, no Senior Default shall exist and be continuing;

> (iii)    unless the Senior Debt has been Finally Paid, after giving *proforma* effect to such Scheduled Payment, Borrowers shall have Revolving Credit Availability of at least $12,500,000;

> (iv)    unless the Senior Debt has been Finally Paid, after giving *proforma* effect to such Scheduled Payment, Borrowers shall have a Fixed Charge Coverage Ratio, as of the date of such Scheduled Payment (if it is to occur on the last day of a calendar month) or the last day of the calendar month most recently ended prior thereto, for the period of twelve (12) consecutive calendar months then-ended, of at least 1.30 to 1.00;

> (v)    such Scheduled Payment, if made, would not give rise to the occurrence of any Senior Default; and

> (vi)    as of the date of such Scheduled Payment, no Proceeding involving any Borrower or any other Loan Party or any of their respective property or assets shall have been commenced.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or governmental authority.

"Proceedings" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the reorganization, recapitalization, liquidation, dissolution or other winding up of a Person (including, without limitation, any such proceeding under the Bankruptcy Code).

"Revolving Credit Availability" shall have the meaning given it in the Revolving Loan Credit Agreement or other Senior Debt Documents.

"Scheduled Payments" shall have the meaning set forth in Section 2.2 hereof.

"Secured Creditor" shall mean the Senior Lenders and the Senior Agents, individually and collectively.

"Senior Debt" shall mean all loans, advances, debts, liabilities, obligations, indemnities, covenants and duties owing to any Senior Lender by the Borrowers or any other Loan Party (or any of them individually or collectively) of any kind, present or future, evidenced by or arising out of this Agreement or any of the Senior Debt Documents, and whether for the payment of money, whether arising out of overdrafts on checking, deposit or other accounts or electronic funds transfers (whether through automatic clearing houses or otherwise) or out of any Senior Lender's non-receipt of, or inability to collect, funds or otherwise not being made whole in connection with depository transfer checks or other similar arrangements and whether direct or indirect (including acquired by assignment), related or unrelated, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired, and including all interest, charges, expenses, fees and any other sums chargeable to any Loan Party (or any of them individually or collectively) in connection with any of the foregoing, and including any refinancing or refunding of any of the foregoing, and all other indebtedness and liabilities (including all principal, interest (including interest accruing after the commencement of a Proceeding whether or not such interest is an allowed claim), default interest, fees, charges and collection expenses) now or hereafter owed by the Borrowers or any other Loan Party under any Senior Debt Document. For all purposes hereunder, the Senior Debt shall also include all indebtedness, obligations and liabilities of any Loan Party to repay any amounts previously paid by any such Loan Party pursuant to the Senior Debt Documents, which amounts have been returned to the Loan Party, to the Loan Party's bankruptcy estate, to a trust or similar structure established under a plan of reorganization or liquidation of the Loan Party or to a trustee or similar Person by any Senior Lender pursuant to Sections 542, 544, 545, 547, 548, 549, 550, 553 and 724(a) of the Bankruptcy Code or otherwise under other applicable legislation.

"Senior Debt Documents" shall mean the collective reference to the Revolving Loan Credit Agreement, the Revolving Loan Guaranty, the Montrose Reimbursement Agreement, the Montrose Guaranty, the Longview Loan Agreement, the Longview Loan Guaranty, the Equipment Loan Credit Agreement, the Equipment Loan Guaranty, the TCF Credit Agreements, the TCF Loan Guaranty, and all notes, security documents, guaranties and other agreements or instruments executed by any Borrower or any other Loan Party in connection therewith, as the same may be amended, supplemented or otherwise modified or restated from time to time as permitted thereunder, including, without limitation, amendments, modifications, supplements and restatements thereof giving effect to renewals, extensions, restructurings, or replacements of or to the arrangements provided therein, whether provided by any Senior Agent, or any successor thereto, or by any other Senior Lender, in each case as permitted thereunder, and all documents entered into in connection with any refinancing or refunding thereof.

"Senior Default" shall mean any Senior Non-Payment Default or any Senior Payment Default under any of the Senior Debt Documents.

"Senior Default Notice" shall mean a written notice from any of the Senior Agents or TCF to the Junior Creditors pursuant to which the Junior Creditors are notified of the occurrence of a Senior Default, which notice incorporates a reasonably detailed description of such Senior Default.

"Senior Lenders" shall mean U.S. Bank, Wells Fargo and TCF, acting in any of their capacities under the Senior Debt Documents, including as the Senior Agents, together with all other lenders party to the Senior Debt Documents and together with any replacement lender that is substituted for any of the foregoing pursuant to Section 10.1.

"Senior Non-Payment Default" shall mean any Event of Default (each as defined under the respective Senior Debt Documents) arising by reason of the failure of any Loan Party to perform or comply with any term or condition contained in the Senior Debt Documents not constituting a Senior Payment Default.

"Senior Payment Default" shall mean any Event of Default (each as defined under the respective Senior Debt Documents) under any of the Senior Debt Documents that arises out of the failure of any Loan Party to make any payment due under any of the Senior Debt Documents.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Minnesota; *provided, however*, to the extent the law of any other state or other jurisdiction applies to the attachment, perfection, priority or enforcement of any Lien granted to any Person in any of the Collateral, "UCC" means the Uniform Commercial Code as in effect in such other state or jurisdiction for purposes of the provisions hereof relating to such attachment, perfection, priority or enforcement of a Lien in such Collateral.  To the extent this Agreement defines the term "Collateral" by reference to terms used in the UCC, each of such terms shall have the broadest meaning given to such terms under the UCC as in effect in any state or other jurisdiction.

### Section 1       SUBORDINATION.

**Section 1.1**      Subordination.  To the extent and in the manner hereinafter set forth in this Agreement, each of the Junior Creditors agrees that, whether in or outside of a Proceeding, the Junior Debt is hereby expressly made subordinate, junior and subject in right of payment and remedies enforcement to the Final Payment of the Senior Debt.

**Section 1.2**      Restriction on Payments.  Notwithstanding any provision of the Junior Debt Documents to the contrary, and in addition to any other limitations set forth herein or therein, except as expressly permitted under Section 1.3, no payment of principal, interest or any other amount due with respect to the Junior Debt shall be made by or received from any Borrower or any other Loan Party, and none of the Junior Creditors shall exercise any right of set-off or recoupment with respect to the Junior Debt or apply any property or assets of any Loan Party to the purchase or other acquisition or retirement of any Junior Debt, until the Senior Debt is Finally Paid.

**Section 1.3**      Permitted Payments.  Notwithstanding Section 1.2, so long as all of the Payment Conditions are fully satisfied, the Borrowers and the other Loan Parties may make, and the Junior Creditors may receive, payments of principal and interest in respect of the Junior Debt in the amounts and at the rates in effect on the date of this Agreement (without giving effect to any provisions of the Junior Debt Documents which would have the effect of increasing the amount, or frequency, of any such payment), as and when required to be paid in cash as expressly provided for in the Junior Debt Documents, (collectively, the "Scheduled Payments"), and, to the extent authorized under the Senior Debt Documents, may make Permitted Tax Distributions (as defined in the Junior Notes) to holders of the Junior Notes in respect of indebtedness evidenced by and obligations under such Junior Notes; *provided, however*, that (i) no payment in respect of the Junior Debt shall be made or received during any Payment Blockage Period, but interest on the Junior Debt shall continue to accrue during such Payment Blockage Period, and (ii) if any Senior Default occurs during the period of thirty (30) days following the date of any such Scheduled Payment, then such Scheduled Payment shall be deemed not to have been permitted under the foregoing provisions of this Section 1.3 and shall be subject to the provisions of Section 1.7 below.  Upon expiration of any Payment Blockage Period and so long as no other Payment Blockage Period is in effect and all of the Payment Conditions are fully satisfied, the Borrowers and the other Loan Parties may make or resume making (and the Junior Creditors may receive and retain) any and all Scheduled Payments.

**Section 1.4**    Liens on Collateral.

(a)    Each Junior Creditor expressly represents and warrants to the Senior Agents and each Senior Lender that, as of the date of this Agreement, such Junior Creditor has no security interest, Lien or other interest in any portion of the Collateral and has no other collateral security for any portion of the Junior Debt. Until Final Payment of the Senior Debt, no Junior Creditor shall acquire a Lien in any Collateral. In the event that any Junior Creditor obtains a Lien in any Collateral, the Junior Creditor shall immediately release, satisfy or terminate such Lien upon demand of any Secured Creditor and, if the Junior Creditor fails to do so, such Junior Creditor hereby irrevocably constitutes and appoints each Secured Creditor and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Creditor or such holder or in such Secured Creditor's own name, from time to time in such Secured Creditor's discretion, for the limited purpose of executing and/or filing all releases, satisfactions and terminations of such Liens granted to such Junior Creditors.

(b)    In the event that any Junior Creditor obtains a Lien in any Collateral, then prior to the release, satisfaction or termination of such Lien under Section 1.4(a), and notwithstanding the date, manner or order of grant, attachment or perfection of the Liens on all or any part of the Collateral granted to (or otherwise arising in favor of) the Secured Creditors and the Junior Creditors, respectively, and notwithstanding the provisions of the UCC or any other applicable law or decision, or the terms or provisions of the Senior Debt Documents or the Junior Debt Documents, respectively, or any understanding between the Loan Parties (or any of them) and the Junior Creditors, or any other circumstance whatsoever, the Secured Creditors and the Junior Creditors each hereby agree that (i) as between the Secured Creditors, on the one hand, and the Junior Creditors, on the other hand, the Secured Creditors shall have first, prior, senior and continuing Liens on all of the Collateral as provided in their respective Senior Debt Documents to secure the prompt and complete payment, performance and observance of all the Senior Debt secured thereby, and (ii) any Lien on all or any part of the Collateral now or hereafter held by any Junior Creditor, regardless of when or how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be in all respects and for all purposes subject to, junior to and subordinate to all Liens on all or any part of the Collateral granted to or held by the Secured Creditors. Such relative priorities of the respective Liens shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement, restructuring, refunding or refinancing of the Senior Debt or the Junior Debt, respectively, or by any action or inaction which any Secured Creditor, on the one hand, or any Junior Creditor, on the other hand, may take or fail to take, including, without limitation, any failure of any Secured Creditor to adequately perfect its security interests in the Collateral, or the avoidance, invalidation or lapse of any Lien on the Collateral securing any Senior Debt, in each case in respect of the Collateral. Nothing in this Section 1.4(b) is intended or shall be deemed or construed to limit the exercise by any Junior Creditor against any Borrower or any other Loan Party of any of such Junior Creditor's rights and remedies as an unsecured creditor of such Borrower or Loan Party, so long as such rights and remedies are not exercised, directly or indirectly, in contravention of this Agreement, including, without limitation, Section 1.6(b).

(c)    In the event one of the Senior Agents or TCF releases or agrees to release any of its Liens on all or any part of the Collateral in connection with the sale, transfer or other disposition thereof at the request of any Borrower or any Loan Party or pursuant to any exercise by any Secured Creditor of its rights and remedies under the Senior Debt Documents or otherwise, the Junior Creditors shall be deemed automatically and unconditionally to have consented to such sale or other disposition under the Junior Debt Documents, or pursuant to any exercise by any Secured Creditor of its rights and remedies under the Senior Debt Documents or otherwise, and the Lien of the Junior Creditors on such Collateral automatically and unconditionally shall be deemed to be, and shall be, released and terminated contemporaneously with the release by the Secured Creditors of their Lien thereon. The Junior Creditors

agree that no further act or documentation shall be necessary to evidence the release and termination by the Junior Creditors of such Lien, and the release by the Secured Creditors of their Lien on the Collateral shall be *prima facie* evidence of release and termination of the Lien of the Junior Creditors upon such Collateral. The Secured Creditors shall be entitled to exercise the rights and powers granted to the Secured Creditors in Section 1.4 (a) to release or terminate any Lien of a Junior Creditor.

(d)     Each of the Junior Creditors and each of the Secured Creditors acknowledge that this Agreement shall constitute notice of their respective interests in the Collateral under, and for any purpose such a notice may be required by, the UCC. The Junior Creditors waive any and all rights to direct the method or challenge the appropriateness of any action by any holder of Senior Debt (or any representative thereof) in connection with, and any right to object to, a strict foreclosure with respect to any Collateral, waive any and all rights of redemption and hereby consent to each holder of the Senior Debt (or any representative thereof) dealing in all respects with the Collateral as if there were no Liens on the Collateral securing the Junior Debt, subject in all cases to the provisions of this Agreement.

(e)     The Junior Creditors each agree not to seek to challenge, to avoid, to subordinate or to contest or directly or indirectly to cause or support any other Person in challenging, avoiding or contesting in any judicial or other proceeding, including, without limitation, any Proceeding, the priority, validity, extent, perfection or enforceability of any Lien held by any Secured Creditor on all or any part of the Collateral. As between the Secured Creditors, on the one hand, and the Junior Creditors, on the other hand, the terms of this Agreement shall govern and control even if part or all of the Junior Debt or the Senior Debt, as the case may be, or the respective Liens securing payment, observance and performance thereof are avoided, disallowed, set aside or otherwise invalidated in any Proceeding or otherwise.

**Section 1.5**     Proceedings.

(a)     In the event of any Proceeding involving any Borrower or any other Loan Party or any of their respective property or assets, (i) all Senior Debt first shall be Finally Paid before any payment or distribution (whether made in cash, securities or other property) with respect to or on account of the Junior Debt shall be made in such Proceeding; (ii) any payment or distribution which, but for the terms hereof, otherwise would be payable or deliverable in such Proceeding in respect of the Junior Debt, shall be paid or distributed directly to the Revolving Loan Agent (or, if the Revolving Loan Debt is Finally Paid, then to the Pari Passu Lenders on a *pari passu* basis) to be held and/or applied thereby in accordance with the terms of the Revolving Loan Credit Agreement (or, as applicable, such other Senior Debt Document) until all the Revolving Loan Debt (or, as applicable, such other Senior Debt) is Finally Paid; *provided*, that any and all proceeds of Collateral derived in connection with the sale, transfer or disposition of, or collection on, such Collateral that otherwise would be payable or deliverable in such Proceeding in respect of the Junior Debt, shall be paid or distributed directly to that Senior Lender which holds the highest priority Lien on such Collateral as provided in the Senior Debt Documents; (iii) the Junior Creditors irrevocably authorize, empower and direct all debtors-in-possession, receivers, trustees, liquidators, custodians, distribution agents, plan representatives, conservators and others having authority in the premises to effect all such payments and distributions, and the Junior Creditors also irrevocably authorize, empower and direct the Revolving Loan Agent (or, as applicable, such other Secured Creditor), to demand, sue for, collect and receive (or cause to do the same) every such payment or distribution; (iv) each of the Junior Creditors agrees to execute and deliver to the Revolving Loan Agent (or, as applicable, such other Secured Creditor), for the benefit of the Revolving Loan Lenders (or, as applicable, such other Secured Creditor), all such further documents or instruments reasonably requested by Revolving Loan Agent (or, as applicable, such other Secured Creditor) confirming the authorization referred to in the foregoing clauses (ii) and (iii); and (v) each of the Junior Creditors hereby irrevocably authorizes, empowers and appoints Revolving Loan Agent (or, as applicable, such other Secured Creditor) as its agent and attorney-in-fact to execute, prepare, verify, deliver and file proofs of claim in

- 10 -

respect of the Junior Debt in connection with any such Proceeding upon the failure of any Junior Creditor to do so prior to ten (10) days before the expiration of the time to file any such proof of claim; *provided*, that Revolving Loan Agent (or, as applicable, such other Secured Creditor) shall have no obligation or duty to execute, prepare, verify, deliver and/or file any such proof of claim and its action or inaction shall not give rise to any claims or liability against Revolving Loan Agent, any Revolving Loan Lender, or any other Secured Creditor.

(b)     The Senior Debt shall continue to be treated as Senior Debt and the provisions of this Agreement shall continue to govern the relative rights and priorities of the Secured Creditors and the Junior Creditors even if all or part of the Liens securing such Senior Debt are subordinated, set aside, avoided or disallowed in connection with any such Proceeding (or if all or part of the Senior Debt is subordinated, set aside, avoided or disallowed in connection with any such Proceeding or if any interest accruing on the Senior Debt following the commencement of such Proceeding is otherwise disallowed). To the extent that any Secured Creditor receives payments on, or proceeds of the Collateral for, the Senior Debt which are subsequently invalidated, declared to be fraudulent or preferential, avoided, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of such payment or proceeds received, the Senior Debt, or part thereof, intended to be satisfied shall not be or be considered Finally Paid and shall be revived (concurrently with the reinstatement of the senior Liens of the Secured Creditors securing the Senior Debt) and continue in full force and effect as if such payments or proceeds had not been received by any such Secured Creditor.  This Agreement shall be reinstated in full force and effect if at any time any payment of any of the Senior Debt is rescinded, invalidated, avoided or must otherwise be returned or set aside (including by settlement of any claim for such avoidance or rescission or similar recovery) by any holder of the Senior Debt or any representative of such holder.

(c)     In the event of any Proceeding involving any Borrower or any Loan Party, each Junior Creditor agrees that it will:

(i)     not object to, contest or oppose (or cause or support any other Person in objecting to, contesting or opposing), and waives any right to object to, contest or oppose, any sale, transfer or other disposition of all or any part of the Collateral free and clear of Liens or other claims of the Junior Creditors under Section 363 of the Bankruptcy Code or any other law applicable to such Proceeding if the applicable Secured Creditors having Liens in such Collateral have consented to or not otherwise opposed such sale, transfer or disposition;

(ii)     (A) at the request of any Secured Creditor, challenge, contest or otherwise object to any use of cash collateral or debtor-in-possession financing under Sections 363 or 364 of the Bankruptcy Code or otherwise that is challenged, contested or otherwise objected to by the Secured Creditors, (B) not challenge, contest or otherwise object to (or support any other Person in challenging, contesting or otherwise objecting to) in any manner (1) any use of cash collateral or debtor-in-possession financing under Sections 363 or 364 of the Bankruptcy Code or otherwise ("DIP Financing") that is consented to or provided by any Secured Creditor, (2) any request by any Secured Creditor for "adequate protection" under Sections 361, 362, 363 or 364 of the Bankruptcy Code (or its equivalent) or (3) any objection by any Secured Creditor to any motion, relief, action or proceeding based on any Secured Creditor's claim of lack of adequate protection, (C) subordinate its Liens (if any) in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto), to the extent the Liens securing the Senior Debt are subordinated to or *pari passu* with such DIP Financing;

(iii)     not assert (or cause or support any other Person in asserting) in any manner any right it may have to adequate protection of its interest in any Collateral or to post-

petition interest, absent written consent or direction of all Senior Lenders; *provided, however,* that in the event all Senior Lenders consent to the request by the Junior Creditors seek adequate protection in respect of their Junior Debt and such adequate protection request is granted in the form of a Lien on additional or replacement collateral, then the Junior Creditors agree that any Secured Creditor (or, if the Revolving Loan Debt is Finally Paid, the Pari Passu Lenders) may seek and obtain, and the Junior Creditors hereby consent to the granting of, a senior Lien on such additional or replacement collateral as security for the Senior Debt and for any debtor-in-possession financing provided by Secured Creditors and to any other Liens granted to the Secured Creditors as adequate protection on the same basis as the other Liens securing the Junior Debt are subordinated under this Agreement. If and to the extent any such additional or replacement Liens are insufficient to provide adequate protection of the interests of the Junior Creditors, any claim of the Junior Creditors under Section 507(b) of the Bankruptcy Code shall be subordinate in right of payment to any claim of the Secured Creditors consistent with this Agreement and, pursuant to Section 1129(a)(9) of the Bankruptcy Code, such claim may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such claim;

(iv)    immediately segregate and turn over to the Secured Creditors any adequate protection of its interest in any Collateral that it receives, directly or indirectly, in any Proceeding for application to the Senior Debt owed to the Senior Lenders, other than adequate protection of the type described in clause (iii) above;

(v)    not seek (or cause or support any other Person seeking) to have the automatic stay of Section 362 of the Bankruptcy Code (or any similar stay under any other applicable law) lifted, vacated or modified (in whole or in part) with respect to any Collateral without the prior written consent of the Secured Creditors; *provided,* that, in the case of this clause (v), if the Secured Creditors seek such aforementioned relief, the Junior Creditors hereby irrevocably consent thereto and shall join in any such motion or application seeking such relief if requested by any such Secured Creditor;

(vi)    (A) not object to, contest or oppose (or cause or support any other Person in objecting to, contesting or opposing) in any manner an election under Section 1111(b) of the Bankruptcy Code by any Senior Lender with respect to its Senior Debt, and (B) expressly waive any claim it may now or hereafter have arising under, in connection with or out of the election by any Senior Lender of the application of Section 1111(b) of the Bankruptcy Code with respect to its Senior Debt;

(vii)    not assert or enforce (or cause any other Person to seek or support any other Person seeking), at any time when any Senior Debt exists that has not been Finally Paid, any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Senior Debt for costs or expenses of preserving or disposing of any Collateral;

(viii)    unless the Senior Lenders consent in writing, not seek (or cause any other Person, including any Loan Party, to seek or support any other Person, including any Loan Party, seeking) the filing or confirmation of any plan of reorganization or liquidation or similar dispositive restructuring plan that (A) does not expressly provide for the Final Payment of the Senior Debt or (B) impairs in any way the rights and remedies of the Secured Creditors under the Senior Debt Documents and under this Agreement;

(ix)    not object to, contest or oppose (or cause any other Person to object to, contest or oppose or support any other Person in objecting to, contesting or opposing) in any

manner the exercise by the Secured Creditors of the right (or amount) to "credit bid" the Senior Debt pursuant to Section 363(k) of the Bankruptcy Code or other applicable law in any Proceeding;

(x)     not request (or cause any other Person to request support any other Person in requesting) judicial relief, in any Proceeding or in any other court, that would in any manner hinder, impair, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to any Secured Creditor or that would limit, impair, invalidate, avoid, set aside or subordinate any Lien or Senior Debt Document or grant the Liens of any Junior Creditor equal ranking to the Liens of the Secured Creditors in or to the Collateral; and

(xi)     not, directly or through an affiliate, seek to provide debtor-in-possession financing unless (A) the Secured Creditors consent in writing, or (B) no Senior Lender elects to provide such debtor-in-possession financing and the Liens securing such debtor-in-possession financing of the Junior Creditors are junior to the Liens of the Secured Creditors and the terms of such debtor-in-possession financing do not violate the terms of this Agreement.

The Secured Creditors agree that they will not object to, contest or oppose (or support any other Person in objecting to, contesting or opposing) the exercise by the Junior Creditors of the right to "credit bid" the Junior Debt pursuant to Section 363(k) of the Bankruptcy Code or other applicable law in any Proceeding if, and only if, such credit bid expressly includes Final Payment of the Senior Debt.

**Section 1.6**     Forbearance of Enforcement Actions.

(a)     Except as otherwise provided in this Agreement, the Secured Creditors do not intend to (i) impair the obligations of any of the Loan Parties to the Junior Creditors to pay the Junior Debt as and when the same shall become due and payable in accordance with its terms; (ii) affect the relative rights of the Junior Creditors against the Loan Parties; or (iii) prevent the Junior Creditors from exercising remedies otherwise permitted by applicable law upon a default or event of default under the Junior Debt Documents or otherwise; *provided, however*, that all rights and remedies of the Loan Parties and the Junior Creditors in respect of the Junior Debt shall be subject in all respects to the rights and remedies of the Secured Creditors under this Agreement, including, without limitation, (A) each Secured Creditor's right to receive payments or distributions otherwise payable or deliverable to, or received by, the Junior Creditors upon the exercise of any such remedy, and (B) the provisions of Section 1.6(b).

(b)     Until the Senior Debt is Finally Paid, none of the Junior Creditors shall, without the prior written consent of the Senior Agents and TCF, take any Enforcement Action except to the extent expressly permitted herein; *provided*, that Junior Creditors may, to the extent provided in the Junior Debt Documents, accelerate the obligations under the Junior Debt Documents if and only if the Senior Debt has been accelerated; *provided, however*, that if acceleration of the Senior Debt is rescinded, the Junior Creditors shall be deemed to have automatically rescinded acceleration of the obligations under the Junior Debt Documents; and *provided, further*, that until all of the Senior Debt shall have been Finally Paid, any payments received by the Junior Creditors as a result of the exercise of any of the foregoing rights or remedies shall, subject to the provisions of this Agreement, be segregated and held in trust for the benefit of the Secured Creditors and immediately paid over or delivered directly to the Senior Lenders for distribution in accordance with Section 1.7. Revolving Loan Agent (or, if the Revolving Loan Debt is Finally Paid, to the Pari Passu Lenders on a *pari passu* basis). Each of the Junior Creditors agrees to provide the Senior Agents and TCF not less than ten (10) Business Days prior written notice of the exercise by any such Junior Creditor of any such permitted legal remedy. If any Junior Creditor, in violation of this Agreement, shall commence an Enforcement Action against any Loan Party, each Secured Creditor is hereby irrevocably authorized to intervene and to interpose as a defense or dilatory

plea the making of this Agreement in the name of one or more Loan Parties. If any Junior Creditors shall attempt to enforce, collect or realize upon any Junior Debt or the Collateral, any other collateral, any security or any guarantees securing the Junior Debt in violation of this Agreement, each of the Secured Creditors may restrain, by virtue of this Agreement, such enforcement, collection or realization, either in its own name or in the name of any Loan Party.

Section 1.7    Incorrect Payments.    If any payment or distribution on account of the Junior Debt not permitted to be made by the Borrowers or received by any Junior Creditor under this Agreement is received by any Junior Creditor, such payment or distribution shall be segregated and not be commingled with any assets or property of such Junior Creditor, shall be held in trust by such Junior Creditor for the benefit of the Senior Lenders and shall be immediately paid over to the Senior Lenders, or their designated representatives, in the form received, properly endorsed if necessary, for application to the payment of the Senior Debt then remaining unpaid, until all of the Senior Debt is Finally Paid. Notwithstanding any provision of this Agreement to the contrary, any amount paid or turned over to the Senior Lenders pursuant to the terms of this Agreement shall, to the extent such amount is derived from or related to any portion of the Collateral, be paid to the Secured Creditor which has the highest priority Lien in such Collateral until the Senior Debt of such Secured Creditor which is secured by such Collateral has been Finally Paid. To the extent that any amount paid or turned over to the Senior Lenders pursuant to the terms of this Agreement is not derived from or related to any portion of the Collateral, such amount shall be paid to the Revolving Loan Agent for application to the Revolving Loan Debt until such Revolving Loan Debt has been Finally Paid and then to the Pari Passu Lenders or a *pari passu* basis until all of the Senior Debt has been Finally Paid.

Section 1.8    Required Language.    Until this Agreement is terminated, all Junior Debt Documents entered into on or after the date hereof shall at all times contain a legend, acceptable to the Senior Lenders, indicating that the indebtedness evidenced thereby is subordinate in the manner and to the extent set forth in this Agreement, and each holder of such Junior Debt Document, by its acceptance thereof, shall be bound by the provisions of this Agreement and agree not to modify such language without the prior written consent of all of the Senior Lenders,.

Section 2    AMENDMENT OF LOAN DOCUMENTS.

Section 2.1    Junior Debt Documents.    Until the Senior Debt is Finally Paid, and notwithstanding anything contained in the Junior Debt Documents to the contrary, none of the Junior Creditors shall, without the prior written consent of Senior Lenders, agree to any amendment, modification, supplement, extension, renewal, restatement, replacement, restructuring, refunding or refinancing to or of the Junior Debt Documents, whether in or outside of a Proceeding.

Section 2.2    Senior Debt Documents. The Senior Lenders may, without prior notice to or the prior written consent of the Junior Creditors, amend, modify, supplement, extend, restructure, refund, refinance, replace or renew the terms of the Senior Debt Documents and the Senior Debt.

Section 3    CONTINUED EFFECTIVENESS OF THIS AGREEMENT. The terms of this Agreement, the subordination effected hereby, and the rights and the obligations of the Junior Creditors or the Senior Lenders (or any subsequent holder of the Senior Debt) arising hereunder, shall not at any time or in any way be affected, modified, prejudiced, diminished or impaired by, nor shall any Junior Creditor be released by, (a) any act or failure to act on the part of any Borrower or any other Loan Party; (b) any act or failure to act by any Senior Lender; (c) any act or failure to act by any other holder of the Senior Debt; (d) any noncompliance by any Borrower or any other Loan Party with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with; (e) any amendment or modification of or supplement to any of the Senior Debt Documents or any of the

- 14 -

Junior Debt Documents (subject to <u>Section 2.1</u> hereof); (f) any release of any Liens or of any Person liable in any manner for the payment of the Senior Debt; (g) the validity or enforceability of any of the Senior Debt Documents or of any Junior Debt Documents; (h) the exercise or the failure to exercise by any Senior Lender of any rights or remedies conferred on it or them under the Senior Debt Documents, under this Agreement or existing at law, in equity or otherwise, or against any of the Collateral; (i) the commencement of an action at law or the recovery of a judgment at law against any Borrower or any other Loan Party for the performance of the Senior Debt and the enforcement thereof through levy or execution or otherwise; (j) the taking or institution or any Proceeding or other action against any Borrower or any other Loan Party; or (k) any delay in taking, pursuing, or exercising any of the foregoing actions, rights, powers, or remedies (even though requested by a Junior Creditor) by any Senior Lender or anyone acting for or on behalf of the Senior Lenders.  Without limiting the generality of the foregoing, the Secured Creditors, from time to time, whether in or outside of a Proceeding, without prior notice to or the consent of any Junior Creditor, may take or cause to be taken all or any of the following actions without in any manner affecting or impairing the obligation or liability of any Junior Creditor hereunder: (i) obtain a Lien or a security interest in any property or assets to secure any of the Senior Debt; (ii) obtain the primary and secondary liability of any party or parties with respect to any of the Senior Debt; (iii) release or compromise any liability of any nature of any Person with respect to the Senior Debt; (iv) exchange, enforce, waive, release, and apply any of the Collateral and direct the order or manner of sale thereof as the Secured Creditors may in their discretion determine; (v) enforce their rights hereunder, whether or not the Secured Creditors shall proceed against any other Person; (vi) exercise their rights to consent to any action or non action of any Borrower or any other Loan Party which may violate the covenants and agreements contained in the Senior Debt Documents, with or without consideration, on such terms and conditions as may be acceptable to it; or (vii) exercise any of their rights conferred by the Senior Debt Documents or by law.  Each of the Junior Creditors hereby acknowledges that the provisions of this Agreement are intended to be enforceable at all times, whether before or after the commencement of a Proceeding.  Each of the Junior Creditors hereby waives any right it may have under applicable law to revoke this Agreement or any provisions hereof.

     **Section 4**     **JUNIOR DEFAULT NOTICE.**   The Borrowers shall provide the Senior Lenders with a Junior Default Notice upon knowledge of the occurrence of each Junior Default, and the Borrowers shall notify the Senior Lenders when and if such Junior Default has been cured or waived.

     **Section 5**     **CUMULATIVE RIGHT, NO WAIVERS; SPECIFIC PERFORMANCE.** Each right, remedy and power granted to any Senior Lender hereunder shall be cumulative and in addition to any other right, remedy or power specifically granted herein, in the Senior Debt Documents or now or hereafter existing in equity, at law, by virtue of statute or otherwise, and may be exercised by any Senior Lender, from time to time, concurrently or independently and as often and in such order as any Senior Lender may deem expedient.  Any failure or delay on the part of any Senior Lender in exercising any such right, remedy or power, or abandonment or discontinuance of steps to enforce the same, shall not operate as a waiver thereof or affect the rights of any Senior Lender thereafter to exercise the same, and any single or partial exercise of any such right, remedy or power shall not preclude any other or further exercise thereof or the exercise of any other right, remedy or power, and no such failure, delay, abandonment or single or partial exercise of the rights of any Senior Lender hereunder shall be deemed to establish a custom or course of dealing or performance among the parties hereto.  At any time that any Junior Creditor fails to comply with any provision of this Agreement that is applicable to the Junior Creditors, any Senior Lender may demand specific performance of this Agreement, whether or not the Borrowers have complied with this Agreement, and may exercise any other remedy available at law or in equity.

     **Section 6**     **INSOLVENCY.**  This Agreement shall be applicable both before and after the filing of any petition by or against any Borrower or any other Loan Party under the Bankruptcy Code and

all converted or succeeding cases in respect thereof, and all references herein to the Borrower(s) or any other Loan Party shall be deemed to apply to a trustee for any Borrower or any other Loan Party and any Borrower or any other Loan Party as debtor-in-possession.

   **Section 7**  **MODIFICATION.** Any modification or waiver of any provision of this Agreement shall not be effective in any event unless the same is in writing and signed by the Senior Agents and TCF, on the one hand, and each Junior Creditor to be bound thereby, on the other hand, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given. No modification or waiver of any provision of this Agreement shall be enforceable against the Borrowers unless the same is in writing and signed by the Borrowers, and then such modification or waiver shall be effective only in the specific instance and for the specific purpose given. Any notice to or demand on the Junior Creditors or the Secured Creditors in any event not specifically required of the Secured Creditors or the Junior Creditors hereunder shall not entitle the Junior Creditors or the Secured Creditors to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

   **Section 8**  **NOTICES.** Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied or sent by overnight courier service or United States mail certified or registered and shall be deemed to have been given (a) if delivered in person, when delivered; (b) if delivered by telecopy, on the date of transmission if transmitted on a Business Day before 3:00 p.m. (Minneapolis time) or, if not, on the next succeeding Business Day; (c) if delivered by overnight courier, one (1) Business Day after delivery to such courier properly addressed; or (d) if by United States mail, four (4) Business Days after deposit in the United States mail, postage prepaid and properly addressed:

Notices shall be addressed as follows:

    If to a Junior Creditor:

      To the address stated on that Junior Creditor's Joinder Agreement

    If to the Borrowers or LHC:

      c/o Lyman Lumber Company
      300 Morse Avenue
      Excelsior, MN 55331
      Attention: John D. Gilpin, Senior Vice President
      Telecopy No.: (952) 470-3666

    with a copy to:

      Fredrikson & Byron
      Suite 4000
      200 South Sixth Street
      Minneapolis, MN 55402-1425
      Attention: James Baillie
      Telecopy No.: (612) 492-7077

If to the Revolving Loan Agent:

    U.S. Bank National Association
    US Bancorp Center
    BC-MN-H22A
    800 Nicollet Mall
    Minneapolis, MN 55402-7020
    Attention:  Gregory B. Wilson
    Telecopy No.:  (612) 303-4507

with a copy to:

    Briggs and Morgan, P.A.
    2200 IDS Center
    80 South Eighth Street
    Minneapolis, MN 55402
    Attention:  John R. McDonald
    Telecopy No.: 612-977-8650

If to the Equipment Loan Agent:

    Wells Fargo Bank, National Association
    Sixth Street and Marquette Avenue
    MAC N9305-198
    Minneapolis, MN 55479
    Attention: Troy Jefferson
    Telecopy No.: (612) 316-1491

If to TCF:

    TCF National Bank
    801 Marquette Avenue
    Minneapolis, MN 55402
    Attention: Greg Drehmel
    Telecopy No.: (612) 661-8552

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section 8.  A notice not given as provided above shall, if it is in writing, be deemed given if and when actually received by the party to whom given.

       **Section 9**     **SEVERABILITY.**  In the event that any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

       **Section 10**     **SUCCESSORS AND ASSIGNS; SALE, TRANSFER, ETC.**

       **Section 10.1**    This Agreement shall inure to the benefit of, and be binding upon, the Senior Lenders and the Junior Creditors, their respective heirs, legal representatives, successors and

assigns. In the event any current Senior Lender is Finally Paid and a replacement lender is granted substantially the same Collateral as such Senior Lender so Finally Paid, that replacement lender shall, at its option, and provided that the remaining Senior Lenders' Senior Debt Documents permit such replacement, succeed to the benefits and burdens under this Agreement in respect of the Senior Lender so replaced. The Junior Creditors shall continue to be subordinate to the replacement Senior Lender, and to that replacement lender's Senior Debt and Senior Debt Documents on the same terms as provided in this Agreement. In the event that all current Senior Lenders are Finally Paid, the Junior Creditors shall continue to be subordinate to any new or replacement Senior Debt on the same terms as provided in this Agreement.

**Section 10.2**   Each of the Junior Creditors warrants and represents, severally and not jointly and severally, to the Secured Creditors that, as of the date of this Agreement, no party owns an interest in such Junior Creditor's Junior Debt other than such Junior Creditor and that the entire Junior Debt of such Junior Creditor is owing to such Junior Creditor. None of the Junior Creditors shall sell, assign, pledge, dispose of or otherwise transfer all or any portion of the Junior Debt, whether in or outside of a Proceeding, without the prior written consent of the Senior Lenders and, in any event, unless prior to the consummation of any such action, the transferee thereof shall have executed and delivered to the Senior Lenders a joinder to this Agreement in substantially the form of Exhibit A attached hereto (each a "Joinder Agreement"). Notwithstanding the failure to execute or deliver any such Joinder Agreement, the subordination effected hereby shall survive any sale, assignment, pledge, disposition or other transfer of all or any portion of the Junior Debt, whether in or outside of a Proceeding, and the terms of this Agreement shall be binding upon the successors and assigns of any Junior Creditor, as provided in Section 10.1. It is understood and agreed that this Agreement shall become effective on the date first above written notwithstanding the fact that one or more of the Joinder Agreements relating hereto may be dated as of an earlier date. It is further understood and agreed that the signatures of the Senior Lenders on the signature page of this Agreement shall be deemed the Senior Lenders' acknowledgement and acceptance of each Joinder Agreement relating hereto that is dated as of an earlier date.

**Section 11**   **SUBROGATION.** Until the Senior Debt is Finally Paid and this Agreement is terminated as provided for herein, the Junior Creditors shall not assert or be entitled to enforce any subrogation rights.

**Section 12**   **NO MARSHALLING.** The Junior Creditors hereby expressly waive to the fullest extent permitted by applicable law any rights such Junior Creditors may have under applicable law to assert the doctrine of marshalling or otherwise to require any Secured Creditor to marshall any property or assets of any Loan Party for the benefit of the Junior Creditors. The Junior Creditors expressly waive all notice of the acceptance by the Secured Creditors of the subordination and other terms and provisions of this Agreement and all the notices whatsoever not specifically required pursuant to the terms of this Agreement or under the UCC in connection with any foreclosure on or sale of property or assets of any of the Loan Parties and the Junior Creditors expressly consent to reliance by the Secured Creditors upon the subordination and other terms and provisions of this Agreement. Each Junior Creditor agrees that (i) no Senior Lender has made any warranties or representations with respect to the due execution, legality, validity, completeness or enforceability of any or all of the Senior Debt Documents, or the collectibility of the Senior Debt and (ii) each Senior Lender shall be entitled to manage and supervise its credit relationship with each Loan Party in accordance with its usual practices, modified from time to time as it deems appropriate under the circumstances.

**Section 13**   **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall be one and the same instrument. A facsimile or digital copy of this signed Agreement shall be deemed to be an original thereof.

**Section 14      DEFINES RIGHTS OF CREDITORS; CONSTRUCTION.** The provisions of this Agreement are solely for the purpose of defining the relative rights of the Junior Creditors and the Senior Lenders and shall not be deemed to create any rights or priorities in favor of any other Person, including, without limitation, the Borrowers or the other Loan Parties. In construing the terms of this Agreement, no rule or law which would require that this instrument be construed against the party who drafted this instrument shall be given any force or effect.

**Section 15      CONFLICT.** In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Senior Debt Documents or the Junior Debt Documents, the provisions of this Agreement shall control and govern.

**Section 16      HEADINGS; EXHIBITS.** The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof. The exhibits attached hereto, including any definitions set forth therein, are incorporated herein in full by this reference and made a part hereof.

**Section 17      TERMINATION.** This Agreement is a continuing agreement of subordination pursuant to its terms and in accordance with Section 510(a) of the Bankruptcy Code and shall terminate upon the Final Payment of the Senior Debt subject, in all respects, to the provisions of Section 1.5.

**Section 18      APPLICABLE LAW.** THIS AGREEMENT SHALL BE GOVERNED BY, AND BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS (INCLUDING ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD APPLY SUCH INTERNAL LAWS) OF THE STATE OF MINNESOTA.

**Section 19      CONSENT TO JURISDICTION AND SERVICE OF PROCESS.** EACH OF THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF HENNEPIN, STATE OF MINNESOTA AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE LITIGATED IN SUCH COURTS. EACH OF THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVE ANY DEFENSE OF *FORUM NON CONVENIENS*, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT. EACH OF THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES IRREVOCABLY AGREE THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MAILED BY REGISTERED MAIL TO THE JUNIOR CREDITORS, THE SENIOR LENDERS AND THE BORROWERS AT THEIR RESPECTIVE ADDRESSES PROVIDED IN SECTION 8 SUCH SERVICE BEING HEREBY ACKNOWLEDGED BY THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 20      WAIVER OF JURY TRIAL.** EACH OF THE JUNIOR CREDITORS, THE BORROWERS, THE OTHER LOAN PARTIES, AND THE SENIOR LENDERS HEREBY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS AMONG THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH

OF THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES ALSO WAIVE ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE BORROWERS, THE OTHER LOAN PARTIES, THE SENIOR LENDERS, OR THE JUNIOR CREDITORS. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT THE SENIOR LENDERS AND THE JUNIOR CREDITORS HAVE ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT THE SENIOR LENDERS AND EACH OF THE JUNIOR CREDITORS WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF THE JUNIOR CREDITORS, THE SENIOR LENDERS, THE BORROWERS AND THE OTHER LOAN PARTIES FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (UNLESS SUCH WRITING MAKES SPECIFIC REFERENCE TO THIS <u>SECTION 20</u>), AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 21    COSTS AND EXPENSES.**  In the event of any dispute or controversy between or among the Junior Creditors (or any one or more of them), on the one hand, and the Senior Lender(s) (or any one or more of them), on the other hand, in connection with the enforcement of this Agreement, such Senior Lender(s) shall be entitled to reimbursement of its (their) reasonable costs and expenses (including, without limitation, its reasonable attorney's fees and legal expenses) from such Junior Creditor(s) if such Senior Lender(s) is the prevailing party.

(Signature Pages Follow)

- 20 -

IN WITNESS WHEREOF, the Junior Creditors (by their execution of the Joinder Agreements), the Borrowers (by their execution of the Acknowledgement below), and the Senior Lenders have caused this Agreement to be executed as of the date first above written.

U.S. BANK NATIONAL ASSOCIATION, a national banking association, for itself and as Revolving Loan Agent

By:_____
Name:_____
Title:_____

WELLS   FARGO   BANK,   NATIONAL ASSOCIATION, a national banking association, as Equipment Loan Agent

By:_____
Name:_____
Title:_____

TCF NATIONAL BANK, a national banking association

By:_____
Name:_____
Title:_____

ACKNOWLEDGMENT

Each of the undersigned accepts notice of subordination created by the foregoing Agreement and agrees that it will take no action inconsistent with the foregoing Agreement and that, except with the prior written approval of the Revolving Loan Agent (or, if the Revolving Loan Debt is Finally Paid, of the Pari Passu Lenders), it shall not make or allow any payment (or any of them) on or with respect to the Junior Debt (except in accordance with the provisions of the foregoing Agreement), so long as the forgoing Agreement remains in effect.   In addition the Borrowers agree to be bound by the provisions of Sections 4, 7, 8 and 11 of the foregoing Agreement.

LYMAN LUMBER COMPANY,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

CONSTRUCTION MORTGAGE INVESTORS CO., a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

MID-AMERICA CEDAR, INC.,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

LYMAN DEVELOPMENT CO.,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

WOODINVILLE LUMBER, INC.,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

WOODINVILLE   CONSTRUCTION   SERVICES, L.L.C., a Minnesota limited liability company

By _____
    John D. Gilpin, Senior Vice President

CARPENTRY CONTRACTORS CORP.,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

LYMAN PROPERTIES, L.L.C.,
a Minnesota limited liability company

By _____
    John D. Gilpin, Senior Vice President

AUTOMATED BUILDING COMPONENTS, INC., a
Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

BUILDING MATERIAL WHOLESALERS, INC.,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

LYMAN LUMBER OF WISCONSIN, INC.,
a Minnesota corporation

By _____
    John D. Gilpin, Senior Vice President

LYMAN HOLDING COMPANY,
a Minnesota corporation

By _____
    John D. Gilpin, _____

## EXHIBIT A

## JOINDER TO SUBORDINATION AGREEMENT

The undersigned, holder(s) of one or more Junior Debentures or Junior Notes as described below, is executing and delivering this Joinder to Subordination Agreement pursuant to Section 10.2 of that certain Subordination and Intercreditor Agreement, dated as of [Merge Date], by and among the Senior Lenders and the Junior Creditors (including the undersigned), and with the acknowledgement of the Borrowers (the "Agreement"; unless otherwise defined herein, all capitalized terms used herein shall have the meanings given them in the Agreement).

By executing this Joinder Agreement and delivering it to the Senior Lenders, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Agreement in the same manner as if the undersigned were an original signatory to the Agreement. The undersigned agrees that it shall be a Junior Creditor in all respects under the Agreement, and that the Senior Lenders shall have the right to rely upon this Joinder Agreement as if it were part of the Agreement.  If the undersigned is the holder of one or more Junior Debentures and has previously executed and delivered to the Revolving Loan Agent one or more Old Subordination Agreements, the undersigned hereby acknowledges that the Agreement amends and restates each such Old Subordination Agreement in its entirety.

Accordingly, the undersigned has executed this Joinder Agreement as of _____, 200___.

| Junior Creditor: | Junior Creditor: |
|---|---|
| _____<br>[Merge Name of Individual] | _____<br>[Merge Name of Individual] |
| _____<br>[Merge Name of Entity]<br>By: _____<br>Name:_____<br>Title:_____ | _____<br>[Merge Name of Entity]<br>By: _____<br>Name:_____<br>Title:_____ |
| **Address of Junior Creditor:**<br><br>_____[Merge Address]_____<br>_____<br>_____ | **Address of Junior Creditor:**<br><br>_____[Merge Address]_____<br>_____<br>_____ |

Holder(s) of the following Junior Debentures or Junior Notes:

1.  Promissory Note issued by [Merge Name of Lyman Entity] dated [Merge Date]
2.  Registered Debenture Due [Merge Due Date] issued by [Merge Name of Lyman Entity] dated [Merge Date]

ACKNOWLEDGEMENT OF SENIOR LENDERS ON FOLLOWING PAGE

Acknowledged and Agreed this _____ day of _____, 20__:

U.S. BANK NATIONAL ASSOCIATION,
a national banking association, for itself and
as Revolving Loan Agent


By: _____
Name:_____
Title:_____


WELLS FARGO BANK, NATIONAL
ASSOCIATION, a national banking
association, as Equipment Loan Agent

By:_____
Name:_____
Title:_____


TCF NATIONAL BANK, a national
banking association


By:_____
Name:_____
Title:_____

## Exhibit 7.1

**Preserved Causes of Action; Avoidance Actions**

The causes of action, potential causes of action, defendants and potential defendants listed on this exhibit are not exhaustive, but are reflective of current knowledge.  To the extent not specifically released under the Plan, the Debtors and Liquidating Agent reserve all rights to bring any causes of action against any defendant. These specifically include:

1.    Causes of Action against any and all parties related to transfers of assets listed on Sections 3(b), 3(c), and 10(a) of the Statement of Financial Affairs filed in the Chapter 11 Cases.

2.    Any claim to recovery of any refunds.

3.    Claims under insurance policies or against insurance contracts.

4.    Claims for setoff or recoupment.

5.    Claims for turnover of property of the Debtors' estates.

6.    Collection of accounts receivable.

7.    All Avoidance Actions, including but not limited to, action to avoid and/or recovery:

   a.    payments relating to Debtors' purchase of Woodinville Lumber, Inc. and Woodinville Construction Services, LLC, including but not limited to earn out payments, cash payments, and the issuance of subordinated debentures;

   b.    payments or other distributions made to the Debtors' shareholders or stockholders, or other insiders of the Debtors (as defined in Section 101(31) of the Bankruptcy Code or Minn. Stat. § 513.41(7)); and

   c.    payments or other distributions made to note holders or debenture holders; and

   d.    payments relating to Debtors' purchase of assets of Carpentry Contractors Corp.; and

   e.    any and all claims relating to the transfer of certain operations to the Longview Property, including but not limited to claims against third parties and insurance carriers.

5015479

## Exhibit 8.1

**Assumed Contracts**

| Contract | Counterparty | Cure Amt. |
|---|---|---|
| Master Software Maintenance and Services Agreement | eDocument Resources, LLC | $0 |
| OnBase® End User License Agreement | Hyland Software, Inc. | $0 |